

**Montgomery County Council**

**Committee:** PS
**Committee Review:** Completed
**Staff:** Christine Wellons, Chief Legislative Attorney
**Purpose:** Final action – vote expected

AGENDA ITEM #4D
July 21, 2026
**Action**

**SUBJECT**

Expedited Bill 23-26, Weapons – Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly

Lead Sponsor: Councilmember Luedtke

Co-Sponsors: Councilmember Stewart, Council President Fani-González, Councilmember Friedson, Council Vice-President Balcombe, and Councilmembers Katz, Evans, and Glass.

**EXPECTED ATTENDEES**

N/A

**COUNCIL DECISION POINTS & COMMITTEE RECOMMENDATION**

- The PS Committee voted (3-0) to recommend the enactment of Expedited Bill 23-26 with amendments.

**DESCRIPTION/ISSUE**

Expedited Bill 23-26 would:

(1)     define terms related to weapons and firearms;
(2)     regulate the sale or transfer of ghost guns with respect to minors;
(3)     amend exceptions to a prohibition against carrying firearms in places of public assembly;
(4)     amend the regulation of the operation of gun shops; and
(5)     generally amend the law regarding firearms and other weapons.

**SUMMARY OF KEY DISCUSSION POINTS**

- The PS Committee adopted amendments to the expedited bill to:

  o alter Section 57-10 and Section 57-11(b), related to an exemption from regulation for firearms within vehicles, so that the exemption more closely mirrors a comparable exemption under State law, Criminal Law Article § 4-111 {Wearing, carrying, or transporting firearms; areas for children or vulnerable individuals; government or public infrastructure areas; special purpose areas}; and

  o retain Section 57-11(d), which provides a limited grandfathering clause from the "places of public assembly" restriction for gun shops in operation prior to January 1, 1997.

**EXHIBIT D**

**This report contains:**

| | |
|---|---|
| Staff report | Page 1 |
| Expedited Bill 23-26 | ©1 |
| Opinion of the Maryland Supreme Court | ©9 |
| Climate Assessment | ©77 |
| Fiscal Impact Statement | ©80 |
| Economic Impact Statement | ©81 |
| Racial Equity and Social Justice Impact Statement | ©83 |
| Public Testimony | ©88 |

**Alternative format requests for people with disabilities.** If you need assistance accessing this report you may submit alternative format requests to the ADA Compliance Manager. The ADA Compliance Manager can also be reached at 240-777-6197 (TTY 240-777-6196) or at adacompliance@montgomerycountymd.gov

Agenda Item #4D<br>
July 21, 2026<br>
**Action**

**M E M O R A N D U M**

July 16, 2026

TO:           County Council

FROM:       Christine Wellons, Chief Legislative Attorney

SUBJECT:   Expedited Bill 23-26, Weapons – Restrictions on Ghost Guns Near Minors and
            Carrying of Firearms in or Near Places of Public Assembly

PURPOSE:   Action – roll call vote expected

**<u>Committee Recommendation</u>**: The Public Safety (PS) Committee recommended (3-0) the enactment of Expedited Bill 23-26 with amendments.

Expedited Bill 23-26, Weapons – Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly, was introduced on May 12, 2026.  The Lead Sponsor is Councilmember Luedtke, and the Co-Sponsors are Councilmember Stewart, Council President Fani-González, Councilmember Friedson, Council Vice President Balcombe, and Councilmembers Katz, Evans, and Glass.

A public hearing occurred on June 9, 2026.  A worksession of the Public Safety (PS) Committee occurred on June 15.  The Committee voted (3-0) to recommend enactment of the bill with amendments.

Expedited Bill 23-26 would:

(1)     define terms related to weapons and firearms;
(2)     regulate the sale or transfer of ghost guns with respect to minors;
(3)     amend exceptions to a prohibition against carrying firearms in places of public assembly;
(4)     amend the regulation of the operation of gun shops; and
(5)     generally amend the law regarding firearms and other weapons.

### BACKGROUND

In 2021 and 2022, the County Council enacted Bills 4-21 and 21-22E, which sought to regulate "ghost guns" and other firearms: (1) within 100 yards of "places of public assembly"; and (2) with respect to minors.

On April 28, 2026, the Maryland Supreme Court issued an opinion in *Engage Armament, LLC, et al. v. Montgomery County, Maryland* (Case No. 485899-V). Under the opinion, the Court upheld portions of Council Bills 4-21 and 21-22E but found that other provisions of the bills exceed County authority or are preempted by State law.

The purpose of Expedited Bill 23-26 is to bring the County law into alignment with the Supreme Court's opinion in *Engage Armament* so that the County law is valid and enforceable under Maryland law.

BILL SPECIFICS

In accordance with the Maryland Supreme Court's opinion, Expedited Bill 23-26 would amend County Code Chapter 57, Sections 57-1, 57-7, and 57-11 regarding: (1) the definition of "ghost gun"; (2) the definition of "place of public assembly"; (3) the possession of ghost guns "in the presence of minors"; and (4) the application of the County law to individuals who have wear-and-carry permits from the state.

*Definition of ghost guns.* The Court held that the County's restrictions on "ghost guns" could be construed, but must not be construed, to apply "with respect to firearms that have been serialized by firearms dealers in compliance with federal and State law." *Id*. at 56. Accordingly, Expedited Bill 23-26 would clarify the County's definition of "ghost guns" to read as follows:

"Ghost gun" means a firearm, including an unfinished frame or receiver, that:

(A)     lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a <u>federally</u> licensed <u>firearms</u> dealer, manufacturer, maker, or importer in accordance with federal law; and

(B)     **[**lacks markings and is not registered with the Secretary of the State Police in accordance with**]** <u>violates</u> Section 5-703(b)(2)**[**(ii)**]** of the Public Safety Article of the Maryland Code, <u>as</u> <u>amended</u>.

"Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968, <u>as</u> <u>amended</u>.

*Definition of "place of public assembly".* While the Court upheld the majority of the components of the County's definition of "place of public assembly," it "conclude[d] that hospitals, community health centers, long-term facilities, childcare facilities, and 'government building[s], including any place owned by or under the control of the County,' are not fairly encompassed within the definition of a 'place of public assembly.'" *Id*. at 34. "In summary, we conclude that the County's regulation of firearms in or within 100 yards of a place of public assembly is authorized by § 4-

209(b)(1)(iii) to the extent it extends to a park, place of worship, school, library, recreational facility, multipurpose exhibition facility, polling place, courthouse, and legislative assembly." *Id*. at 36.

In accordance with the opinion, the bill would amend the definition of "place of public assembly" as follows:

> *Place of public assembly:* A "place of public assembly" is:
>
> (1)    a publicly or privately owned:
>
>> (A)    park;
>>
>> (B)    place of worship;
>>
>> (C)    school;
>>
>> (D)    library;
>>
>> (E)    recreational facility; or
>>
>> [(F)    hospital;
>>
>> (G)    community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;;
>>
>> (H)    long-term facility, including any licensed nursing home, group home, or care home;
>>
>> (I)] (F)    multipurpose exhibition facility, such as a fairgrounds or conference center[; or
>>
>> (J)    childcare facility];
>
> (2)    government building[, including any place owned by or under the control of the County] open to the public for the business of government;
>
> (3)    polling place;
>
> (4)    courthouse; or
>
> (5)    legislative assembly[; or

3

(6)     a gathering of individuals to collectively express their constitutional right to protest or assemble**]**.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

***Ghost guns in the presence of minors.***  The Court held that state law preempts the following provision of County law: "A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor." *Id*. at 39-40.  Accordingly, Expedited Bill 23-26 would remove the provision from County law (County Code Section 57-7(d)).

***Exemption for individuals with licenses traveling through the County.***  The Court held that the County's prohibition against possessing a firearm in "a place of public assembly" exceeded the County's authority to enact local laws because the prohibition could be construed to apply to an individual licensed by the state to carry a firearm while the person is travelling on a public highway. *Id*. at 61.  Accordingly, Expedited Bill 23-26 would add an exemption to the prohibition for: "the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly".

SUMMARY OF IMPACT STATEMENTS

**Racial Equity and Social Justice**. "Taken together, the Office of Legislative Oversight (OLO) finds the anticipated racial equity and social justice (RESJ) impact of Expedited Bill 23-26 is indeterminate."

**Fiscal Impact**. According to the Office of Management and Budget, "Bill 23-26 clarifies existing law to conform with a Maryland Supreme Court ruling and is not expected to impact revenues and expenditures."

**Economic Impact**. "The Office of Legislative Oversight (OLO) anticipates that Expedited Bill 23-26 would have an insignificant impact on economic conditions in the County, as measured by the Council's priority economic indicators."

**Climate Assessment**. "The Office of Legislative Oversight (OLO) anticipates Expedited Bill 23-26 will likely have no impact as it is proposing changes to restrictions on ghost guns which is not expected to impact the County's contribution to climate change."

SUMMARY OF PUBLIC TESTIMONY

Several individuals and organizations testified for and against Expedited Bill 23-26.  The attorney representing the plaintiffs against the County in *Engage Armament, LLC, et al. v. Montgomery County, Maryland* testified in opposition to the bill.  Several speakers, including the plaintiffs' attorney, stated that state permit-holders travelling within 100 yards of places of public

4

assembly should be fully exempt from the prohibition under the bill.  Speakers also expressed concern about legal fees the County may incur related to defending its gun regulations.

SUMMARY OF COMMITTEE'S WORKSESSION

Based upon additional review and analysis of the Supreme Court's opinion by the Office of the County Attorney, the Committee adopted the following amendments to Expedited Bill 23-26.

1.      **Clarification of the Limited Exemption for Firearms in Vehicles**

As explained above (on page 4), the Court held that the County's prohibition against possessing a firearm in "a place of public assembly" exceeded the County's authority to enact local laws. *Id*. at 61.  The Court held that the prohibition was not "local" because the prohibition could be construed to apply to an individual licensed by the state to carry a firearm while the person is travelling on a public highway. *Id*.  Accordingly, Expedited Bill 23-26 was drafted to exempt from the "places of public assembly" prohibition: "the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly".

Council staff recommended, and the Committee agreed, to further refine the exemption related to firearms within vehicles so that it more closely mirrors a comparable exemption under State law, Criminal Law Article § 4-111 {Wearing, carrying, or transporting firearms; areas for children or vulnerable individuals; government or public infrastructure areas; special purpose areas}.

Under Criminal Law § 4-111, a person generally must not, *inter alia*, "wear, carry, or transport a firearm in a government or public infrastructure area." An exception to this prohibition exists for:

(11)    a firearm that is carried or transported in a motor vehicle if the firearm is:

(i) locked in a container; or

(ii) a handgun worn, carried, or transported in compliance with any limitations imposed under § 5-307 of the Public Safety Article, by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article.

§ 4-111(b)(11).

The amendment to Expedited Bill 23-26 adopted by the Committee would mirror the state language as follows:

*Amend lines 84-103 to read as follows.*

5

(b)    This section does not:

*    *    *

(6)    apply to **[[**the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly**]]** a firearm that is carried or transported in a motor vehicle if the firearm is:

(i)    locked in a container; or

(ii)    a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

To make Chapter 57 internally consistent, and to avert similar challenges to Code Section 57-10 {Keeping guns on person or in vehicles}, the Committee also adopted the following amendment to Section 57-10.

*After line 76, insert the following.*

**57-10. Keeping guns on person or in vehicles.**

*    *    *

This Section must not be interpreted to prohibit a firearm that is carried or transported on person or in a motor vehicle, as defined under the Maryland Transportation Article, as amended, if the firearm is:

(1)    in a motor vehicle, locked in a container; or

(2)    a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

6

##### 2.        Retention of Section 57-11(d) – Gun Shops; Limited Grandfathering Clause

As originally drafted, the expedited bill would have deleted from the law Section 57-11(d), which provides a limited grandfathering clause from the "places of public assembly" restriction for gun shops in operation prior to January 1, 1997.  The reason for the deletion was that the Circuit Court had struck down Section 57-11(d).

However, the Office of the County Attorney has determined after further review that the Supreme Court overturned the Circuit Court's rejection of subsection (d).  In addition, research has revealed that subsection (d) is still relevant to at least two existing gun shops in the County – including one, Atlantic Guns, Inc., which has been in business since 1957 according to the State Department of Assessments and Taxation.

Given that subsection (d) was upheld by the Supreme Court and continues to be relevant, the Committee voted to amend the bill to retain subsection (d).

**Next Step**:      Roll call vote to enact Expedited Bill 23-26 with amendments, as recommended by the PS Committee.

| This packet contains: | Circle # |
|---|---|
| Expedited Bill 23-26 | 1 |
| Opinion of the Maryland Supreme Court | 9 |
| Climate Assessment | 77 |
| Fiscal Impact Statement | 80 |
| Economic Impact Statement | 81 |
| Racial Equity and Social Justice Impact Statement | 83 |
| Public Testimony | 88 |

Expedited Bill No. __23 - 26__
Concerning: __Weapons – Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly__
Revised: __June 15, 2026__ Draft No. __3__
Introduced: __May 12, 2026__
Expires: __December 7, 2026__
Enacted: _____
Executive: _____
Effective: _____
Sunset Date: _____
Ch. _____, Laws of Mont. Co. _____

# COUNTY COUNCIL
# FOR MONTGOMERY COUNTY, MARYLAND

Lead Sponsor: Councilmember Luedtke
Co-Sponsors: Councilmember Stewart, Council President Fani-González, Councilmember Friedson, Council Vice-President Balcombe, and Councilmembers Katz, Evans, and Glass

**AN EXPEDITED ACT** to:
(1)    define terms related to weapons and firearms;
(2)    regulate the sale or transfer of ghost guns with respect to minors;
(3)    amend exceptions to a prohibition against carrying firearms in places of public assembly;
(4)    amend the regulation of the operation of gun shops; and
(5)    generally amend the law regarding firearms and other weapons.

By amending
Montgomery County Code
Chapter 57, Weapons
Sections 57-1, 57-7, __57-10,__ and 57-11

| | |
|---|---|
| **Boldface** | *Heading or defined term.* |
| Underlining | *Added to existing law by original bill.* |
| **[Single boldface brackets]** | *Deleted from existing law by original bill.* |
| <u>Double underlining</u> | *Added by amendment.* |
| **[[Double boldface brackets]]** | *Deleted from existing law or the bill by amendment.* |
| * * * | *Existing law unaffected by bill.* |

*The County Council for Montgomery County, Maryland approves the following Act:*

(1)

**Sec. 1.  Sections 57-1, 57-7, <u>57-10,</u> and 57-11 are amended, as follows:**

**57-1.  Definitions.**

In this Chapter, the following words and phrases have the following meanings:

\*　　\*　　\*

*Gun* or *firearm:* Any rifle, shotgun, revolver, pistol, ghost gun, undetectable gun, air gun, air rifle, or any similar mechanism by whatever name known which is designed to expel a projectile through a gun barrel by the action of any explosive, gas, compressed air, spring, or elastic.

\*　　\*　　\*

(2)　　"Ghost gun" means a firearm, including an unfinished frame or receiver, that:

　　(A)　lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a <u>federally</u> licensed <u>firearms</u> <u>dealer,</u> manufacturer, maker, or importer in accordance with federal law; and

　　(B)　**[**lacks markings and is not registered with the Secretary of the State Police in accordance with**]** <u>violates</u> Section 5-703(b)(2)**[(ii)]** of the Public Safety Article of the Maryland Code, <u>as</u> <u>amended</u>.

"Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968, <u>as</u> <u>amended</u>.

\*　　\*　　\*

*Place of public assembly:* A "place of public assembly" is:

(1)　　a publicly or privately owned:

　　(A)　park;

　　(B)　place of worship;

(2)

(C)    school;

(D)    library;

(E)    recreational facility; <u>or</u>

**[**(F)    hospital;

(G)    community health center, including any health care facility or community-based program licensed by the Maryland Department of Health;;

(H)    long-term facility, including any licensed nursing home, group home, or care home;

(I)**]** <u>(F)</u>    multipurpose exhibition facility, such as a fairgrounds or conference center**[**; or

(J)    childcare facility**]**;

(2)    government building**[**, including any place owned by or under the control of the County**]** <u>open to the public for the business of government or community use</u>;

(3)    polling place;

(4)    courthouse; <u>or</u>

(5)    legislative assembly**[**; or

(6)    a gathering of individuals to collectively express their constitutional right to protest or assemble**]**.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

\*    \*    \*

**57-7. Access to guns by minors.**

(a)    A person must not give, sell, rent, lend, or otherwise transfer any rifle or shotgun or any ammunition or major component for these guns in the County to a minor. This subsection does not apply when the transferor is

- 3 -

(3)

at least 18 years old and is the parent, guardian, or instructor of the minor, or in connection with a regularly conducted or supervised program of marksmanship or marksmanship training.

(b)    An owner, employee, or agent of a gun shop must not allow a minor to, and a minor must not, enter the gun shop unless the minor is accompanied by a parent or other legal guardian at all times when the minor is in the gun shop.

(c)    A person must not give, sell, rent, lend, or otherwise transfer to a minor:

(1)    a ghost gun or major component of a ghost gun;

(2)    an undetectable gun or major component of an undetectable gun; or

(3)    a computer code or program to make a gun through a 3D printing process.

[(d)    A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.

(e)] (d)    A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

[(f)] (e)    This section must be construed as broadly as possible within the limits of State law to protect minors.

*    *    *

**57-10. Keeping guns on person or in vehicles.**

*    *    *

This Section must not be interpreted to prohibit a firearm that is carried or transported on person or in a motor vehicle, as defined under the Maryland Transportation Article, as amended, if the firearm is:

- 4 -

(4)

(1)    in a motor vehicle, locked in a container; or

(2)    a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

**57-11.  Firearms in or near places of public assembly.**

(a)    In or within 100 yards of a place of public assembly, a person must not:

(1)    sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms; or

(2)    sell, transfer, possess, or transport a firearm created through a 3D printing process.

(b)    This section does not:

(1)    prohibit the teaching of firearms safety or other educational or sporting use in the areas described in subsection (a);

(2)    apply to a law enforcement officer, or a security guard licensed to carry the firearm;

(3)    apply to the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's own home;

(4)    apply to the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm; [or]

(5)    apply to separate ammunition or an unloaded firearm:

(5)

(A) transported in an enclosed case or in a locked firearms rack on a motor vehicle, unless the firearm is a ghost gun or an undetectable gun; or

(B) being surrendered in connection with a gun turn-in or similar program approved by a law enforcement agency; or

(6) apply to [[the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly]] a firearm that is carried or transported in a motor vehicle if the firearm is:

(A) locked in a container; or

(B) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

\*     \*     \*

[(d) Notwithstanding subsection (a), a gun shop owned and operated by a firearms dealer licensed under Maryland or federal law on January 1, 1997, may conduct regular, continuous operations after that date in the same permanent location under the same ownership if the gun shop:

(1) does not expand its inventory (the number of guns or rounds of ammunition displayed or stored at the gun shop at one time) or square footage by more than 10 percent, or expand the type of guns (handgun, rifle, or shotgun) or ammunition offered for sale since January 1, 1997;

- 6 -

(6)

(2)   has secure locks on all doors and windows;

(3)   physically secures all ammunition and each firearm in the gun shop (such as in a locked box or case, in a locked rack, or with a trigger lock);

(4)   has adequate security lighting;

(5)   has a functioning alarm system connected to a central station that notifies the police; and

(6)   has liability insurance coverage of at least $1,000,000.]

(d)   Notwithstanding subsection (a), a gun shop owned and operated by a firearms dealer licensed under Maryland or federal law on January 1, 1997, may conduct regular, continuous operations after that date in the same permanent location under the same ownership if the gun shop:

(1)   does not expand its inventory (the number of guns or rounds of ammunition displayed or stored at the gun shop at one time) or square footage by more than 10 percent, or expand the type of guns (handgun, rifle, or shotgun) or ammunition offered for sale since January 1, 1997;

(2)   has secure locks on all doors and windows;

(3)   physically secures all ammunition and each firearm in the gun shop (such as in a locked box or case, in a locked rack, or with a trigger lock);

(4)   has adequate security lighting;

(5)   has a functioning alarm system connected to a central station that notifies the police; and

(6)   has liability insurance coverage of at least $1,000,000.

(7)

**Sec. 2.  Expedited Effective Date.** The Council declares that this legislation is necessary for the immediate protection of the public interest. This Act takes effect on the date on which it becomes law.

**Sec. 3. Severability.** If any provision of this Act, or any provision of Chapter 57, is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect.

**Sec. 4.** This Act and Chapter 57 must be construed in a manner that is consistent with regulations of the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives.

(8)

Circuit Court for Montgomery County
Case No. 485899-V
Argued:  September 8, 2025

IN THE SUPREME COURT

OF MARYLAND

No. 9

September Term, 2025

_____

ENGAGE ARMAMENT LLC, ET AL.

v.

MONTGOMERY COUNTY, MARYLAND

_____

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

_____

Opinion by Fader, C.J.

_____

Filed: April 28, 2026

(9)

To ensure that firearm regulations are largely uniform across the State, the Maryland General Assembly has enacted comprehensive laws regulating many aspects of firearm ownership, possession, and use, and has simultaneously prohibited local jurisdictions from enacting additional regulations, subject to limited exceptions. In 2021 and 2022, Respondent Montgomery County amended provisions of its County Code that regulate firearms. The question before us is whether the County's enactments exceeded either: (1) the scope of authority the General Assembly has provided for the local regulation of firearms; or (2) the County's authority under the Constitution of Maryland to enact local laws.

The petitioners, two businesses and eight individuals (collectively, the "Challengers"), contend that the amended code provisions: (1) are preempted by State law; (2) constitute a general law, not a local law, and are therefore beyond the County's authority to enact; and (3) effected an unconstitutional taking of their property. We conclude that some of the challenged provisions of the ordinance are preempted, either expressly or by conflict, and others are not. Of the preempted provisions, one can be severed from the remaining valid provisions, and others cannot. We further conclude that the amended code provision banning the possession of firearms within 100 yards of or in a place of public assembly is not a local law to the extent it now encompasses carry on public highways by individuals with State-issued handgun wear-and-carry permits. Finally, we conclude that the amended ordinance did not effect an unconstitutional taking.

Under the Home Rule Amendment to the Maryland Constitution, Article XI-A, the General Assembly is directed to "provide a grant of express powers" to charter counties to

(10)

"enact many types of county public local laws" and "achieve a significant degree of political self-determination." *Tyma v. Montgomery County*, 369 Md. 497, 504-05 (2002). Montgomery County is one such charter county. *Id.* at 504.

Among the powers the General Assembly expressly granted to charter counties in the Express Powers Act, §§ 10-201 through 10-206 of the Local Government Article (2013 Repl.; 2025 Supp.), is the authority to enact ordinances that "may aid in maintaining the peace, good government, health, and welfare of the county." *Id.* § 10-206(a)(2). That authority is, however, cabined to (1) areas the General Assembly has not expressly reserved for itself, and (2) ordinances that are limited in operation and effect to a single county and that do not conflict with State law. *See id.* § 10-206(b). At issue in this case is the interplay of these limitations and the County's authority to regulate firearms.

The General Assembly has enacted several statutes that expressly preempt local regulation of firearms. Most applicable here is § 4-209(a) of the Criminal Law Article (2021 Repl.; 2025 Supp.), which contains a broad preemption of the right of any local government "to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of" a firearm or ammunition. However, § 4-209(b)(1) carves out an exception to that prohibition for local regulation of "the purchase, sale, transfer, ownership, possession, and transportation" of firearms: (i) "with respect to minors;" (ii) "with respect to law enforcement officials of the subdivision;" and (iii) "within 100 yards of or in a park, church, school, public building, and other place of public assembly."

2

(11)

The County regulates firearms in Chapter 57 of the Montgomery County Code. Montgomery County, Md., Code Ch. 57 (2025) ("Chapter 57 (2025)").  In 2021 and 2022, the County enacted amendments to Chapter 57.  As relevant here, those amendments: (1) enacted regulations of so-called "ghost guns," which are firearms lacking required serial numbers;[1] (2) expanded the County's prohibition on the carry of firearms in or within 100 yards of a place of public assembly to additional locations; and (3) removed an exception to that prohibition for carriers of State-issued handgun wear-and-carry permits.

The Circuit Court for Montgomery County agreed with the Challengers that Chapter 57, as amended, is preempted by State law, is not a local law, and effects an unconstitutional taking in violation of the Constitution of Maryland.  The court granted the Challengers declaratory and injunctive relief.  The Appellate Court of Maryland remanded for further explanation and analysis of the preemption and takings claims.  Both parties petitioned for certiorari review in this Court, which we granted.  *Engage Armament LLC v. Montgomery County*, 490 Md. 121 (2025).

We will vacate the opinion of the Appellate Court, and remand to that court with instructions to: (1) affirm in part and reverse in part the circuit court's entry of summary judgment in favor of the Challengers, as set forth in this opinion; (2) vacate the circuit court's declaratory judgment order and order granting injunctive relief; and (3) remand to

---

[1] We refer to the unserialized firearms at issue as "ghost guns" because that is the term used in the Montgomery County Code.  The Challengers prefer "personally manufactured firearms."  Our use of the term contained in the County Code has no bearing on our resolution of this appeal.

3

(12)

the circuit court for further proceedings consistent with this opinion, including the entry of new orders awarding declaratory and injunctive relief to the Challengers.

## BACKGROUND

### A.    Legal Background

Chapter 57 of the Montgomery County Code regulates many aspects of the use and possession of firearms and other weapons in the County.  Most relevant here are § 57-1, which defines terms used in the other sections; § 57-7, which regulates access to firearms by minors; and § 57-11(a), which prohibits the sale, transfer, possession, or transportation of firearms in or within 100 yards of a place of public assembly.

In 2021 and 2022, the Montgomery County Council passed Bills 4-21 and 21-22E, which became Chapters 7 and 36 of the 2021 and 2022 Laws of Montgomery County, respectively (collectively, the "Amendments").  We discuss the Amendments in the aggregate for simplicity, noting differences only where relevant.

The Amendments made three relevant categories of changes to Chapter 57.  First, before the Amendments, the County defined "place of public assembly" to encompass only "a government owned park," a "place of worship," an "elementary or secondary school," a "public library," a "government-owned or -operated recreational facility," or a "multipurpose exhibition facility."  Montgomery County, Md., Code Ch. 57, § 57-1 (2014, 2021 Supp.) ("Chapter 57 (2021)").  Through the Amendments, the County expanded that definition, which now provides:

A "place of public assembly" is:

4

(13)

(1) a publicly or privately owned:  (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility;

(2) government building, including any place owned by or under the control of the County;

(3) polling place;

(4) courthouse;

(5) legislative assembly; or

(6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

Chapter 57, § 57-1 (2025).  This had the effect of significantly expanding the geographic scope of the prohibition in § 57-11(a) against the sale, transfer, possession, or transportation of a firearm in or within 100 yards of a "place of public assembly."

Second, the Amendments removed an exception to that same prohibition for holders of a State-issued handgun wear-and-carry permit.

Third, the Amendments made a series of changes to address ghost guns.[2]  Section 57-1 now defines a ghost gun as a firearm that lacks both (1) a unique serial number on the

---

[2] In addition to ghost guns, the Amendments added regulations addressing so-called "undetectable guns" and technology related to firearms that can be created using a 3D printing process.  In their complaint, various Challengers identify an intent to manufacture, possess, sell, or serialize ghost guns, but not undetectable guns or technology related to firearms that can be made through a 3D printing process.  As a result, we will focus our analysis only on the regulation of ghost guns.

frame or receiver in accordance with federal law, and (2) markings and registration with the Secretary of State Police in accordance with State law. *Id.* § 57-1. Chapter 57 also regulates "major component[s]" of ghost guns, which it defines as "the slide or cylinder or the frame or receiver" of any firearm and the barrel of a rifle or shotgun. *Id.*

Before the Amendments, § 57-7 generally prohibited any person other than an adult parent, guardian, or instructor from giving, selling, renting, lending, or transferring a rifle, shotgun, major component of those firearms, or ammunition to a minor. Chapter 57, § 57-7(a) (2021). It also prohibited minors from entering gun stores without a parent or legal guardian. *Id.* § 57-7(b). As amended, § 57-7 now also prohibits any person from (1) providing a ghost gun or a major component of a ghost gun to a minor, (2) purchasing, selling, transferring, possessing, or transporting a ghost gun or major component of a ghost gun in the presence of a minor, and (3) storing or leaving a ghost gun or major component of a ghost gun "in a location that the person knows or should know is accessible to a minor." Chapter 57, § 57-7(c), (d), (e) (2025).

Additionally, after the Amendments, § 57-11 now expressly includes ghost guns and major components of ghost guns among the firearms that individuals may not possess in or within 100 yards of a place of public assembly. *Id.* § 57-11(a). And, unlike with all other types of firearms, that prohibition applies to ghost guns even inside an individual's own home, if that home overlaps with a prohibited area. *Id.* § 57-11(b)(3).

In addition to those changes, in 2022, the County also adopted an uncodified severability provision, which provides: "If any provision of . . . Chapter 57, is found to be

6

(15)

invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect." 2022 Laws of Montgomery County ("L.M.C."), Ch. 36, § 3.

### B.    Procedural History

The Challengers initiated this action in the Circuit Court for Montgomery County. As stated in the operative Second Amended Complaint, the Challengers contend that Chapter 57, as amended: (1) is preempted by State law (Count I); (2) is not a local law and so violates the Express Powers Act (Count II); (3) effects an unconstitutional taking in violation of the Constitution of Maryland (Count III); (4) violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights (Counts IV, V, and VI); and (5) violates the Second Amendment to the United States Constitution (Counts VII and VIII).

The County removed the case to the United States District Court for the District of Maryland, which then remanded Counts I, II, and III to the Circuit Court for Montgomery County and stayed proceedings concerning the remaining counts. *See Maryland Shall Issue, Inc. v. Montgomery County*, No. TDC-21-1736, 2022 WL 375461 (D. Md. Feb. 7, 2022); *Maryland Shall Issue, Inc. v. Montgomery County*, No. TDC-21-1736, 2023 WL 3276497 (D. Md. May 5, 2023).[3] In the circuit court, both parties moved for summary judgment. The following factual allegations support the Challengers' motion.

---

[3] The district court denied the Challengers' motion for a temporary restraining order and preliminary injunction. *Maryland Shall Issue, Inc. v. Montgomery County*, 680 F.

7

(16)

Petitioner Engage Armament, LLC, a federally licensed firearms dealer, contends that the new restrictions have caused it to suffer a loss in sales. It claims that before the Amendments, it possessed, serialized, and sold ghost guns and their major components. It further contends that it fears prosecution under § 57-7, because minors are sometimes present in its store, and under § 57-11, because its business "arguably" includes a private library and is therefore a place of public assembly.

Petitioner I.C.E. Firearms & Defensive Training, LLC, a company that provides firearms training, avers that it fears prosecution under § 57-11 because it provides firearms training within 100 yards of a place of public assembly. I.C.E. also possesses ghost guns within its facility and provides training to minors.

Of the eight individual Challengers,[4] seven possessed State-issued wear-and-carry permits at the time they filed their complaint, and the eighth had an application pending. Their collective complaints fall largely into three categories. First, they contend that the expanded definition of "place of public assembly" renders them unable to enjoy the privileges of their permits in large swaths of the County. They aver that before the Amendments they regularly engaged in now-prohibited conduct in or within 100 yards of locations now identified as places of public assembly, intend to continue engaging in that

Supp. 3d 567, 594 (D. Md. 2023). On appeal, the Fourth Circuit granted the County's motion for abeyance pending a decision in this case.

[4] The individual Challengers are Andrew Raymond, Carlos Rabanales, Brandon Ferrell, Deryck Weaver, Joshua Edgar, Ronald David, Nancy David, and Eliyahu Shemony.

8

(17)

conduct, and reasonably fear prosecution if they do so.  That conduct includes possessing firearms while driving, carrying firearms at work, possessing firearms on their own real estate outside of their homes, and carrying their firearms in or near places of worship, libraries, and schools.  Second, some of the individual Challengers allege that they possessed ghost guns in their businesses or homes before the Amendments, that they intend to do so again, and reasonably fear prosecution if they do so.  Third, three of the individual Challengers allege that before the Amendments, they assembled and disassembled ghost guns in the presence of minors, intend to do so again, and reasonably fear prosecution if they do so.

In a memorandum opinion and order, the circuit court denied the County's motion for summary judgment and granted the Challengers' motion.  The court concluded that "the challenged provisions of" Chapter 57 "conflict with and are preempted by State law."  The court determined that Chapter 57 impermissibly seeks to regulate "who may own a firearm, where it may be possessed, and what one may do with it in Montgomery County," which it concluded were all "already the subject of comprehensive State regulation."  The court also held that Chapter 57 impermissibly "purports to define what constitutes a firearm[,]" that its "extraordinarily expansive language regarding the definition of 'within 100 [yards] of' a place of public assembly sweeps too broadly[,]" that the County's regulation was intended "to largely eliminate the State granted right to wear and carry a firearm in the County," and that the County had exceeded its authority under the Express Powers Act by

9

(18)

regulating inconsistently with State law. The court's memorandum opinion did not substantively address the Challengers' local law or takings claims.

The circuit court subsequently entered a declaratory judgment and an order granting injunctive relief. In the former, the court declared that §§ 57-1, 57-7, 57-10,[5] and 57-11 are preempted by State law, that Chapter 57 "is not a 'local law' within the meaning of [the] Maryland Constitution," and that Chapter 57 effects an unconstitutional taking. The court did not provide any analysis or explanation of its conclusion that Chapter 57 effected a taking.[6]

In a separate order, the court enjoined the enforcement or application of several definitions included in § 57-1, including the definitions of "ghost gun" and "place of public assembly." The court also enjoined the enforcement of §§ 57-10 and 57-11 in their entirety and enjoined the enforcement of § 57-7 to the extent it purports to regulate: (1) certain actions related to ghost guns "by adults in the presence of minors"; (2) "access to or possession of a 'regulated firearm' . . . by a minor where such access or possession is

---

[5] Section 57-10 provides that it is unlawful for any person to have a firearm on their person or readily available in a motor vehicle subject to several enumerated exceptions. We have not yet introduced § 57-10 because it was not altered by the Amendments or raised in the Challengers' complaint. As we discuss below, the circuit court erred in ordering relief with respect to § 57-10 because that provision was not properly before the court.

[6] At the Challengers' request, the circuit court delayed any determination as to the amount of just compensation that would be required for the taking pending the result of this appeal. The court entered an order pursuant to Rule 2-602 directing the entry of a final judgment as to the matters resolved by its memorandum opinion and order, declaratory judgment, and order of injunctive relief.

permitted by [State law]"; and (3) "access to or the possession of a firearm by a minor who has a certificate of firearm and hunter safety issued by the Maryland Department of Natural Resources[.]"  The court also enjoined the County from implementing or enforcing any of the provisions of Chapter 57 relating to ghost guns until it first paid "full and complete just compensation for the taking of these items[.]"

The Appellate Court of Maryland reversed in part and remanded for further proceedings on two issues. *Montgomery County v. Engage Armament, LLC*, No. 2319, Sept. Term, 2023, 2025 WL 289153, at *1 (Md. App. Ct. Jan. 24, 2025).  First, the Appellate Court remanded for the circuit court to determine whether the County's expansion of the definition of "place of public assembly" was permissible. *Id.* at *7.  The court expressed concern that the expanded definition might include locations that are not places of public assembly and, if not, could have rendered the prohibition too broad to be a local law. *Id.* at *7-8.  The court remanded the case to the circuit court to make factual findings concerning "what places of public assembly § 4-209(b)(1)(iii) authorizes localities to regulate aside from those listed in § 4-209(b)(1)(iii)." *Id.* at *7.  In the meantime, the court refrained from reaching a conclusion concerning preemption or whether Chapter 57 is a local law. *Id.* at *1.

Second, the Appellate Court remanded for the circuit court to explain its reasoning in concluding that the Amendments effected an unconstitutional taking. *Id.* at *8.

We granted petitions for writs of certiorari filed by both sides.  We granted the Challengers' petition to address:  (1) whether State law preempts the challenged provisions;

11

(20)

(2) whether Chapter 57 is a local law; and (3) whether the Amendments effected a taking. We granted the County's cross-petition to address whether the circuit court erred in addressing §§ 57-10 and 57-11(d).

## DISCUSSION

### I.    RELIEF RELATED TO MONTGOMERY COUNTY CODE §§ 57-10 AND 57-11(D)

We begin our discussion with the County's cross-petition, which addresses the preliminary issue of whether two provisions of Chapter 57 that the circuit court declared invalid and enjoined were properly at issue. The County argues that the circuit court erred by ruling on the validity of §§ 57-10 and 57-11(d), neither of which were altered by the Amendments or mentioned in the complaint. The Challengers respond that they effectively put those provisions at issue by challenging "Chapter 57" throughout their complaint. The Challengers further claim that the County waived its argument by failing to respond to arguments the Challengers raised concerning §§ 57-10 and 57-11(d) in their summary judgment filings.

As an initial matter, the Challengers' complaint did not place all of Chapter 57 at issue. The operative complaint consistently challenges "Chapter 57, as amended by Bills 4-21 and 21-22E." Absent context, that ambiguous phrase could reasonably be interpreted as a challenge to either: (1) the entirety of Chapter 57 as it exists following the passage of Bills 4-21 and 21-22E; or (2) the changes to Chapter 57 made by the passage of Bills 4-21 and 21-22E. Context resolves the ambiguity. The complaint discusses in detail the changes made to §§ 57-1, 57-7, and 57-11(a) and (b), as well as the Challengers' claims relating

12

(21)

specifically to those changes.  The complaint does not directly or indirectly mention §§ 57-10 or 57-11(d), or any claims relating to those provisions.  Reading the complaint as a whole, the challenge to "Chapter 57, as amended by Bills 4-21 and 21-22E" is consistent only with the interpretation that the challenge was to the provisions of Chapter 57 that the County Council had amended.  The complaint does not provide reasonable notice of any challenge beyond that.

### A.    Section 57-10

Section 57-10 provides that it is unlawful for any person to have a firearm on their person or readily available in a motor vehicle, subject to several enumerated exceptions.  By cross-motion for summary judgment, the Challengers sought "a declaratory judgment that the State has 'occupied the field' and that Sections 57-10 and 57-11 of the County Code are not 'local laws' within the meaning of the Maryland Constitution," and asked the court to enjoin both.  In its response, the County objected, arguing in a footnote that § 57-10 was not properly before the court because the operative complaint did not include a single reference to § 57-10.  Accordingly, the County stated that it would "not address [the Challengers'] arguments regarding § 57-10."

The circuit court's memorandum opinion and order granting the Challengers' motion for summary judgment also does not mention § 57-10 in the explanation of its rulings.  Nonetheless, the circuit court's subsequent declaratory judgment and injunction orders both awarded relief with respect to § 57-10.

13

(22)

Rule 2-302 identifies the permitted pleadings in Maryland's circuit courts, which are limited to complaints, counterclaims, cross-claims, third-party complaints, answers to each of them, and, if ordered by the court, a reply to an answer. The complaint, as the initial pleading, frames a plaintiff's claims and provides notice to the defendant of the claims being made, the basis for them, and the relief being sought. *Liberty Mut. Ins. Co. v. Ben Lewis Plumbing, Heating & Air Conditioning, Inc.*, 121 Md. App. 467, 476-77 (1998) (stating that due process requires that a "claim or defense be asserted with sufficient particularity to put the opposing party on fair notice of both the basis of the claim and the relief sought"). In doing so, it establishes the playing field on which the litigation will proceed. *E.g.*, *Univ. of Md. E. Shore v. Rhaney*, 159 Md. App. 44, 47 (2004) ("The allegations in the complaint frame the issues before the court."); *see* Paul Mark Sandler et al., *Pleading Causes of Action in Maryland* xxix (7th ed. 2022) ("The complaint is the foundation of all verdicts or judgments. Throughout discovery and even during trial, the complaint—the blueprint for the theory of the case—serves as the road map for both counsel and the trier of fact in interpreting and resolving the dispute between the parties.").

To ensure that pleadings serve their purpose, Rule 2-303 requires that all averments "be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances[.]" Md. Rule 2-303(a). Each averment also must "be simple, concise, and direct[,]" containing "only such statements of fact as may be necessary to show the pleader's entitlement to relief or ground of defense[,]" and without, among other things, "argument." Md. Rule 2-303(b). And Rule 2-305

14

(23)

requires that "[a] pleading that sets forth a claim for relief . . . shall contain a clear statement of the facts necessary to constitute a cause of action and a demand for judgment for the relief sought."

Our rules also govern how pleadings may be amended. Rule 2-341 permits amendments without leave of court by a date set forth in a scheduling order or, if none, "no later than 30 days before a scheduled trial date." Md. Rule 2-341(a). Subsequent amendments may be made only with leave of court. Md. Rule 2-341(b). The rule outlines seven purposes an amendment can serve, including to "change the nature of the action or defense[.]" Md. Rule 2-341(c)(1).

Motions for summary judgment and memoranda in support thereof serve a different purpose. They are not pleadings, and they do not frame the issues to be litigated. *See* Md. Rule 2-302. Instead, they provide a mechanism short of trial to resolve claims that have been pled where "there is no genuine dispute as to any material fact" and a party claims entitlement to judgment as a matter of law. Md. Rule 2-501(a); *see Charles Riley, Jr. Revocable Tr. v. Venice Beach Citizens Ass'n, Inc.*, 487 Md. 1, 16-20 (2024) (discussing the functions of summary judgment). Our rules do not sanction the amendment of pleadings through summary judgment practice. *See Liberty Mut. Ins. Co.*, 121 Md. App. at 481 (holding that asserting a defense for the first time in a response to a motion for summary judgment, when the defense was required to be asserted in an answer, does not meet pleading requirements); *see also Qian v. Sec'y, Dep't of Veterans Affs.*, 432 F. App'x 808, 809-10 (11th Cir. 2011) ("[E]ven liberal pleading standards do not afford plaintiffs

15

with an opportunity to raise new claims at the summary judgment stage.  At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint. . . ." (citation modified)); *In re Petition of Waitsfield-Fayston Tel. Co.*, 928 A.2d 1219, 1223 (Vt. 2007) ("Failure to plead a claim means that the claim is not in the case, and the court may not grant relief on it unless the claim subsequently comes before the court" through a formal "amendment of the complaint" or by "express or implied consent of the parties[.]").

Here, as noted, the operative complaint did not raise any issue or seek any relief concerning § 57-10.  Instead, the Challengers first raised a challenge to that provision in their cross-motion for summary judgment and in their associated 103-page memorandum in support thereof.  When they did so, the County properly objected.  Had the Challengers wanted to pursue a challenge to § 57-10 at that point, they should have sought leave to amend their complaint.  They did not do so.  Under those circumstances, the court erred in granting relief concerning that section.

### B.    Section 57-11(d)

We reach a different conclusion with respect to § 57-11(d).  Section 57-11(d) is a carve-out from the prohibition against possession of firearms in or within 100 yards of a place of public assembly in § 57-11(a).  Adopted in 1997, § 57-11(d) allows firearms dealers who were licensed to operate before January 1, 1997, to continue to "conduct regular, continuous operations" thereafter in the same location, but imposes certain restrictions on those operations.  As with § 57-10, the operative complaint never mentions

16

§ 57-11(d).  Although the complaint contains several references to § 57-11, each of those, in context, is specific to § 57-11(a) or (b).  Unlike with § 57-10, however, when the Challengers raised § 57-11(d) in their cross-motion for summary judgment, the County did not object.  Accordingly, the County did not preserve its appellate argument that the court should not have addressed § 57-11(d) at all.

## II.     MONTGOMERY COUNTY'S AUTHORITY AS A CHARTER COUNTY

Montgomery County is a charter county.  *Tyma v. Montgomery County*, 369 Md. 497, 504 (2002).   As such, its legislative authority is provided by the Home Rule Amendment, Article XI-A of the Constitution of Maryland; and the Express Powers Act, Title 10 of the Local Government Article.  Article XI-A authorizes the "transfer [of] the General Assembly's power to enact many types of county public local laws to the . . . home rule counties."  *McCrory Corp. v. Fowler*, 319 Md. 12, 16 (1990), *superseded by statute as stated in Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 627-29 (2010).

Article XI-A provides a structure for the interplay between State and local power. Section 2 of Article XI-A directs the General Assembly to "provide a grant of express powers" for charter counties.  Section 3 provides the County Council of a charter county with the "full power to enact local laws . . . upon all matters covered by the express powers granted" by the General Assembly, and further provides "that in case of any conflict between said local law" and any general law enacted by the General Assembly, the general law "shall control."  Section 4 then prohibits the General Assembly from enacting local laws "on any subject covered by express powers granted."  Taken together, these sections

17

(26)

authorize a shift of authority to legislate on "matters of purely local concern" from the General Assembly to charter counties. *State v. Stewart*, 152 Md. 419, 422 (1927).

The General Assembly carried out its charge under § 2 of Article XI-A by adopting the Express Powers Act, which "endows charter counties with a wide array of legislative and administrative powers[.]" *Angel Enters. Ltd. P'ship v. Talbot County*, 474 Md. 237, 261 (2021) (alteration in original) (quoting *Ritchmount P'ship v. Bd. of Supervisors of Elections for Anne Arundel County*, 283 Md. 48, 57 (1978)). Most relevant here, § 10-206(a)(2) of the Local Government Article provides that a "county council may pass any ordinance . . . not inconsistent with State law that . . . may aid in maintaining the peace, good government, health, and welfare of the county." Section 10-206(b) reinforces that a "county may exercise the powers provided under this title only to the extent that the powers are not preempted by or in conflict with public general law."

In summary, pursuant to the Home Rule Amendment and the Express Powers Act, ordinances enacted pursuant to the County's otherwise broad authority to legislate to promote "the peace, good government, health, and welfare of the county" must: (1) not be inconsistent with, preempted by, or in conflict with State law; and (2) be local laws. The Challengers contend that the challenged provisions of Chapter 57 fail on both counts. We will take each argument in turn.

### A.    Preemption

Preemption protects "the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the

18

(27)

doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field." *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County*, 307 Md. 307, 324 (1986).   State law may preempt local ordinances in three ways:   express preemption, preemption by conflict, and implied preemption.   *Talbot County v. Skipper*, 329 Md. 481, 487-88 (1993).

"Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute."   *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 512 n.6 (2004).   Preemption by conflict occurs when a local government ordinance "conflicts with a public general law enacted by the General Assembly."   *Coal. for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 379-80 (1994).   And implied preemption occurs when an ordinance "deal[s] with an area in which the [State] Legislature has acted with such force that an intent by the State to occupy the entire field must be implied[.]"   *County Council for Montgomery County v. Montgomery Ass'n*, 274 Md. 52, 59 (1975).   The Challengers contend that all three types of preemption are implicated here.

### 1.  Express Preemption

The Challengers identify six preemption provisions that they contend expressly preempt some or all of the challenged provisions of Chapter 57:  Criminal Law § 4-209(a); Public Safety §§ 5-104, 5-133(a), 5-134(a), and 5-207(a); and § 6 of Chapter 13 of the 1972 Laws of Maryland.  For its defense, the County contends that § 4-209(b)(1) of the Criminal Law Article expressly authorizes the challenged provisions.  The Challengers respond that (1) § 4-209(b)(1) does not supersede the express preemption provisions, and (2) even if it

19

(28)

does, the challenged provisions of Chapter 57 go beyond what is authorized by § 4-209(b)(1). Accordingly, we must first address whether the express preemption provisions have abrogated § 4-209(b)(1). Because we conclude that they have not, we will then examine whether § 4-209(b)(1) authorizes the challenged provisions of Chapter 57.

### i. Criminal Law § 4-209(a) and (b)(1)

Section 4-209 contains both a broad preemption of local regulation of firearms, in subsection (a), and an express authorization of local regulation of firearms in three specific areas, in subsection (b)(1). As relevant here, § 4-209(a) and (b)(1) provide:

> (a) Except as otherwise provided in this section, the State preempts the right of a county . . . to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of:
>
> (1) a handgun, rifle, or shotgun; and
>
> (2) ammunition for and components of a handgun, rifle, or shotgun.
>
> (b)(1) A county . . . may regulate the purchase, sale, transfer, ownership, possession, and transportation of the items listed in subsection (a) of this section:
>
> (i) with respect to minors;
>
> (ii) with respect to law enforcement officials of the subdivision; and
>
> (iii) except as provided in paragraph (2) of this subsection, within 100 yards of or in a park, church, school, public building, and other place of public assembly.

In construing the scope of § 4-209, and the interplay between subsections (a) and (b)(1), we employ our familiar canons of statutory construction. As we summarized recently:

20

(29)

The goal of statutory construction is to discern and carry out the intent of the Legislature. Our search for legislative intent begins with the text of the provision we are interpreting, viewed not in isolation but within the context of the statutory scheme to which it belongs. Our review of the text is wholistic, seeking to give effect to all of what the General Assembly included and not to add anything that the General Assembly omitted. In our analysis of statutory text, we therefore take the language as we find it, neither adding to nor deleting from it; we avoid forced or subtle interpretations; and we avoid constructions that would negate portions of the language or render them meaningless. When statutory terms are undefined, we often look to dictionary definitions as a starting point, to identify the ordinary and popular meaning of the terms, before broadening our analysis to consider the other language of the provisions in which the terms appear and the statutory scheme as a whole, including any legislative purpose that is discernible from the statutory text. Presuming the General Assembly intends its enactments to operate together as a consistent and harmonious body of law, we also seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

After exhausting the tools available for our textual analysis, viewed in context of the statutory scheme and in light of apparent legislative purpose, we determine whether the statute is ambiguous. Ambiguity can arise in two different ways: Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme. If neither applies, our inquiry generally ceases at that point and we apply the statute as written. If, however, the statute is ambiguous, we seek to resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. Such sources include the derivation of the statute, comments and explanations regarding it by authoritative sources during the legislative process, and amendments proposed or added to it.

Finally, in every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense. When one interpretation of statutory language would produce such a result, we will reject that interpretation in favor of another that does not suffer the same flaw.

21

(30)

*Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644-46 (2024) (citation modified).

Applying these familiar rules to § 4-209 is straightforward.  Section 4-209(a) is a broad express preemption of local firearm regulations addressing nine types of conduct, "[e]xcept as otherwise provided in this section[.]"  Section 4-209(b)(1) then provides express authorization for local firearm regulations addressing six of those types of conduct in three specific areas: (1) with respect to minors; (2) with respect to law enforcement officials; and (3) within 100 yards of or in a park, school, public building, or other place of public assembly.  Thus, under § 4-209, County regulations of the purchase, sale, transfer, ownership, possession, and transportation of firearms are permissible when—and only when—limited to one of those three specific areas.

### ii.  *Public Safety §§ 5-104, 5-133(a), 5-134(a), 5-207(a), and 1972 Maryland Laws, Chapter 13, § 6*

Sections 5-104, 5-133(a), 5-134(a), and 5-207(a) of the Public Safety Article and § 6 of Chapter 13 of the 1972 Laws of Maryland all also expressly preempt certain types of local firearm regulations.  Public Safety § 5-104 provides that Subtitle 1 of Title 5 of the Public Safety Article supersedes and preempts all local regulation of the sale of regulated firearms.[7]  Sections 5-133(a) and 5-134(a) each "preempt[] the right of any local jurisdiction to regulate" the possession and transfer, respectively, of regulated firearms.

---

[7] A "regulated firearm" is a defined term meaning "a handgun" or any of a list of "specific assault weapons or their copies[.]"  Pub. Safety § 5-101(r).  Although other long guns are regulated by State law, *see id.* §§ 5-201 – 5-207, they do not fall within the statutory definition of a regulated firearm.

22

Section 5-207(a) does the same for the transfer of rifles and shotguns. And § 6 of Chapter 13 of the 1972 Laws of Maryland does the same for the wear, carry, or transportation of handguns.

None of these provisions is ambiguous when considered on its own. Each employs absolute language with no express exceptions. However, all become ambiguous when considered alongside Criminal Law § 4-209(b)(1). Section 4-209(b)(1) employs similarly absolute language, authorizing localities to regulate in certain areas, subject only to a self-contained exception for regulations addressing teaching or training in firearms safety and other educational or sporting uses. Crim. Law § 4-209(b)(2). Accordingly, we "seek to resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Westminster Mgmt.*, 486 Md. at 645.

The General Assembly enacted § 4-209 as Chapter 724 of the 1985 Laws of Maryland. Notably, the year before, Governor Harry Hughes vetoed legislation that would have completely preempted local firearms regulations, except with respect to discharge. S.B. 66; H.B. 315, 392nd Md. Gen. Assemb., Reg. Sess. (1984).[8] In his veto letter, Governor Hughes expressed his intent to protect existing local regulations from

---

[8] Senate Bill 66 and House Bill 315 from the 1984 legislative session would have "preempt[ed] the rights of any county . . . to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation" of, among other things, handguns, rifles, shotguns, and ammunition for any of them. Section 2 of those bills would further have repealed all inconsistent laws or parts of laws.

23

(32)

preemption.  Veto Letter from Gov. Hughes, S.B. 66, 392nd Gen. Assemb., Reg. Sess. (May 29, 1984).  Governor Hughes acknowledged the importance of uniformity in firearm regulations throughout the State but stated that preserving "beneficial existing local legislation" for the sake of "public safety" was even more important.  *Id.*

The following year, at a time when all but one of the other express preemption provisions at issue had already been enacted,[9] the General Assembly passed Chapter 724, which contained three provisions that expressly preserved or authorized local firearms regulations.  First, as we have discussed, subsection (b)(1) of what is now § 4-209

---

[9] The provisions now codified as Public Safety §§ 5-104, 5-133(a), and 5-134(a) were originally enacted in 1966 and codified in former Article 27 of the Maryland Code. *See* 1966 Md. Laws, Ch. 502 (enacting, among others, Art. 27 §§ 442(a) (precursor to § 5-104) and 445(a) (precursor to §§ 5-133(a) and 5-134(a))).  Those provisions were moved to the Public Safety Article in 2003 as part of the code revision process. *See* 2003 Md. Laws, Ch. 5, § 2, at 215 (§ 5-104); *id.* at 248 (§ 5-133(a)); *id.* at 250-51 (§ 5-134(a)). The only substantive change identified in the revisor's note was to break out what had been a single provision in § 445 of former Article 27, regulating "possession and transfer" of regulated firearms, into two separate provisions, with § 5-133 regulating possession and § 5-134 regulating transfer. *See* 2003 Md. Laws Ch. 5, § 2, at 250 Revisor's Note; *id.* at 252-53 Revisor's Note.

Similarly, what is now Criminal Law § 4-209 was originally codified in former Article 27 of the Maryland Code. *See* 1985 Md. Laws, Ch. 724.  It became part of the Criminal Law Article in 2002 as part of the code revision process.  2002 Md. Laws, Ch. 26, at 348-49.  The Challengers contend that we should treat the Public Safety provisions as more recently enacted than § 4-209 because the Public Safety Article was adopted one year after the Criminal Law Article.  That contention is meritless.  When examining legislative intent, we focus on the time of adoption or, if relevant, substantive change. *See State v. Ghajari*, 346 Md. 101, 115 (1997) (noting that, if two statutes conflict irreconcilably, "the statute whose relevant substantive provisions were enacted most recently" prevails (quoting *State v. Harris*, 327 Md. 32, 39 (1992))).  Because the Public Safety provisions were neither newly adopted nor substantively changed in 2003, we will not treat them as more recently enacted than Criminal Law § 4-209.

authorized local firearm regulations of six types of conduct in three specific areas. 1985 Md. Laws, Ch. 724. Second, subsection (c) of what is now § 4-209 allowed limited changes to existing local firearms regulations provided that the changes did "not create an inconsistency with this section or expand existing regulatory control[.]" *Id.* And third, uncodified § 2 of Chapter 724 provided "[t]hat this Act shall not affect or repeal any local ordinance in existence as of January 1, 1985." *Id.*

In his letter reviewing the legislation that became Chapter 724, Attorney General Steven Sachs identified certain "interpretive problems," including how § 4-209(b)(1) would interact with existing express preemption provisions related to firearms. Md. Att'y Gen. Letter to Gov. Hughes, H.B. 176 Bill File at 1 (May 23, 1985). The Attorney General discussed two "well settled" principles of statutory interpretation that he found to be dispositive. *Id.* at 3. First, "to the extent the provisions of the two statutes are irreconcilable, the later statute governs." *Id.* (citing *Carroll County Educ. Ass'n v. Bd. of Educ.*, 294 Md. 144, 152 (1982)). Second, "a specific provision controls over a general provision on the same subject matter." *Id.* (citing *Balt. Nat. Bank v. State Tax Comm'n*, 297 U.S. 209, 215 (1936); *Montgomery County v. Lindsay*, 50 Md. App. 675, 678-79 (1982)). Attorney General Sachs concluded that "[u]nder either principle, the new authority [under what is now § 4-209(b)(1)] to regulate in specific ways would control over the older broad preemption [provisions]." *Id.* After receiving the Attorney General's bill review letter and analysis, Governor Hughes signed Chapter 724 into law.

(34)

We agree with the Attorney General's contemporaneous analysis for essentially the same reasons.  When possible, this Court "attempt[s] to harmonize provisions dealing with the same subject so that each may be given effect."  *Doe v. Montgomery County Bd. of Elections*, 406 Md. 697, 713 (2008).  But when integrating the two statutes is impossible, as is the case here, we must determine which statute the General Assembly intended to prevail.   As Attorney General Sachs noted, in making that determination we have frequently called upon the principles that a later enacted statute will ordinarily prevail over an earlier enacted one, and a more specific statute will ordinarily prevail over a more general one.  *See, e.g.*, *Dep't of Motor Vehicles v. Greyhound Corp.*, 247 Md. 662, 667 (1967) (observing that a newer statute may more accurately reflect the General Assembly's intent as the "last expression of the legislative will"); *Maguire v. State*, 192 Md. 615, 623 (1949) (stating "an old and familiar rule" that when a particular statute and a general one conflict, "the particular enactment must be operative, and the general enactment must be taken to affect only such cases within its general language as are not within the provisions of the particular enactment" (quoting *Pretty v. Solly* (1859) 53 Eng. Rep. 1032, 1034 (Ch.)).  With respect to Public Safety §§ 5-104, 5-133(a), and 5-134(a), and § 6 of Chapter 13 of the 1972 Maryland Laws, both the legislative history and our interpretive principles point persuasively in the same direction:  the General Assembly's intent was for the later-enacted and more specific § 4-209(b)(1) to prevail over the earlier-enacted and more general preemption provisions, thus permitting local regulation of firearms in the three specific areas set forth in § 4-209(b)(1).

26

(35)

We ultimately reach the same conclusion with respect to Public Safety § 5-207(a), although the analysis is slightly more complicated because the General Assembly enacted that provision after Criminal Law § 4-209.  At times, the application of multiple canons of construction "may lead to conflicting interpretations[.]"  *Wheeling v. Selene Finance LP*, 473 Md. 356, 378 (2021).  When at this crossroad, to determine "which standard wins the day[,]" *id.*, we return to our ultimate purpose in applying these canons—"discern[ing] the legislative intent underlying the provision[s,]" *Bennett v. Harford County*, 485 Md. 461, 468 (2023).

Public Safety § 5-207(a), enacted by the General Assembly in 2021, is part of a statute generally regulating the transfer of long guns in Maryland.  2021 Md. Laws, Chs. 11, 37.  While enacted after Criminal Law § 4-209(b), Public Safety § 5-207(a) is the more general statute when applied to the subject they both address, the local regulation of long gun transfers.  While Public Safety § 5-207(a) broadly preempts all local regulation of transfers of long guns, § 4-209(b)(1) expressly permits such local regulation in three limited areas.

Ultimately, we resolve the conflict between these two provisions on the ground that whatever preemptive authority Public Safety § 5-207(a) might have is irrelevant to the provisions under review here.  Criminal Law § 4-209(b)(1) expressly authorizes local regulation of the "purchase, sale, transfer, ownership, possession, and transportation" of all firearms in three specific areas.  Public Safety § 5-207(a) precludes local regulation only of the transfer of long guns.  It does not purport to preclude local regulation of the

27

possession of long guns.  And if a county may regulate the possession of long guns within 100 yards of or in a place of public assembly, it can implicitly regulate the transfer of long guns in those same areas because possession, in this context, is a prerequisite to transfer. Notably, the challenged provisions of Chapter 57 do not purport to alter or deviate from any of the substantive regulations concerning the transfer of long guns that are set forth in Public Safety § 5-207(b) and (c).  Whether an attempt to modify those substantive regulations in connection with any purported exercise of authority granted by Criminal Law § 4-209(b)(1) would be preempted by Public Safety § 5-207(a) must await a case that presents that issue.  Any such preemptive authority is irrelevant to the questions presented here.

In sum, we conclude that § 4-209(b)(1) has not been abrogated by any of the express preemption provisions we have discussed.

### iii.   Criminal Law § 4-209(b)(1)

We now consider whether Criminal Law § 4-209(b)(1) authorizes the challenged provisions.  As discussed, § 4-209(b)(1) authorizes local regulation of six types of conduct related to firearms in three areas, two of which are relevant here:  "with respect to minors"; and "within 100 yards of or in a park, church, school, public building, and other place of public assembly."  Crim. Law § 4-209(b)(1)(i), (iii).  Any local firearm regulation that does not fit within the scope of that authorization is expressly preempted by, among other provisions, § 4-209(a).

The County contends that its regulation of firearms near places of public assembly in § 57-11(a) and its regulation of ghost guns in § 57-7 fall within the scope of regulation authorized by § 4-209(b)(1).  The Challengers reject both claims.

### a.  The County's Regulation of Firearms In or Within 100 Yards of a Place of Public Assembly

Section 57-11(a) bans the sale, transfer, possession, or transport of a firearm, ammunition, or a major component of a firearm in or within 100 yards of a place of public assembly.  In 2022, the County significantly expanded the scope of that prohibition, at least partially in response to the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).  Two aspects of that decision were particularly influential in the County Council's adoption of the 2022 amendments.  First, the Supreme Court found that New York's "may issue" handgun carry permitting scheme—issuing permits only to individuals who "demonstrate a special need" to carry a handgun in public—violated the Second Amendment to the United States Constitution.  *Id.* at 11-14.  The ruling in *Bruen* meant that Maryland's own "may issue" permitting scheme, which was similar to New York's, *see Woollard v. Gallagher*, 712 F.3d 865, 868-70 (4th Cir. 2013) (describing Maryland's pre-*Bruen* permitting scheme), was also unconstitutional, *see In re Rounds*, 255 Md. App. 205, 206 (2022).

Second, the Supreme Court recognized a presumptively constitutional historical practice of banning firearms within "sensitive places," such as "legislative assemblies, polling places, and courthouses[.]"  *Bruen*, 597 U.S. at 30.  The Court opined that lower courts might "use analogies to those historical regulations of 'sensitive places' to determine

29

(38)

that modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places are constitutionally permissible." *Id.*

Reacting to *Bruen*, the County: (1) expanded its definition of place of public assembly; and (2) eliminated an exception in the ordinance for holders of State-issued wear-and-carry permits. 2022 L.M.C., Ch. 36, § 1. In a memorandum to the County Council, the County's Senior Legislative Attorney explained that the expanded definition of place of public assembly was adopted "[i]n order to make this definition more closely aligned with *Bruen*'s approach to 'sensitive places' . . . and in order to include places that *Bruen* has specifically said do qualify as 'sensitive places[.]'"

As noted, a "place of public assembly" now includes all of the following, along with "all property associated with the place, such as a parking lot or grounds of a building":

(1) a publicly or privately owned: (A) park; (B) place of worship; (C) school; (D) library; (E) recreational facility; (F) hospital; (G) community health center, including any health care facility or community-based program licensed by the Maryland Department of Health; (H) long-term facility, including any licensed nursing home, group home, or care home; (I) multipurpose exhibition facility, such as a fairgrounds or conference center; or (J) childcare facility;

(2) government building, including any place owned by or under the control of the County;

(3) polling place;

(4) courthouse;

(5) legislative assembly; or

(6) a gathering of individuals to collectively express their constitutional right to protest or assemble.

Chapter 57, § 57-1 (2025).

30

(39)

The issue before this Court is not whether any of the locations the County has defined as "places of public assembly" qualify as "sensitive places" for Second Amendment purposes. Before us is only whether these new locations qualify as parks, churches, schools, public buildings, or "other place[s] of public assembly," as that phrase is used in Criminal Law § 4-209(b)(1)(iii). We conclude that some do, and others do not.

As an initial matter, several of the locations the County has identified as "places of public assembly" are either enumerated in § 4-209(b)(1)(iii) or are directly analogous to one of those enumerated locations. Thus, we readily conclude that § 4-209(b)(1)(iii) authorizes the inclusion of a park, place of worship, school, library, courthouse, and legislative assembly on that list. Parks and schools are enumerated locations. A place of worship is an analogue to a church. And libraries, courthouses, and legislative assemblies are paradigmatic examples of public buildings.

The Challengers nonetheless argue that even these locations exceed the County's authority because they apply to places that are "privately owned." We disagree. Section 4-209(b)(1)(iii) does not limit its scope only to locations that are publicly owned. Indeed, such a limitation would be nonsensical as applied to churches and many schools. The important limitation § 4-209(b)(1)(iii) places on what a local jurisdiction may identify as a "place of public assembly" is not ownership but, as we discuss next, whether the location is open to the public for assembly. To the extent the Challengers contend that there may be private parks or libraries in the County that do not meet that standard, such a claim is more appropriately adjudicated on an individual as-applied basis.

31

(40)

For the remaining locations, our analysis turns on the meaning of "place of public assembly."  "When statutory terms are undefined, we often look to dictionary definitions as a starting point, to identify the 'ordinary and popular meaning' of the terms, before broadening our analysis to consider the other language of the provisions in which the terms appear and the statutory scheme as a whole[.]"  *Hollabaugh v. MRO Corp.*, 491 Md. 165, 176-77 (2025) (alteration in original) (quoting *Westminster Mgmt.*, 486 Md. at 644).

Affording the terms their plain meaning, a place of public assembly is a location that is open for members of the public to gather for a common purpose, such as deliberating, legislating, worship, entertainment, education, or recreation.  *See Public*, Merriam-Webster's Collegiate Dictionary 1005 (11th ed. 2014) (defining "public" as "accessible to or shared by all members of the community"); *Public*, New Oxford American Dictionary 1411 (3rd ed. 2010) (defining "public" as "open to or shared by all the people of an area or country"); *Assembly*, Merriam Webster's Collegiate Dictionary 73-74 (defining "assembly" as "a company of persons gathered for deliberation and legislation, worship, or entertainment"); *Assembly*, New Oxford American Dictionary 96 (defining "assembly" as "a group of people gathered together in one place for a common purpose").

As applied to § 4-209(b)(1)(iii), that definition comports with the doctrine of *ejusdem generis*, a canon of statutory construction that instructs that "when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned."  *In re Wallace W.*, 333 Md. 186,

32

(41)

190 (1993) (quoting *Giant of Md. v. State's Att'y*, 274 Md. 158, 167 (1975)).  Here, "place of public assembly" follows the specific terms park, church, school, and public building.  Crim. Law § 4-209(b)(1)(iii).  Parks are generally open to members of the public for entertainment and recreation.  Churches are generally open for worship.  Public buildings are generally open to attend to the business of government.  And although many schools are generally not open to the public during the school day, they provide a place for students and teachers to assemble during the school day and, outside of that time, they have traditionally served as places for public assembly.  *See, e.g.*, Lee Benson et al., *The Enduring Appeal of Community Schools: Education Has Always Been a Community Endeavor*, Am. Educator 24 (2009) ("By 1913, 71 cities in 21 states reported having schools that functioned as social centers; by 1914, 17 states had enacted legislation allowing wider use of school facilities by communities."); *Facility Reservation – Montgomery County Public School Facilities*, Community Use of Public Facilities, https://www.montgomerycountymd.gov/CUPF/info-reservation/MCPS.html, *archived at* https://perma.cc/7YEC-AXFL (describing the availability of Montgomery County school buildings for rental for "community events and activities").[10]

---

[10] The County website's Facility Reservation page for public school facilities includes the following introductory statement:

> Schools are great places to conduct a wide variety of activities, classes, performances, camps, cultural and religious programs, recreational activities, sports tournaments, instructional dance, and so much more. There are more than 200 school sites, each with several rooms, both large and small, available for use by the community.  We welcome all

33

Applying our plain meaning definition, we conclude that a "recreational facility," a "multipurpose exhibition facility, such as fairgrounds or conference center," and a "polling place" are all fairly encompassed within the phrase "place of public assembly." Although recreational facility is not defined, we interpret it in context to encompass only recreational facilities that are open to the public—with or without a fee—for recreational purposes. We similarly interpret multipurpose exhibition facility in context, and with the aid of the included examples, as a facility open to the public for recreational, entertainment, educational, or similar purposes. And polling places, many of which would likely already be covered as schools or other public buildings, are open to the public for the purpose of assembling for the common purpose of voting.

In contrast, we conclude that hospitals, community health centers, long-term facilities, childcare facilities, and "government building[s], including any place owned by or under the control of the County," are not fairly encompassed within the definition of a "place of public assembly."[11] Hospitals, community health centers, long-term facilities,

---

        responsible parties to utilize these facilities for community events and activities at reasonable costs to County residents and businesses. Come on in!

*Facility Reservation – Montgomery County Public School Facilities*, Community Use of Public Facilities, https://www.montgomerycountymd.gov/CUPF/info-reservation/MCPS.html, *archived at* https://perma.cc/7YEC-AXFL.

[11] Notably, the carry of firearms in all these locations—although not within 100 yards of them—is now prohibited by State law. In 2023, the General Assembly, also acting in the wake of the *Bruen* decision, enacted § 4-111 of the Criminal Law Article. 2023 Md. Laws, Ch. 680. Subject to exceptions that do not include holders of State-issued

34

and childcare facilities are not generally open to the public for any purpose of assembly. And although some "government building[s]" would certainly qualify as "public buildings," if open to the public for purposes we have described, the County goes too far in including within that term "any place owned by or under the control of the County." The County owns buildings throughout its borders, including single-family homes, that cannot reasonably be described as places of public assembly. *See* Publicly Owned Land, Montgomery County, https://www.mcatlas.org/county_owned_land/ (last visited Apr. 27, 2026). To be sure, we are not opining here on whether the County could preclude the carry of firearms on any property it owns in its proprietary capacity. But § 4-209(b)(1)(iii) does not authorize the County to preclude carry of firearms within 100 yards of its property unless the property is a "place of public assembly."

---

wear-and-carry permits, that section prohibits the wear, carry, or transport of a firearm in "an area for children or vulnerable individuals," "in a government or public infrastructure area," and "in a special purpose area." Crim. Law § 4-111(c), (d)(1), (e). The section defines an area for children and vulnerable individuals to include, among other things, "a preschool or prekindergarten facility or the grounds of the facility" and "a health care facility." *Id.* § 4-111(a)(2). It defines government or public infrastructure area to include, among other things, "a building or any part of a building owned or leased by a unit of State or local government[.]" *Id.* § 4-111(a)(4). And it defines special purpose area to include stadiums, museums, amusement parks, racetracks, casinos, and locations that sell alcohol or cannabis. *Id.* § 4-111(a)(9). The United States Court of Appeals for the Fourth Circuit recently upheld the constitutionality of all these restrictions. *Kipke v. Moore*, 165 F.4th 194, 204-05 (4th Cir. 2026) (upholding Maryland's prohibitions on firearms in government buildings, State parks and forests, museums, healthcare facilities, and locations that sell alcohol; at stadiums, racetracks, amusement parks, and casinos; on public transportation and school grounds; and within 1,000 feet of a public demonstration; but holding unconstitutional Maryland's prohibition on carrying guns on private property without express permission).

35

Finally, a "gathering of individuals to collectively express their constitutional right to protest or assemble" is not a location. Although that language may describe a "public assembly," it does not describe a "*place* of public assembly" for which § 4-209(b)(1)(iii) authorizes local regulation.

In summary, we conclude that the County's regulation of firearms in or within 100 yards of a place of public assembly is authorized by § 4-209(b)(1)(iii) to the extent it extends to a park, place of worship, school, library, recreational facility, multipurpose exhibition facility, polling place, courthouse, and legislative assembly. The County's regulation is not authorized by § 4-209(b)(1)(iii)—and therefore is preempted by § 4-209(a)—to the extent it includes a hospital, community health center, long-term facility, childcare facility, other government building (as defined), or gathering of individuals without regard to the place they are gathering.

As noted, the County adopted a severability provision to save valid provisions of Chapter 57 in the event any provisions of that chapter are found invalid. 2022 L.M.C., Ch. 36, § 3. If these were the only deficiencies in § 57-11, we would proceed to a severability analysis to determine if the valid provisions of the County Code could be severed from the unauthorized locations. *See, e.g.*, *Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 319 Md. 558, 573-77 (1990) (describing and performing a severability analysis). Because we will identify other deficiencies within § 57-11 that cannot be rectified by severing the valid provisions from the unauthorized locations, we will not undertake that analysis here.

36

(45)

### b. *The County's Regulation of Firearms With Respect to Minors*

Through the Amendments, the County expanded its regulation in § 57-7, titled "Access to guns by minors," by adding what are now subsections (c), (d), and (e):

> (c) A person must not give, sell, rent, lend, or otherwise transfer to a minor:
>
> > (1) a ghost gun or major component of a ghost gun;
> >
> > (2) an undetectable gun or major component of an undetectable gun; or
> >
> > (3) a computer code or program to make a gun through a 3D printing process.
>
> (d) A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor.
>
> (e) A person must not store or leave a ghost gun, an undetectable gun, or a major component of a ghost gun or an undetectable gun, in a location that the person knows or should know is accessible to a minor.

Chapter 57, § 57-7(c), (d), (e) (2025).

The County contends that the new subsections fall within the authorization of § 4-209(b)(1)(i) to regulate firearms "with respect to minors." According to the County, the plain language of that phrase gives it the authority to regulate in any manner that "bears a reasonable relation to minors' access to, or use of, firearms." The Challengers respond that "with respect to minors" cannot be interpreted so broadly as to impermissibly regulate the sale, transfer, possession, and transport of ghost guns by adults. The resolution of that dispute turns on the meaning of "with respect to minors" in § 4-209(b)(1)(i).

37

In interpreting the scope of regulation permitted "with respect to minors," we are cognizant of both the breadth of the phrase—*see, e.g.*, *Respect*, Merriam-Webster's Collegiate Dictionary 1061 (defining "with respect to" as "concerning," "with reference to," and "in relation to")—and its placement within a statutory scheme that broadly preempts all local firearms regulations, subject to exceptions in three specific areas. We consider statutory language within its larger statutory scheme. *Westminster Mgmt.*, 486 Md. at 644-45. Here, that context suggests that the General Assembly intended to authorize local regulations that meaningfully address minors' unsupervised use of and access to firearms, but not in such a way as to undermine the General Assembly's intent to create a mostly uniform set of firearms regulations statewide.

Although not binding on our analysis, the Attorney General has twice opined on the intended breadth of § 4-209(b)(1)(i). *See A.S. Abell Publ'g Co. v. Mezzanote*, 297 Md. 26, 40 (1983) ("While an opinion of the Attorney General is entitled to consideration in determining legislative intent, it is not binding upon the courts."). In 1991, the Attorney General advised that the predecessor to § 4-209(b)(1)(i) authorized a local bill prohibiting any person from leaving a loaded firearm without a trigger lock in a location where the person knows a minor may have access to it. 76 Op. Md. Att'y Gen. 240, 242 (1991). Although noting that the legislation would regulate the conduct of adults, not children, the Attorney General observed that "since children gain access to firearms because adults are careless, no other manner of regulation would serve the goal of protecting children." *Id.*

38

(47)

The Attorney General opined that what is now § 4-209(b)(1)(i) authorized "any regulation that bears a reasonable relation to minors' access to, or use of, firearms." *Id.*

In 1997, the Attorney General reached the same conclusion concerning a similar proposed local regulation but added a caveat. 82 Op. Md. Att'y Gen. 84, 85-86 (1997). He cautioned "that authorization for local regulation 'with respect to minors' cannot be a pretext for regulation of *adults*' access to handguns. . . . The Legislature could not have intended to authorize localities to achieve indirectly what they may not achieve directly: across-the-board regulation of firearms." *Id.* at 86. We find the Attorney General's analysis, including the point of caution raised in his 1997 opinion, to be persuasive and correct.

Returning to § 57-7, two of the provisions added to that section fall comfortably within the scope of the authority provided by § 4-209(b)(1)(i). Subsection (c) prohibits any person from providing a minor with certain types of firearms. And subsection (e) precludes persons from storing or leaving those same types of firearms "in a location that the person knows or should know is accessible to a minor." Those provisions directly regulate activities that would provide minors with unsupervised access to specific types of firearms and present minimal intrusion on firearm ownership and use by adults.

Subsection (d) is different. Unlike subsections (c) and (e), this provision prohibits a broad swath of otherwise lawful (and constitutionally protected) conduct by adults merely because it occurs in the presence of a minor, without any apparent connection to whether that activity might result in minors gaining unsupervised access to those firearms. The

39

(48)

County has not identified any such connection, and we cannot divine any.  Accordingly, § 57-7(d) is not authorized by § 4-209(b)(1)(i) and so is preempted by § 4-209(a).

Unlike with § 57-11, we have not identified other deficiencies in § 57-7. Accordingly, we undertake a severability analysis to determine whether the valid portions of that section can be severed from § 57-7(d) and "continue in full force and effect." *See* 2022 L.M.C., Ch. 36, § 3.

We recognize a "strong presumption 'that a legislative body generally intends its enactments to be severed if possible.'" *Sugarloaf*, 319 Md. at 574 (quoting *State v. Burning Tree Club, Inc.*, 315 Md. 254, 297 (1989)).  However, even the existence of a severability clause "only raises the presumption of severability" because not all valid provisions of a legislative act are severable.  *County Council of Prince George's County v. Chancey Enters. L.P.*, 454 Md. 514, 539-40 (2017).  The test to determine whether a provision is severable is if a legislative body would "have enacted the statute or ordinance if it knew that part of the enactment was invalid[.]"  *Id.* at 540 (quoting *Anne Arundel County v. Moushabek*, 269 Md. 419, 428 (1973)).  "When the dominant purpose of an enactment may largely be carried out notwithstanding the [enactment's] partial invalidity, courts will generally hold the valid portions severable and enforce them."  *O.C. Taxpayers for Equal Rights, Inc. v. Mayor & City Council of Ocean City*, 280 Md. 585, 601 (1977).

Here, the legislative intent is clear.  The County Code includes a general presumption of severability.  Montgomery County, Md., Code § 1-202 (2025) ("[I]t is the intent of the Council that the provisions of this Code and all laws enacted by the County

40

(49)

Council are severable.  If a provision is held invalid or inapplicable, the remainder of the Code or the law remains in effect.").  Taking a belt-and-suspenders approach, the County Council also adopted a special severability provision applicable only to Chapter 57.  2022 L.M.C., Ch. 36, § 3 (stating that if "any provision of Chapter 57[] is found to be invalid by the final judgment of a court of competent jurisdiction, the remaining provisions must be deemed severable and must continue in full force and effect").  We will therefore sever the valid provisions of § 57-7 from the invalid provision if possible.

Severance is possible here.  Section 57-7(d) is a standalone prohibition.  No other provision of Chapter 57 is dependent on § 57-7(d), nor would the application of any other provision of the Chapter be altered in any way if that provision is severed.  Accordingly, the dominant purpose of the remainder of § 57-7 may be carried out without § 57-7(d).  We therefore hold that the remainder of § 57-7 is severed from the invalid § 57-7(d).

### 2.  *Implied Field Preemption*

In addition to their express preemption arguments, the Challengers also argue that § 4-209(b)(1) has been impliedly abrogated by the State's significantly increased regulation of firearms in the years since it was enacted, thus resulting in the implied preemption of local laws enacted pursuant to its authority, including Chapter 57.  Implied field preemption occurs only when a local law "deal[s] with an area in which the [State] Legislature has acted with such force that an intent by the State to occupy the entire field must be implied[.]"  *Talbot County v. Skipper*, 329 Md. 481, 488 (1993) (first two alterations in original) (quoting *County Council for Montgomery County v. Montgomery Ass'n*, 274 Md.

41

(50)

52, 59 (1975)); *Bd. of County Comm'rs of Washington County v. Perennial Solar, LLC*, 464 Md. 610, 620 (2019) (noting that this Court has "stated repeatedly that '[t]he primary indicia of legislative purpose to preempt an entire field of law is the comprehensiveness with which the General Assembly has legislated in the field'" (quoting *Howard County v. Potomac Elec. Power Co.*, 319 Md. 511, 523 (1990))).

The primary problem with the Challengers' implied preemption claim is that, here, the General Assembly has not left us searching for its intent in implication. The General Assembly has expressly preempted local regulation of firearms where that has been its intent, and, in § 4-209(b)(1), it has expressly authorized limited local regulation of firearms in three specific areas. The Challengers are correct that the extent of the State's regulation of firearms has increased substantially since the adoption of § 4-209. However, we would be hard pressed to infer from that increased regulation an intent to implicitly repeal the express grant of authority contained in § 4-209(b)(1), and thereby impliedly preempt the local laws enacted under its authority. We will not do so here.

### 3. Conflict Preemption

The Challengers argue that even if authorized by § 4-209(b)(1) and not preempted by implication, certain portions of the Amendments place Chapter 57 in conflict with State law and are therefore preempted.

While it has been "recognized with some frequency" that the General Assembly intends there to be "concurrent power" and "functional interplay between State and local legislation[,]" *Mayor & City Council of Baltimore v. Sitnick*, 254 Md. 303, 312 (1969), a

42

(51)

"local government ordinance which conflicts with a public general law enacted by the General Assembly is preempted and thus is invalid[,]" *Coal. for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 379 (1994). A local ordinance conflicts with public general law when "it either prohibits an act that under State law is permitted, or it permits an act that under State law is prohibited." *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 513 (2004). However, although "a political subdivision may not prohibit what the State by general public law has permitted . . . it may prohibit what the State has not expressly permitted." *Coal. for Open Doors*, 333 Md. at 381 (emphasis omitted) (quoting *Sitnick*, 254 Md. at 317). In other words, "[t]he State's prohibition of certain[, but not all,] activity in a field does not impliedly guarantee that all other activity [in that field] shall be free from local regulation[.]" *Id.*

"Not all conflicts . . . fit squarely within the 'prohibit-permit' category." *Worton Creek Marina*, 381 Md. at 513. Even where a local law does not specifically permit an act prohibited by the State, or specifically prohibit an act permitted by the State, the local law may nevertheless be invalid if it creates a "direct conflict" with a State statute regulating the same matter. *See id.* at 514 (collecting cases).

Much of the Challengers' argument concerning conflict preemption constitutes a general complaint that certain aspects of §§ 57-7 and 57-11(a), (b), and (d) are more restrictive than State law. For example, the Challengers complain that while Public Safety §§ 5-114 and 5-145 require firearms dealers to implement "safe storage" in a safe, vault, or special room only "outside of business hours," § 57-11(d)(3) requires dealers to secure

43

their firearms at all times.  The Challengers similarly assert that the County's safe storage requirements for ghost guns are more restrictive than the general safe storage provisions in § 4-104 of the Criminal Law Article in two ways.  First, § 4-104 applies only to loaded firearms, while § 57-7(e) applies to ghost guns whether loaded or not, and second, § 57-7(e) lacks an exception contained in § 4-104 for minors with certificates of firearm and hunter safety.[12]

An established rule in our conflict preemption jurisprudence is that, while "ordinances which assume directly or indirectly to permit acts or occupations which the State statutes prohibit, or to prohibit acts permitted by statute or Constitution, are . . . uniformly declared to be null and void[,]" that is not the case if the local regulation is merely an "[a]dditional regulation" supplementing State law.  *Rossberg v. State*, 111 Md. 394, 416 (1909) (holding that a municipal ordinance can impose greater penalties on the possession and sale of cocaine than imposed under State law without causing conflict).  The "fact[] that an ordinance enlarges upon the provisions of a [State] statute by requiring more than the statute requires creates no conflict[.]"  *Sitnick*, 254 Md. at 315 (quoting *E. Tar Prods. Corp. v. State Tax Comm'n*, 176 Md. 290, 296-97 (1939)).

Our caselaw also has consistently recognized the distinction between State laws that affirmatively permit conduct—thus protecting that conduct from encroachment by local

---

[12] The Challengers also complain that § 57-7(a) includes an exception allowing "parental supervised minor access to components of a rifle or a shotgun" but not to components of handguns.  However, § 57-7(a) does not regulate handguns at all, so an "exception" related to components of handguns would be nonsensical.

44

(53)

legislation—and laws that merely exempt certain conduct from the reach of a State prohibition.  In *Sitnick*, for example, we held that Baltimore City could apply its local minimum wage ordinance to taverns even though taverns were exempted from the State's minimum wage law.  254 Md. at 311.  We concluded that by exempting taverns from the reach of the State law, the General Assembly had left them open to local regulation, rather than making "an affirmative guarantee against local regulation."  *Id.* at 324.

Similarly, in *National Asphalt Pavement Association v. Prince George's County*, we held that Prince George's County could apply its ordinance prohibiting employment discrimination to employers with fewer than 15 employees even though the State exempted such employers from its analogous statute.  292 Md. 75, 80-81 (1981).  We reasoned that the "state statute would have to *permit* discrimination by employers with less than fifteen employees for there to be a conflict under the test set forth in our cases[,]" not just exempt such employers from the regulation.  *Id.* at 79 n.3.

And in *Mayor & City Council of Baltimore v. Hart*, we held that a Baltimore City ordinance permitting emergency vehicles to pass red lights only after coming to a full stop at the intersection was not preempted by a State law permitting such vehicles to pass red lights "only after slowing down as necessary for safety[.]"  395 Md. 394, 405, 409 (2006).  We concluded that the City ordinance merely imposed an "additional requirement[]" that did "not allow conduct the State statute prohibits."  *Id.* at 406; *see also Mayor & Alderman of City of Annapolis v. Annapolis Waterfront Co.*, 284 Md. 383, 393 (1979) ("Municipalities are free to provide for additional standards and safeguards in harmony

45

(54)

with concurrent state legislation."); *E. Tar Prods. Corp.*, 176 Md. at 296-97 (holding that Baltimore could set an earlier deadline than State law for applications for a tax exemption).

In contrast, in *Heubeck v. Mayor & City Council of Baltimore*, we struck down a Baltimore City ordinance prohibiting landlords from initiating litigation to evict tenants who continued to pay rent after the termination of a lease because it conflicted with a State law authorizing landlords to file tenant holding over actions to evict tenants.  205 Md. 203, 210-11 (1954).  There, the City ordinance purported to prohibit what State law expressly permitted.  *Id.*

Local jurisdictions also may not permit what State law prohibits.  Thus, in *Levering v. Williams*, we held that a Baltimore City ordinance permitting professionals to play baseball on Sundays conflicted with a State law declaring that "no person whatsoever shall work or do any bodily labor on . . . Sunday[.]"  134 Md. 48, 53, 60 (1919).

As in *Sitnick*, *National Asphalt*, and *Hart*, most of the Challengers' allegations of conflict between State law and Chapter 57 are examples of the County supplementing State law, rather than true conflicts.  Requiring firearms dealers to secure firearms during business hours does not conflict with State law requiring them to be secured at other times.[13]  And ensuring that minors do not have access to ghost guns in certain circumstances does not conflict with State law ensuring that minors do not have access to

---

[13] For this reason, although the circuit court did not err in addressing § 57-11(d), *see* discussion above at 17, we nonetheless conclude that the court erred in striking down § 57-11(d) on the merits because it is not in conflict with State law.

46

firearms in other circumstances.  Accordingly, other than as specifically discussed next, we reject the Challengers' arguments concerning conflict preemption.

Two categories of alleged conflict preemption challenges merit more analysis.  First, the Challengers contend that the County's removal of the exception previously in § 57-11(b) for holders of State-issued wear-and-carry permits places that provision in conflict with Criminal Law § 4-203.  Second, the Challengers argue that aspects of the County's regulation of ghost guns in §§ 57-7 and 57-11 conflict with a recent State law regulating such firearms.

### i.   Alleged Conflict with State Law Regulating Permit Holders

Before the Amendments, § 57-11(b)(5) excepted all holders of State-issued wear-and-carry permits from the restrictions contained in § 57-11(a).  Chapter 57, § 57-11(b)(5) (2021).  The Challengers argue that the removal of that exception places § 57-11(a) in conflict with § 4-203 of the Criminal Law Article.

Section 4-203(a) broadly prohibits the "wear, carry, or transport [of] a handgun, whether concealed or open, on or about the person" or "in a vehicle traveling on a road or parking lot generally used by the public, highway, waterway, or airway of the State[.]" Section 4-203(b) carves out several exceptions to that general prohibition, three of which are particularly relevant here:

> (b) This section does not prohibit:
>
> . . .

47

(56)

(2) the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

. . .

(6) the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;

(7) the wearing, carrying, or transporting of a handgun by a supervisory employee:

> (i) in the course of employment;
>
> (ii) within the confines of the business establishment in which the supervisory employee is employed; and
>
> (iii) when so authorized by the owner or manager of the business establishment[.]

The Challengers contend that § 57-11 conflicts with each of these exceptions because it now contains no exception for permit holders and because the exceptions in § 57-11 related to homes and businesses are significantly narrower than the exceptions in § 4-203(b)(6) and (7). In particular, § 57-11(b)(3) excepts "the possession of a firearm or ammunition, other than a ghost gun or an undetectable gun, in the person's home," but not on other real estate the person owns, leases, or resides in, as does § 4-203(b)(6). And § 57-11(b)(4) excepts only "the possession of one firearm, and ammunition for the firearm, at a business by either the owner who has a permit to carry the firearm, or one authorized employee of the business who has a permit to carry the firearm[.]" That exception does not apply to carry in a business establishment the person owns or leases, as does

48

(57)

§ 4-203(b)(6), or by a supervisory employee when authorized by the owner or manager, as does § 4-203(b)(7).

Resolving these challenges requires us to determine whether the exceptions in Criminal Law § 4-203(b)(2), (6), and (7), function as carve-outs from a general prohibition, like the exception in *Sitnick* for taverns, or affirmative grants of permission to engage in the conduct described, like the authorization to file a tenant holding over action at the end of a lease term at issue in *Heubeck*.

For three reasons, we conclude that the exceptions in § 4-203(b)(2), (6), and (7) function as carve-outs from the general prohibition against the carry of handguns in § 4-203(a).  First, that conclusion best fits the plain language of § 4-203(b), which does not provide the holders of carry permits with an affirmative right, but instead states only what "[t]his section does not prohibit[.]".[14]  Second, that conclusion also best matches the structure of the statutory scheme, which identifies a broad prohibition and several specific exceptions.  Third, the provisions now codified in § 4-203 existed at the time the General Assembly authorized local jurisdictions to regulate possession of firearms within 100 yards of or in schools, churches, parks, public buildings, and other places of public assembly. Nothing about the statutory scheme or legislative history suggests that the General Assembly intended to mandate that local jurisdictions allow permit holders to carry

---

[14] The provisions of the Public Safety Article relating to handgun carry permits similarly describe a permit as being required to carry a handgun, but not as establishing an entitlement or right to do so.  *See, e.g.*, Pub. Safety § 5-303 ("A person shall have a permit issued under this subtitle before the person carries, wears, or transports a handgun.").

49

(58)

concealed firearms in or in close proximity to, for example, schools and courthouses.  We see no conflict between the exceptions in § 4-203(b)(2), (6), and (7) and § 57-11 as amended.[15]

### ii.  *Alleged Conflict with State Law Regulating Ghost Guns*

The Challengers further contend that the new ghost gun provisions added to Chapter 57 conflict with a recent State law.  The County first regulated ghost guns in 2021.  In 2022, the State regulated ghost guns for the first time, through provisions codified at §§ 5-701 through 5-703 of the Public Safety Article.  *See* 2022 Md. Laws, Chs. 18, 19.  Later that same year, the County amended the ghost gun provisions in Chapter 57 to more closely conform with the new State law.  *See* 2022 L.M.C., Ch. 36, § 1.  The Challengers contend that the remaining differences in the two schemes place Chapter 57 in conflict with the State law.  We begin by exploring the differences between the two schemes.

The County defines ghost gun to mean:

a firearm, including an unfinished frame or receiver, that:

(A) lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker or importer in accordance with federal law; and

---

[15] As discussed above in footnote 11, in 2023, the General Assembly enacted § 4-111 of the Criminal Law Article, which prohibits carry of firearms, including by holders of State-issued wear-and-carry permits, in several types of locations, including schools, government-owned buildings, and healthcare facilities.  The General Assembly thus does not see any conflict between the State's carry permit scheme and legislation prohibiting carry in specific locations even by holders of those permits.

50

(59)

> (B) lacks markings and is not registered with the Secretary of the State Police in accordance with Section 5-703(b)(2)(ii) of the Public Safety Article of the Maryland Code.
>
> "Ghost gun" does not include a firearm that has been rendered permanently inoperable, or a firearm that is not required to have a serial number in accordance with the Federal Gun Control Act of 1968.

Chapter 57, § 57-1 (2025). In essence, a ghost gun for purposes of Chapter 57 is a firearm that is required by federal law to contain a serial number on its frame or receiver and that has neither a serial number nor alternative markings made in accordance with State law.[16]

Currently, Chapter 57 regulates ghost guns in both §§ 57-7 and 57-11. Section 57-7 contains three such provisions. As we already held § 57-7(d) to be preempted, *see* above at 39-40, we will not discuss that further here. Section 57-7(c) prohibits an individual from providing a ghost gun or a major component of a ghost gun to a minor. And § 57-7(e) prohibits an individual from leaving a ghost gun or a major component of a ghost gun in a location that the person knows or should know is accessible to a minor. For purposes of Chapter 57, a "major component" includes "the slide or cylinder or the frame or receiver" of any firearm and the barrel of a rifle or shotgun. *Id.* § 57-1.

---

[16] The terms "frame" and "receiver" are defined in 27 C.F.R. § 478.12. A "frame" is the part of a handgun "that provides housing or a structure for the component . . . designed to hold back the hammer, striker, bolt, or similar primary energized component prior to initiation of the firing sequence[.]" *Id.* § 478.12(a)(1). A "receiver" is the part of a long gun "that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence." *Id.* § 478.12(a)(2). The regulation provides helpful illustrations of both frames and receivers. *See id.* § 478.12(a)(4).

Section 57-11 now includes a ghost gun and a major component of a ghost gun among the types of firearms that cannot be sold, transferred, possessed, or transported in or within 100 yards of a place of public assembly.  That regulation treats ghost guns like any other type of handgun, rifle, or shotgun, with one difference:  There is no exception allowing a ghost gun to be possessed in a person's own home.  Thus, the County bans the sale, possession, transfer, or transport of a ghost gun in or within 100 yards of a place of public assembly, even if that area includes one's own home.

Maryland law does not use the term "ghost gun."  However, § 5-703 of the Public Safety Article generally:  (1) prohibits the purchase, receipt, sale, offer to sell, and transfer of an unfinished frame or receiver unless it is required by federal law to be imprinted with a serial number and has been so imprinted, Pub. Safety § 5-703(a)(1); and (2) prohibits the sale, offer to sell, transfer, or possession of a firearm unless it either (a) has been imprinted with a serial number if required to be so under federal law; or (b) has been registered with the Secretary of the Maryland State Police and imprinted with a unique number that includes the zip code and initials of the owner or person who made the firearm, *id.* § 5-703(a)(2), (b)(2).  Section 5-703 contains several relevant exceptions, including for the possession of such a firearm by a person who:  (1) neither knew nor reasonably should have known that it was not imprinted with a serial number; (2) inherited it, for a period not exceeding 30 days; or (3) made or manufactured it, for a period not exceeding 30 days.  *Id.* § 5-703(b)(1).

52

(61)

The Challengers identify three primary alleged conflicts arising from the differences between Chapter 57 and Public Safety § 5-703.  First, they claim that under § 57-7(c), but not State law, minors are prohibited from having access to major components of ghost guns.  The Challengers point out that although § 57-1 defines "major component" to include a slide, cylinder, or barrel of a firearm, in addition to a frame or receiver, federal and State law require only the frame or receiver to be serialized or marked.  And because components of firearms are often interchangeable, a slide, cylinder, or barrel that is not currently attached to a frame or receiver could just as easily be attached to a serialized frame or receiver as one that is not serialized.  Thus, the Challengers argue, a major component of a ghost gun can be the same as, and completely interchangeable with, a major component of a serialized firearm.

The inclusion of major components of ghost guns in Chapter 57 does not create a conflict with State law.  Chapter 57 simply regulates something the State law does not.  Nonetheless, the Challengers have identified a potential difficulty in the application of Chapter 57.  Because of their interchangeability, an unattached slide, cylinder, or barrel will sometimes, perhaps often, not be readily identifiable as a major component of either a ghost gun or a firearm that is not a ghost gun.  In such circumstances, because such a component could not be identifiable as a major component of a ghost gun, it would not be prohibited under Chapter 57.  In other words, § 57-7 regulates items that *are* major components of ghost guns, not items that *could become* major components of ghost guns.  Any challenge based on the difficulty of determining whether a particular slide, cylinder,

53

(62)

or barrel is a major component of a ghost gun will be more appropriately addressed on a case-by-case basis. *Cf. Pizza di Joey, LLC v. Mayor & City Council of Baltimore*, 470 Md. 308, 361 (2020) (noting that when a person asserts a facial vagueness challenge to a statute, the person "must establish that there is no set of circumstances under which the [statute] would be constitutional" (alteration in original) (quoting *Motor Vehicle Admin. v. Seenath*, 448 Md. 145, 181 (2016))).

Second, the Challengers argue that there is a conflict between Chapter 57 and State law concerning the possession and transport of ghost guns in certain circumstances. Specifically, the Challengers note that under § 57-11, individuals are prohibited from having a ghost gun in a home that is located within 100 yards of a place of public assembly for any length of time or from transporting a ghost gun through such areas. By contrast, State law provides a 30-day grace period to get a firearm serialized in two circumstances: (1) after inheriting it; and (2) after making or manufacturing it. Pub. Safety § 5-703(b)(1)(ii), (iii). Thus, the Challengers argue, the State scheme contemplates the transport of ghost guns to a federal firearms licensee for serialization.

The Challengers have again identified a difference but not a conflict with State law. The 30-day grace periods included in Public Safety § 5-703(b)(1) operate as exceptions from the general prohibition against ownership of ghost guns, not as extensions of an affirmative right to possess ghost guns in those circumstances for that period. And they certainly do not establish a right to possess ghost guns in or within 100 yards of a place of public assembly or to make them available to minors. In any event, we agree with the

54

(63)

County that Chapter 57, in requiring the serialization of firearms for lawful possession in a home located within 100 yards of a place of public assembly, also contemplates the lawful transport of ghost guns for serialization. [17]

Third, the Challengers contend that Chapter 57 conflicts with Public Safety § 5-703(b)(2) because the latter permits possession of firearms serialized by federally licensed firearms dealers, while Chapter 57 does not. State law permits possession of firearms if serialized in accordance with federal law by a federally licensed firearms manufacturer, importer, "or other federal licensee authorized to provide marking services." Pub. Safety § 5-703(b)(2). Federal regulations permit licensed dealers to provide such services. 27 C.F.R. § 478.92(a)(2). In contrast, Chapter 57 defines a ghost gun as one lacking serialization in accordance with federal law "by a licensed manufacturer, maker or importer[,]" omitting federal firearm dealers. Chapter 57, § 57-1 (2025). Chapter 57 thus appears to reject serialization by federally licensed firearms dealers in conformance with federal serialization requirements as a mechanism to make an unserialized firearm legitimate. [18]

---

[17] At oral argument, the County disavowed any interpretation of Chapter 57 that would prohibit an individual from transporting a ghost gun for the purpose of having it imprinted with a serial number.

[18] Both State law and Chapter 57 recognize an alternate pathway to rendering lawful firearms that lack serial numbers in compliance with federal law, which is the separate marking and registration system provided by Public Safety § 5-703(b)(2)(ii). Those markings may be "imprinted by a federally licensed firearms dealer," among others. *Id.* § 5-703(b)(2)(ii)(1).

We agree with the Challengers that a conflict exists between § 5-703(b)(2) and Chapter 57 to the extent that Chapter 57, read literally, would not recognize serialization by a federally licensed firearms dealer in accord with federal requirements as sufficient. Although the County can regulate the possession of firearms that are not compliant with federal and State law to the extent of its authority under § 4-209(b), it cannot dictate who may render those firearms compliant with federal and State law in a manner that is inconsistent with those authorities. On remand, the circuit court should enjoin the County from enforcing the ghost-gun-related provisions of §§ 57-7 and 57-11(a) with respect to firearms that have been serialized by firearms dealers in compliance with federal and State law. Otherwise, Chapter 57 is not in conflict with State law.

**B.    Local Law**

The Challengers also contend that Chapter 57, as amended in 2021 and 2022, violates Article XI-A of the Maryland Constitution because it is not substantively a local law. As discussed above, Article XI-A provides charter counties legislative authority to enact local laws to the extent the General Assembly has authorized them. Through the Express Powers Act, the General Assembly has authorized charter counties to enact local laws that promote "the peace, good government, health, and welfare of the county." Local Gov't § 10-206(a)(2). However, that authority is limited to enacting "local laws," as distinct from general laws. Md. Const. art. XI-A, § 4; *Baltimore City Bd. of Elections v. Mayor & City Council of Baltimore*, 489 Md. 465, 478 (2025) (observing that while the Home Rule Amendment gives "local jurisdictions the ability to share . . . powers formerly

56

(65)

reserved to the General Assembly[,]" it cabins counties' jurisdiction to local laws). Even an act of the General Assembly cannot validly authorize a county to pass a general law. *Holiday Universal, Inc. v. Montgomery County*, 377 Md. 305, 318-19 (2003).

A general law ordinarily deals with "a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Id.* at 315 (quoting *Steimel v. Bd. of Election Supervisors of Prince George's County*, 278 Md. 1, 5 (1976)). By contrast, a local law "applies to only one subdivision" and "pertains only to a subject of local import." *Tyma v. Montgomery County*, 369 Md. 497, 507 (2002). "[W]hether a law is general or local is 'to be determined by the application of settled legal principles to the facts of particular cases in which the distinction may be involved.'" *Id.* at 508 (quoting *Dasch v. Jackson*, 170 Md. 251, 260 (1936)).

This Court looks "beyond the form of the ordinance to its substance" because "'some statutes, local in form,' are [effectively] 'general laws[.]'" *Holiday Universal*, 377 Md. at 315 (quoting *Cole v. Sec'y of State*, 249 Md. 425, 434 (1968)). A law is not local "merely because its operation is confined to . . . a single county[.]" *Gaither v. Jackson*, 147 Md. 655, 667 (1925). "Where a charter county attempts to enact an ordinance on 'matters of significant interest to the entire state,' [this Court has] determined that it is not, in fact, 'a local law' under Article XI-A." *Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*, 480 Md. 394, 425 (2022) (quoting *McCrory Corp. v. Fowler*, 319 Md. 12, 19 (1990)). Thus, a law that is executed in only one county but "substantially affects persons and entities outside of" the county is not a local law. *Holiday Universal*, 377 Md. at 319.

57

(66)

We have recognized that distinction for more than a century. In *Bradshaw v. Lankford*, for example, we addressed a law authorized by the General Assembly that submitted to the voters of Somerset County the question of whether to prohibit the taking of oysters from the County's waters.[19]  73 Md. 428, 429 (1891).  We held that the enactment was "in no sense" a local law. *Id.* at 431.  Although purportedly limited to the waters of Somerset County, the Court observed that the law would "deprive[] the people of the entire State of the common right which they enjoyed to take oysters by scoop or dredge within the waters of [Somerset] County." *Id.*  This made the law, in effect, a general law. *Id.* at 431-32.  We noted that a law is local only when it is both "local in [its] operation, and affect[s only] the people" who live in the county. *Id.* at 431.

In *Gaither v. Jackson*, this Court addressed changes Baltimore City made to local laws regulating the conduct of auctions and auctioneers in the City.  147 Md. at 664.  The issue was whether the changes were authorized under the City's authority to revise local laws that had been in existence at the time it adopted home rule. *Id.* at 663-64.  The changes included the transfer of authority over auctions from a State-controlled board to a City-controlled board and a requirement that payments for auction licenses be made to the City, rather than the State. *Id.* at 664.  We observed that "the mere designation of a law as a

---

[19] The issue in *Bradshaw* was whether the General Assembly had the power to submit to the voters of Somerset County the question of whether it should be "unlawful for any person to take oysters by scoop or dredge within the waters of said county."  73 Md. at 429.  The answer turned on whether the law to be enacted was a local law, limited in effect to Somerset County, or a general law. *Id.*  Because we determined that the law had general effect, it could not be decided by the voters of Somerset County. *Id.* at 432.

58

(67)

local law or its treatment as such by the General Assembly does not make it a local law for all purposes," and that "a law is not necessarily a local law merely because its operation is confined to Baltimore City or to a single county, if it affects the interests of the people of the whole State." *Id.* at 667. Because the effect of the City's amendments would have been to shift a revenue stream from the State to the City, which would necessarily have effect on the State as a whole, we held that the amendments were beyond the City's authority. *Id.*; *see also Dasch*, 170 Md. at 261 (determining that a State law regulating the conduct of paper hangers in Baltimore City was a general law because it directed funds raised by licensing fees to be deposited in the general treasury of the State and because it affected the rights of persons not residing in the City).

And in *Holiday Universal, Inc. v. Montgomery County*, we held unconstitutional a Montgomery County ordinance making it unlawful to engage in unfair trade practices related to future service contracts. 377 Md. at 308. The ordinance applied to any "future service contract where the performance of the contract" was "'primarily' in Montgomery County or, regardless of where performance [would take] place, when the contract [was] merely signed in Montgomery County." *Id.* at 307-08. We held "that, because of its significant extraterritorial impact, the ordinance is not a 'local law'" and so was beyond the authority of the County to enact. *Id.* at 308.

By contrast, in *Cole v. Secretary of State*, we held that a law enacted by the General Assembly that substituted "a people's court for a system of justices of the peace, constables, and magistrates" in Cecil County was a local law because "in subject matter

59

(68)

and substance it [was] a law which is confined in its operation to prescribed territorial limits, equally applicable to all persons within such limits."[20]  249 Md. at 426, 435.

Similarly, in *Tyma v. Montgomery County*, we upheld as a valid local law a Montgomery County ordinance "extend[ing] employment benefits to the domestic partners of county employees."  369 Md. at 500.  We observed that the ordinance "affects only the personnel policies of Montgomery County and does not implicate the State's interest in marriage or affect the State's ability to regulate marriage on a statewide basis."  *Id.* at 515.

The Challengers contend that Chapter 57, as amended, while local in form, is not local in effect.  They argue that the cumulative effect of the amendments to Chapter 57—especially the expanded definition of place of public assembly and the elimination of the exception for permit holders from the restrictions in § 57-11(a)—prohibits all permit holders from carrying their firearms in a substantial portion of Montgomery County, including the State and county highways running through the County.

---

[20] At the time the General Assembly enacted the legislation under review in *Cole*, Cecil County was not a charter county and so the General Assembly retained authority to enact local laws for the county. *See* Local Gov't §§ 10-102, 10-202 (granting charter counties the right to enact local laws); Cheryl Mattix, *Charter Government Finally Prevails in Cecil County*, Cecil Whig (Nov. 3, 2010), https://www.cecildaily.com/business/charter-government-finally-prevails-in-cecil-county/article_1b18d654-e756-11df-adb9-001cc4c002e0.html, *archived at* https://perma.cc/JMU8-23UW (noting that the Cecil County Charter was passed in 2010 and took effect in 2012).  At issue in *Cole* was the number of votes required to petition the legislation to referendum.  249 Md. at 427-28.  If the law was a local law, the petitioners had met the threshold; if it was a general law, they had not.  *Id.*

The County does not really dispute the Challengers' contentions concerning the effect of the Amendments to Chapter 57 on the ability of permit holders to carry firearms in or while traveling through the County. When questioned at oral argument about whether § 57-11(a) applies to a permit holder driving through the County on a State highway within 100 yards of a place of public assembly, the County asserted that it does. According to the County, permit holders traveling through the County could comply with the law by either (1) identifying all places of public assembly in the County, creating maps identifying the areas in which carry is prohibited, and avoiding those areas, or (2) placing their firearms in an enclosed case or locked firearms rack as permitted in § 57-11(b)(5)(A).

We hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly. In effect, the County's regulation creates pockets of roadway throughout the County's lengthy and complex highway system in which travelers with State-issued wear-and-carry permits are banned from carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible from the road. That highway system carries large volumes of traffic coming from or going to the seven jurisdictions directly bordering the County—Prince George's, Frederick, Carroll, and Howard Counties in Maryland; Fairfax and Loudoun Counties in Virginia; and Washington, D.C.—including traffic originating in other locations throughout Maryland and beyond. Indeed, highways passing through Montgomery County such as Interstates 495 and 270, US Route 29, and State Route 97

61

(70)

serve as primary corridors of travel for much of the State of Maryland into Washington, D.C. and portions of Virginia, and vice versa.[21]  Applying the County's regulation in that way imposes a burden on travel "of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state."[22]  *Holiday Universal*, 377 Md. at 315 (quoting *Steimel*, 278 Md. at 5).

The County's proposed solutions do not solve its State constitutional problem.  To the contrary, both options burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders.  As currently constructed, § 57-11(a) has significant extraterritorial impact. Therefore, it is not a local law and is beyond the authority of the County.

---

[21] This list of such highways is intended to be illustrative, not exclusive, as the impact of § 57-11(a) on non-Montgomery County residents traveling on such highways in Montgomery County is alone sufficient for us to conclude that § 57-11(a) is not a local law. Because our other holdings in this opinion ensure that any revised version of § 57-11(a) will necessarily be different from the version before us, we will not venture further with our local law analysis of the current ordinance. This opinion should not be construed to suggest, one way or the other, whether similar concerns would exist with respect to any other highway in Montgomery County under any revised version of the ordinance. *See* footnote 23.

[22] Although our State Constitution would prevail to the extent of any conflict with a State statute, we note that we see no genuine conflict between this result and the intent underlying § 4-209(b)(1) of the Criminal Law Article.  The clear intent underlying the statute is to authorize local regulation of firearms where they pose localized threats, i.e., when possessed within 100 yards of or in a place of public assembly.  It seems unlikely that the General Assembly had travelers riding in vehicles on public highways, with little or no access to the locations they are passing, in mind in carving out that exception.

We decline to offer any opinion concerning the Challengers' other contentions that Chapter 57, as amended, is not a local law. We have held that several portions of Chapter 57 are invalid. Given that the scope of any revised ordinance the County may enact will differ from that currently under review, any further review of the County's authority should await such a revised ordinance.[23]

In sum, we hold that § 57-11(a), as amended and currently constructed, is not a local law, and so is beyond the legislative authority of the County.

## III.  TAKING

The Challengers' final contention is that § 57-11's regulation of ghost guns and their major components is a taking under Article III, § 40 of the Maryland Constitution without just compensation and a deprivation of property without due process under Article 24 of the Maryland Declaration of Rights. The circuit court, without explanation or analysis, agreed. We do not.

A taking occurs when a governmental entity physically appropriates property from its owner and thus the government is required to compensate the property owner. *Serio v. Baltimore County*, 384 Md. 373, 399 (2004). A regulation can also amount to a taking when an owner (1) suffers permanent physical invasion of their property because of the

---

[23] Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways should not be interpreted as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law. Any determination of whether an amended § 57-11(a) is a local law will depend on the scope of the amended law and evidence concerning its effects.

63

(72)

regulation, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982), or (2) is denied all economically beneficial or productive use of the land, *Assateague Coastal Trust, Inc. v. Schwalbach*, 448 Md. 112, 128 (2016).  Outside of those two categories, "most regulatory takings cases should be resolved by balancing the public and private interests at stake, considering three primary factors: (1) the economic impact of the regulation on the claimant, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action." *Neifert v. Dep't of Env't*, 395 Md. 486, 517 (2006).

Here, we need not engage in that analysis because, for three reasons, the circuit court erred in determining that the Amendments constituted a taking of ghost guns.  First, the circuit court declared the portions of Chapter 57 regulating ghost guns to be invalid and enjoined their enforcement.  Unenforceable laws cannot accomplish a taking, at least not a permanent one,[24] and the Challengers cannot receive compensation for something they did not lose.

Second, the Amendments did not require the owners of ghost guns who wanted to possess them in or within 100 yards of a place of public assembly to surrender them; it simply required that they either keep them in other locations or get them serialized.  *See* Chapter 57, §§ 57-1, 57-11 (2025).  Other than the Challengers' flawed argument that the

---

[24] The Challengers did not make a temporary takings claim, for which damages are measured "between the initial taking and the time that the property is returned or restored." *See Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Highway Admin.*, 388 Md. 500, 511 (2005).

64

(73)

ordinance prohibits them from getting ghost guns serialized, *see discussion above* at 54-55, neither the Challengers nor the circuit court explained how a serialization requirement could amount to a taking.

Third, by the time the circuit court ruled, the State had enacted legislation generally banning most ghost guns everywhere in the State, with minor exceptions. *See* Pub. Safety §§ 5-701 – 5-703. The Challengers have not presented any viable argument that the relatively minor differences between the State and County regulations effected a taking.

## CONCLUSION

First, we hold that the circuit court erred in awarding the Challengers relief with respect to § 57-10 of the County Code.

Second, we hold that Criminal Law § 4-209(b)(1) has not been abrogated, and that it authorizes local regulation of firearms, as relevant here, with respect to minors and within 100 yards of or in a park, church, school, public building, and other place of public assembly.

Third, we hold that the County exceeded its authority under Criminal Law § 4-209(b)(1)(iii) when it included within the definition of a place of public assembly the following locations: hospital, community health center, long-term facility, childcare facility, government building (as defined), and gathering of individuals without regard to the place in which they are gathering. The other locations the County includes in its definition of place of public assembly in § 57-1 fall within the authorization of § 4-209(b)(1)(iii).

65

(74)

Fourth, we hold that the County exceeded its authority under Criminal Law § 4-209(b)(1)(i) in adopting § 57-7(d) of the County Code. The remainder of § 57-7 is authorized by § 4-209(b)(1)(i) and is severable from § 57-7(d).

Fifth, we hold that the provisions of Chapter 57 that are authorized by § 4-209(b)(1) are not preempted by implied field preemption.

Sixth, we hold that the definition of "ghost guns" in § 57-1 conflicts with State law to the extent it includes firearms that have been serialized in compliance with federal and State law. Accordingly, the provisions of §§ 57-7 and 57-11(a) addressing ghost guns are preempted to the extent they purport to apply to firearms that have been serialized by firearms dealers in compliance with federal and State law. Otherwise, §§ 57-7 and 57-11(a), (b), and (d) are not preempted by conflict with State law.

Seventh, we hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly.

Eighth, we hold that the amendments to Chapter 57 of the County Code did not effect a taking in violation of the Constitution of Maryland.

66

(75)

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND VACATED WITH INSTRUCTIONS TO AFFIRM IN PART AND REVERSE IN PART THE DECISION OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND TO THAT COURT WITH INSTRUCTIONS TO ENTER JUDGMENT AND AWARD DECLARATORY AND INJUNCTIVE RELIEF CONSISTENT WITH THIS OPINION; COSTS TO BE PAID TWO-THIRDS BY THE RESPONDENT AND ONE-THIRD BY THE PETITIONER.**

(76)

# Climate Assessment

**Office of Legislative Oversight**

## EXPEDITED BILL 23-26:   WEAPONS – RESTRICTIONS ON GHOST GUNS NEAR MINORS AND CARRYING OF FIREARMS IN OR NEAR PLACES OF PUBLIC ASSEMBLY

## SUMMARY

The Office of Legislative Oversight (OLO) anticipates Expedited Bill 23-26 will likely have no impact as it is proposing changes to restrictions on ghost guns which is not expected to impact the County's contribution to climate change.

## BACKGROUND AND PURPOSE OF EXPEDITED BILL 23-26

"Ghost guns" are commonly understood as homemade firearms using 3D printers that lack serial numbers and are therefore untraceable under traditional gun-tracking systems.[1]

In 2021 and 2022, the Council passed Bills 4-21 and 21-22E to regulate "ghost guns" and other firearms. This included restrictions within 100 yards of public gathering places and rules involving minors. On April 28, 2026, the Maryland Supreme Court ruled in *Engage Armament, LLC v. Montgomery County*. The ruling upheld some parts of these laws while determining that others go beyond the County's authority or are overridden by state law.[2]

The purpose of Expedited Bill 23-26 is to align County law with the Supreme Court's opinion in *Engage Armament.* If enacted, Bill 23-26 would:[3]

- **Clarify the definition of "ghost gun."**  The Bill would update the definition to clarify that it does not apply to firearms with a unique serial number by a federally licensed firearms dealer.

- **Update the definition of "place of public assembly."** The Bill would remove the following from the definition of "place of public assembly," where firearms are prohibited in or within 100 yards: hospital, community health center, long-term facility, childcare facility, and a gathering of individuals to collectively express their constitutional right to protest or assemble. The Bill would also clarify that a government building "open to the public for the business of government or community use" is a place of public assembly.

- **Remove provision on ghost guns in the presence of minors.**  The Bill would remove the provision that "A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor."

- **Add exemption for individuals with wear-and-carry permits traveling through the County.** For the prohibition on firearms in a place of public assembly, the Bill would add an exemption for "the

(77)

possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly."

- **Remove certain regulations on gun shop operations.** The Bill would remove certain regulations on gun shop operations. These are described in Figure A (Appendix).[4]

## ANTICIPATED IMPACTS

As the Bill proposes restrictions on ghost guns , OLO anticipates Expedited Bill 23-26 will have no impact on the County's contribution to addressing climate change, including the reduction and/or sequestration of greenhouse gas emissions and community climate resilience.

## RECOMMENDED AMENDMENTS

The Climate Assessment Act requires OLO to offer recommendations, such as amendments or other measures to mitigate any anticipated negative climate impacts.[5] OLO does not offer recommendations or amendments as Expedited Bill 23-26 is likely to have little to no impact on the County's contribution to addressing climate change, including the reduction and/or sequestration of greenhouse gas emissions and community climate resilience.

## CAVEATS

OLO notes two caveats to this climate assessment. First, predicting the impacts of legislation upon climate change is a challenging analytical endeavor due to data limitations, uncertainty, and the broad, global nature of climate change. Second, the analysis performed here is intended to inform the legislative process, not determine whether the Council should enact legislation. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the bill under consideration.

## PURPOSE OF CLIMATE ASSESSMENTS

The purpose of the Climate Assessments is to evaluate the anticipated impact of legislation on the County's contribution to addressing climate change. These climate assessments will provide the Council with a more thorough understanding of the potential climate impacts and implications of proposed legislation, at the County level. The scope of the Climate Assessments is limited to the County's contribution to addressing climate change, specifically upon the County's contribution to greenhouse gas emissions and how actions suggested by legislation could help increase the County's community climate resilience.

While co-benefits such as health and cost savings may be discussed, the focus is on how proposed County bills may impact GHG emissions and community resilience.

**Office of Legislative Oversight**          2

## CONTRIBUTIONS

OLO staffer Kaitlyn Simmons drafted this assessment.

## APPENDIX

**Figure A. Removal of Regulations on Gun Shop Operations in Bill 23-26**

*If enacted, Bill 23-26 would remove the following regulations on gun shop operations from County law:[6]*

Notwithstanding subsection (a), a gun shop owned and operated by a firearms dealer licensed under Maryland or federal law on January 1, 1997, may conduct regular, continuous operations after that date in the same permanent location under the same ownership if the gun shop:

(1) does not expand its inventory (the number of guns or rounds of ammunition displayed or stored at the gun shop at one time) or square footage by more than 10 percent, or expand the type of guns (handgun, rifle, or shotgun) or ammunition offered for sale since January 1, 1997;

(2) has secure locks on all doors and windows;

(3) physically secures all ammunition and each firearm in the gun shop (such as in a locked box or case, in a locked rack, or with a trigger lock);

(4) has adequate security lighting;

(5) has a functioning alarm system connected to a central station that notifies the police; and

(6) has liability insurance coverage of at least $1,000,000.

---

[1] Rina Torchinsky, "The Biden administration is regulating 'ghost guns.' Here's what the rule does," NPR, April 12, 2022.
[2] See Christine Wellons to County Council, Memorandum, May 7, 2026, in Introduction Staff Report for Expedited Bill 23-26.
[3] Ibid. pgs. 2-4.
[4] Expedited Bill 21-23, Introduction Staff Report for Expedited Bill 23-26, pgs. (5)-(6).
[5] Bill 3-22, Legislative Branch – Climate Assessments – Required, Montgomery County Council, Effective date October 24, 2022
[6] Expedited Bill 21-23, Introduction Staff Report for Expedited Bill 23-26, pgs. (5)-(6).



# Fiscal Impact Statement

Office of Management and Budget

| **Bill 23-26** | **Weapons - Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly** |
|---|---|
| **Bill Summary** | Bill 23-26 amends existing law to conform with a recent Maryland Supreme Court ruling regarding the regulation of ghost guns in Montgomery County. Based on the court's findings, the definitions for "ghost gun" and "place of public assembly" are clarified, as well as an exemption for an individual possessing a ghost gun while traveling through the County on a public highway. In addition, the court found that prohibiting the sale of a ghost gun in the presence of a minor is preempted by State law, and that section is deleted. |
| **Fiscal Impact Summary** | Bill 23-26 clarifies existing law to conform with a Maryland Supreme Court ruling and is not expected to impact revenues and expenditures. |
| **Fiscal Impact Analysis** | Bill 23-26 amends four sections of County law to conform with a Maryland Supreme Court ruling concerning ghost guns. Three amendments are clarifications of existing law and the fourth deletes a paragraph concerning the sale of a ghost gun in the presence of a minor. None of these amendments are expected to impact revenues or expenditures. |
| **Staff Impact** | The bill is not expected to impact staff time or duties. |
| **Actuarial Analysis** | The bill is not expected to impact retiree pension or group insurance costs. |
| **Information Technology Impact** | The bill is not expected to impact the County Information Technology (IT) or Enterprise Resource Planning (ERP) systems. |
| **Other Information** | |
| *Later actions that may impact revenue or expenditures if future spending is projected* | The bill does not authorize future spending. |
| *Contributors* | Amy Costanza, Montgomery County Police Department<br>Taman Morris, Montgomery County Police Department<br>Richard H. Harris, Office of Management and Budget. |



(80)

# Economic Impact Statement

**Montgomery County, Maryland**

## Expedited Bill 23-26, Weapons – Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly

## Summary

The Office of Legislative Oversight (OLO) anticipates that Expedited Bill 23-26 would have an insignificant impact on economic conditions in the County, as measured by the Council's priority economic indicators. The Bill would amend the County Code to conform to the Maryland Supreme Court's recent decision concerning "ghost guns." OLO does not expect any of the proposed amendments to directly affect the Council's priority indicators.

## Background and Purpose of Expedited Bill 23-26

"Ghost guns" are commonly understood as homemade firearms using 3D printers that lack serial numbers and are therefore untraceable under traditional gun-tracking systems.[1]

In 2021 and 2022, the Council passed Bills 4-21 and 21-22E to regulate "ghost guns" and other firearms, including restrictions within 100 yards of public gathering places and rules involving minors. On April 28, 2026, the Maryland Supreme Court ruled in *Engage Armament, LLC v. Montgomery County* upholding some parts of these laws while determining that others go beyond the County's authority or are overridden by state law.[2]

The purpose of Expedited Bill 23-26 is to align County law with the Supreme Court's opinion in *Engage Armament.* To do so, the Bill would amend County Code Chapter 57, Sections 57-1, 57-7, and 57-11 regarding:

- the definition of "ghost gun";
- the definition of "place of public assembly";
- the possession of ghost guns "in the presence of minors"; and
- the application of the County law to individuals who have wear-and-carry permits from the state.[3]

The Council introduced the Bill on May 12, 2026.

## Information Sources, Methodologies, and Assumptions

As required by Section 2-81B of the Montgomery County Code, this Economic Impact Statement evaluates the impacts of Bill 23-26 on residents and private organizations, using the Council's priority economic indicators as the measure. In doing so, it examines whether the Bill would have a net positive or negative impact on overall economic conditions in the County.[4]

---

[1] Rina Torchinsky, "The Biden administration is regulating 'ghost guns.' Here's what the rule does," NPR, April 12, 2022.
[2] See Christine Wellons to County Council, Memorandum, May 7, 2026, in Introduction Staff Report for Expedited Bill 23-26.
[3] Ibid; and Expedited Bill 23-26 in Introduction Staff Report.
[4] Montgomery County Code, "Sec. 2-81B, Economic Impact Statements."

The Bill would amend the County Code to align with the Maryland Supreme Court's recent opinion related to "ghost guns." None of the proposed amendments would directly affect the Council's priority indicators. Therefore, OLO concludes that the Bill would have no significant impact on economic conditions in the County.

## Variables

Not applicable

## Impacts

**WORKFORCE ▪ TAXATION POLICY ▪ PROPERTY VALUES ▪ INCOMES ▪ OPERATING COSTS ▪ PRIVATE SECTOR CAPITAL INVESTMENT ▪ ECONOMIC DEVELOPMENT ▪ COMPETITIVENESS**

Not applicable

## Discussion Items

Not applicable

## Caveats

Two caveats to the economic impact analysis conducted here should be noted. First, predicting the economic impacts of legislation is a challenging analytical endeavor due to data limitations, the multitude of causes of economic outcomes, economic shocks, uncertainty, and other factors. Second, the analysis performed here is intended to *inform* the legislative process, not determine whether the Council should enact legislation. Thus, any conclusion made in this statement does <u>not</u> represent OLO's endorsement of, or objection to, the Bill under consideration.

## Contributions

Stephen Roblin, PhD (OLO) prepared this report.

# Racial Equity and Social Justice (RESJ) Impact Statement

## Office of Legislative Oversight

## EXPEDITED BILL 23-26: WEAPONS - RESTRICTIONS ON GHOST GUNS NEAR MINORS AND CARRYING OF FIREARMS IN OR NEAR PLACES OF PUBLIC ASSEMBLY

### SUMMARY

Taken together, the Office of Legislative Oversight (OLO) finds the anticipated racial equity and social justice (RESJ) impact of Expedited Bill 23-26 is indeterminate. Most provisions in Bill 23-26 are likely to have a minimal RESJ impact. However, OLO cannot determine the potential impact of removing certain locations as "places of public assembly" (places where firearms are prohibited in or within 100 yards) on racial inequities or disparities in gun violence.

### PURPOSE OF RESJ IMPACT STATEMENTS

RESJ impact statements (RESJIS) evaluate the anticipated impact of legislation on racial equity and social justice in the County. RESJ is a **process** that focuses on centering the needs, leadership, and power of Black, Indigenous, and other People of Color (BIPOC) and communities with low incomes. RESJ is also a **goal** of eliminating racial and social inequities. Applying a RESJ lens is essential to achieve RESJ.[1]  This involves seeing, thinking, and working differently to address the racial and social inequities that cause racial and social disparities.[2]

### PURPOSE OF EXPEDITED BILL 23-26

Ghost guns are commonly understood as homemade firearms using 3D printers that lack serial numbers and are therefore untraceable under traditional gun-tracking systems.[3]

In 2021 and 2022, the Council passed Bills 4-21 and 21-22E to regulate ghost guns and other firearms. This included restrictions within 100 yards of public gathering places and rules involving minors. On April 28, 2026, the Maryland Supreme Court ruled in *Engage Armament, LLC v. Montgomery County*. The ruling upheld some parts of these laws while determining that others go beyond the County's authority or are overridden by state law.[4]

The purpose of Expedited Bill 23-26 is to align County law with the Supreme Court's opinion in *Engage Armament.* If enacted, Bill 23-26 would:[5]

- **Clarify the definition of "ghost gun."**  The Bill would update the definition to clarify that it does not apply to firearms with a unique serial number by a federally licensed firearms dealer.

- **Update the definition of "place of public assembly."** The Bill would remove the following from the definition of "place of public assembly," where firearms are prohibited in or within 100 yards: hospital, community health center, long-term facility, childcare facility, and a gathering of individuals to collectively express their constitutional right to protest or assemble. The Bill would also clarify that a government building "open to the public for the business of government or community use" is a place of public assembly.

- **Remove provision on ghost guns in the presence of minors.**  The Bill would remove the provision that "A person must not purchase, sell, transfer, possess, or transport a ghost gun, including a gun created through a 3D printing process, in the presence of a minor."

**Office of Legislative Oversight**                                                                 **June 8, 2026**

(83)

Case 8:26-cv-02912-DKC    Document 1-4    Filed 07/27/26    Page 93 of 159

- **Add exemption for individuals with wear-and-carry permits traveling through the County.** For the prohibition on firearms in a place of public assembly, the Bill would add an exemption for "the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly."

- **Remove certain regulations on gun shop operations.** The Bill would remove certain regulations on gun shop operations. These are described in Figure A (Appendix).[6]

The Council introduced Expedited Bill 23-26 on May 12, 2026.

This RESJIS builds on the ones for:

- Bill 4-21, Weapons – Protection of Minors and Public Places - Restrictions Against Ghost Guns and Undetectable Guns, which OLO published in February 2021;[7] and

- Expedited Bill 21-22, Weapons – Firearms In or Near Places of Public Assembly, which OLO published in August 2022.[8]

Please refer to the RESJIS for Expedited Bill 21-22 for background on gun violence and racial equity.

## ANTICIPATED RESJ IMPACTS

To consider the anticipated impact of Bill 23-26 on RESJ in the County, OLO recommends the consideration of two related questions:

- Who would primarily benefit or be burdened by this bill?

- What racial and social inequities could passage of this bill weaken or strengthen?

Because of racial inequities like segregation and concentrated poverty, Black and Latinx community members are most impacted by gun violence. To understand how Bill 23-26 could impact RESJ, OLO considered how the proposed changes could impact racial inequities and disparities in gun violence. Figure 1 summarizes the main policy changes from Bill 23-26 and their anticipated RESJ impact based on this assessment.

**Figure 1. Policy Changes in Bill 23-26 and Anticipated RESJ Impacts**

| Policy Change | Anticipated RESJ Impact |
|---|---|
| Clarify the definition of "ghost gun." | **Minimal** – This is a technical change that is not likely to meaningfully impact racial inequities or disparities in gun violence. |
| Update the definition of "place of public assembly" to remove several locations where firearms are prohibited in or within 100 yards. | **Indeterminate** – Advocates generally recommend restrictions on guns in public places as a solution to prevent gun violence.[9] This includes in some locations that would be removed through this Bill. However, empirical research is inconclusive on how gun-free zones impact gun violence.[10] |
| Remove provision that prohibits purchasing, selling, transferring, possessing, or transporting ghost guns in the presence of minors. | **Minimal** – OLO could not find information from advocacy or research that suggests this change would meaningfully impact racial inequities or disparities in gun violence. |

(84)

Case 8:26-cv-02912-DKC    Document 1-4    Filed 07/27/26    Page 94 of 159

| Add exemption for individuals with wear-and-carry permits travelling through the County. | **Minimal** – OLO could not find information from advocacy or research that suggests this change would meaningfully impact racial inequities or disparities in gun violence. |
|---|---|
| Remove certain regulations on gun shop owners. | **Minimal** – According to publicly available information, only a few gun shops in the County appear to meet the requirements for this provision. Therefore, its removal would practically have a minimal impact.[11] |

Taken together, OLO finds the anticipated RESJ impact of Bill 23-26 is indeterminate. Most of the provisions in the Bill are likely to have a minimal RESJ impact. However, OLO cannot determine the potential impact of removing certain locations as "places of public assembly" (places where firearms are prohibited in or within 100 yards) on racial inequities or disparities in gun violence.

## RECOMMENDED AMENDMENTS

The County's RESJ Act requires OLO to consider whether to recommend amendments to bills that could reduce racial and social inequities and advance RESJ.[12] OLO finds the anticipated RESJ impact of Expedited Bill 23-26 is indeterminate. As such, OLO does not offer recommended amendments. However, should the Council seek to improve the RESJ impact of this Bill, OLO offers two policy options for Council consideration:

- **Increase investment in community-based violence intervention programs.** Because of racial inequities like segregation and concentrated poverty, Black and Latinx community members are disproportionately impacted by gun violence.[13] Researchers and advocates highlight community-based violence interruption programs as effective interventions to reduce gun violence in BIPOC communities.[14]

- **Increase investment in efforts to address intimate partner violence against Black women.** The interaction of racial inequities like segregation and concentrated poverty with gender-based inequities puts Black women in particular at a disproportionate risk of gun violence.[15] Specifically, researchers and advocates note that intimate partner violence (IPV) is a significant driver of violence against Black women.[16]  Researchers and advocates highlight increasing funding for culturally-competent, IPV service and prevention programs that primarily serve Black communities and supporting efforts that center Black-women survivors in program, policy and funding decisions as promising practices to prevent IPV against Black women.[17]

## CAVEATS

Two caveats to this RESJIS should be noted. First, predicting the impact of bills on RESJ is challenging due to data limitations, uncertainty, and other factors.  Second, this RESJIS is intended to inform the Council's decision-making process rather than determine it. Thus, any conclusion made in this statement does not represent OLO's endorsement of, or objection to, the bill under consideration.

# RESJ Impact Statement
## Expedited Bill 23-26

### APPENDIX

**Figure A. Removal of Regulations on Gun Shop Operations in Bill 23-26**

*If enacted, Bill 23-26 would remove the following regulations on gun shop operations from County law:*[18]

Notwithstanding subsection (a), a gun shop owned and operated by a firearms dealer licensed under Maryland or federal law on January 1, 1997, may conduct regular, continuous operations after that date in the same permanent location under the same ownership if the gun shop:

(1) does not expand its inventory (the number of guns or rounds of ammunition displayed or stored at the gun shop at one time) or square footage by more than 10 percent, or expand the type of guns (handgun, rifle, or shotgun) or ammunition offered for sale since January 1, 1997;

(2) has secure locks on all doors and windows;

(3) physically secures all ammunition and each firearm in the gun shop (such as in a locked box or case, in a locked rack, or with a trigger lock);

(4) has adequate security lighting;

(5) has a functioning alarm system connected to a central station that notifies the police; and

(6) has liability insurance coverage of at least $1,000,000.

---

[1] Definition of racial equity and social justice adopted from M. Gamblin et al., "Applying Racial Equity to U.S. Federal Nutrition Programs," Bread for the World and Racial Equity Tools.

[2] Ibid.

[3] R. Torchinsky, "The Biden administration is regulating 'ghost guns.' Here's what the rule does," NPR, April 12, 2022.

[4] Introduction Staff Report for Expedited Bill 23-26, Montgomery County Council, Introduced May 12, 2026, pg. 1.

[5] Ibid. pgs. 2-4.

[6] Expedited Bill 21-23, Introduction Staff Report for Expedited Bill 23-26, pgs. (5)-(6). This provision was not addressed in the recent ruling by the Maryland Supreme Court. However, it was previously blocked by a Circuit Court decision. OLO communication with Council staff on May 22, 2026.

[7] RESJIS for Bill 4-21, Office of Legislative Oversight, February 8, 2021.

[8] RESJIS for Expedited Bill 21-22, Office of Legislative Oversight, August 5, 2022.

[9] "Prohibit Guns in Sensitive Areas," Everytown for Gun Safety; "Guns in Public Spaces," Brady; "Location Restrictions," Giffords Law Center to Prevent Gun Violence.

[10] "Effects of Gun-Free Zones on Violent Crime," Gun Policy in America, RAND, updated January 29, 2026.

[11] OLO communication with Office of County Attorney staff on June 4, 2026.

[12] Bill 27-19, Administration – Human Rights – Office of Racial Equity and Social Justice – Racial Equity and Social Justice Advisory Committee – Established, Montgomery County Council.

[13] RESJIS for Expedited Bill 21-22.

[14] S.D. Randolph, et al., "Addressing Systemic Racism and Racialized Violence to Reduce Firearm Injury and Mortality Inequities," JAMA Health Forum, April 4, 2024; "Community Gun Violence," Center for Gun Violence Solutions, John Hopkins Bloomberg School of Public Health; "Impact of Gun Violence on Historically Marginalized Communities," Everytown Research & Policy.

[15] "Black Women in the U.S. Murdered Six Times More Often Than White Women," Columbia University Mailman School of Public Health, February 8, 2024.

**Office of Legislative Oversight**          4          **June 8, 2026**

Case 8:26-cv-02912-DKC   Document 1-4   Filed 07/27/26   Page 96 of 159

[16] S. Gedeon, "Black Femicide: A Silent Public Health Crisis," Connecticut Children's, March 14, 2023.

[17] "Elevating Solutions and Impacts in the Black Community," Let's End DV, Blue Shield of California Foundation; B. Waller, et al., "Caught in the Crossroad: An Intersectional Examination of African American Women Intimate Partner Violence Survivors' Help Seeking," Trauma Violence Abuse, February 18, 2021.

[18] Expedited Bill 21-23, Introduction Staff Report for Expedited Bill 23-26, pgs. (5)-(6).

(87)

**Testimony of Mark W. Pennak, President of Maryland Shall Issue, Inc.,
In Opposition to County Bill 23-26**

**Summary:**

I am counsel and President for Maryland Shall Issue, Inc., and appear today in opposition to Bill 23-26. I am also counsel of record for the petitioners in the Maryland Supreme Court's decision in *Engage Armament, LLC, et al. v. Montgomery County, MD*, --- Md. ---, --- A.3d ----, 2026 WL 1144313 (April 28, 2026). A copy of that decision is attached to the Staff Report for the Bill.

Bill 23-26 is a flawed attempt to bring County law into compliance with the Court's decision in *Engage Armament.* As detailed below, that attempt fails. In so far as the Bill bans firearms completely within 100 yards of places of public assembly or in or on private property held open to the public (including a privately owned library), the Bill also violates the Second Amendment under controlling precedent. Federal court of appeals precedent also makes clear that the Bill's imposition of bans on places of worship likewise violates the Second Amendment. The Bill's bans in other places, such as in "recreational" facilities or at a "multipurpose exhibition facility" are the types of bans under active litigation in the federal courts and will also likely also fail. In so far as it incorporates vague,

1

undefined terms in a criminal statute, the Bill fails under the Due Process Clause of the State and federal Constitutions.[1]

Any suit in federal district court challenging Bill 23-26 will also challenge the County-wide application of Section 57-10 as unauthorized by MD Code, Criminal Law, § 4-209. While *Engage Armament* did not reach Section 57-10, the reasoning of the Court makes clear that the County's power of enact firearms legislation is allowed only to the extent of the authority granted by MD Code, Criminal Law, § 4-209(b)(1). That section cannot be read as allowing the County to enact County-wide restrictions. The federal district court will have ancillary jurisdiction over these State law claims. Should plaintiffs prevail on either the State law claims or the federal Constitutional claim, County will then be liable for equitable relief and substantial attorneys' fees and costs under federal law, 42 U.S.C. § 1988. Those fees will be sought in the *Engage Armament* litigation and will likely be quite substantial.

To be clear, Section 1988 fees are available in cases where state law claims are mixed with federal claims filed under Section 1983, and Section 1988 fees may be awarded even though the plaintiff prevails only on the State law claims. See, e.g.,

---

[1] Bill 23-26 amends Chapter 57 of the County Code. Under Section 57-15, any violation of Chapter 57 (other than for Section 57-8) "is a Class A violation to which the maximum penalties for a Class A violation apply." Under Section 1-19 of the County Code, a Class A violation is punishable by a $1,000 fine and 6 months in jail. Under Section 1-20(c) "[e]ach day any violation of County law continues is a separate offense."

2

*State v. Braverman*, 228 Md. App. 239, 253-54, 137 A.3d 377 (2016) (collecting case law).  See also *Maher v. Gagne*, 448 U.S. 122, 132 (1980) (holding that an award of fees is permitted where "the plaintiff prevails on a wholly statutory, non-civil-rights claim pendent to a substantial constitutional claim."); *Osterweil v. Bartlett*, 92 F.Supp.3d 14, 23 (N.D.N.Y. 2015) (same). "It is enough" that a court order has "provide[d] a party with some of the relief sought in the complaint." *Cities4Life, Inc. v. City of Charlotte,* 52 F.4th 576, 580 (4th Cir. 2022), citing *Maher*, 448 U.S. at 127-130. "[A] civil-rights plaintiff need not prevail on every claim or obtain all relief sought to receive attorney's fees." *Id.* at 581. "[T]he prevailing party inquiry does not turn on the magnitude of the relief obtained." *Id.*, citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).  Any suit challenging Bill 23-26 will be precisely such a mixed case as it will include a federal challenge under the Second Amendment and state law challenges as permitted by *Engage Armament*.

The *Engage Armament* litigation is precisely such a mixed case as plaintiffs in that case sought relief on a federal claim in the initial Complaint (Count IV) filed in 2021, on two federal claims in the First Amended Complaint (Counts IV and V) and in multiple federal claims in the Second Amended Complaint (Counts IV-VIII).[2]

---

[2] In Maryland such attorney fee requests are collateral to and independent of the merits. See, e.g., *Williams v. Board of Education of Prince Georges Co.*, 2023 WL 3476326 at *9 (MD Appellate Ct. 2023), citing *Grove v. Grove*, 192 Md. App. 428, 430, 994 A.2d 1032 (2010).

The fee award in *Engage Armament* will soon be determined by the Circuit Court of Montgomery County and is likely to be hundreds of thousands of dollars. The pending **federal court** litigation against the County on **federal** claims with respect to Bill 21-22E, enacted in 2022 and Bill 4-21, enacted in 2021, will result in additional Section 1988 fees liability against the County.[3] If the County wishes to avoid a similar substantial fee liability with respect to Bill 23-26, it must reject Bill 23-26 or amend the Bill to bring it into full and strict compliance with the Maryland Supreme Court's decision in *Engage Armament* and the Second Amendment.

**Article XI-A of the Maryland Constitution and *Engage Armament*:**

In the *Engage Armament* decision, the Maryland Supreme Court held that Section 57-11(a), of the County Code constituted an impermissible "general law" within the meaning of Article XI-A of the Maryland Constitution. The Court stated: "We hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly." Slip op. at 61. The Court explained that "[i]n effect, the County's regulation creates pockets of roadway

---

[3] Plaintiffs' Second Amendment claim as to these bills is currently pending in the United States Court of Appeals for the Fourth Circuit. *Maryland Shall Issue, Inc. v. Montgomery Co.*, Nol 23-1719 (4th Cir.). Those proceedings are currently stayed pending the upcoming decision of the Supreme Court in *Wolford v. Lopez*, No. 25-1046 (argued Jan. 20, 2026), and petitions for certiorari filed in *Moore v. Kipke*, No. 25-1206 (SCt), and in Novotny v. Moore, No. 25-1324 (SCt). See note 7, *infra*.

4

(91)

throughout the County's lengthy and complex highway system in which travelers with State-issued wear-and-carry permits are banned from carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible from the road." *Id.*

The Court rejected the County's proposed solutions for permit holders, under which permit holders could create "maps" of all banned areas and avoid those areas, or by "placing their firearms in an enclosed case or locked firearms rack." *Id.* at 61-62. The Court explained that "both options burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. The Court thus concluded that "[a]s currently constructed, § 57-11(a) has significant extraterritorial impact" that made it into a prohibited general law. *Id.*

Bill 23-26 attempts to read *Engage Armament* as allowing the County to narrow the scope of Section 57-11(a) to permit holders while traveling in vehicles. The Bill provides that Section 57-11(a) does not "apply to the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly." That amendment is simply insufficient to convert Section 57-11(a) into a permissible local law within the meaning of Article XI-A of the Maryland Constitution. Permit holders outside the County do not simply drive through the

5

(92)

County without stopping and getting out of their vehicles. Rather, such permit holders come into the County to work, to shop and to conduct other activities that involve getting out of their vehicles. This Bill would slap criminal penalties on every such permit holder the moment he or she gets out of the vehicle or walked within 100 yards of a place of public assembly, as that term is defined by the Bill.[4]

Even as narrowed by the Bill, places of public assembly literally encompass thousands of locations. Specifically, Montgomery County is home to **1,262** public bikeways, https://bit.ly/40MxYgZ, **605** houses of worship, https://bit.ly/3OLbfvG, **693** *public* parks, https://bit.ly/3qjHLfb (not including four federal parks and any privately owned "parks"), **258** private schools, https://bit.ly/3RyA0wd, **137** public elementary schools, https://bit.ly/40JIzcB, **40** middle schools, https://bit.ly/3PTz8RL, **25** high schools, https://bit.ly/4htvDNF, **42** public recreation centers, https://bit.ly/3WB1VhL, **10** colleges and universities, https://bit.ly/3Csn5Yr, **29** municipalities https://bit.ly/4g9jAE8, **45** Post Offices, https://bit.ly/4h8YAhZ, **38** fire stations, https://bit.ly/4gfCxVy, 15 public swimming

---

[4] Specifically, the Bill narrows the definition of places of public assembly to include: "a publicly or privately owned park, place of worship, school, library, recreational facility; multipurpose exhibition facility, such as a fairgrounds or conference center," or a "government building open to the public for the business of government, polling place, courthouse, or legislative assembly." The Bill further provides that "[a] 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building." This narrowing does not save the Bill from attack.

6

pools, https://bit.ly/4awPtW2, **13** Metro stations, https://bit.ly/4aySiG0, and **11** MARC commuter train locations, https://bit.ly/3Cdo3b7.

In short, the 100-yard zones for each of these places often encompass ordinary places of commerce and associated public sidewalks. A few additional examples are sufficient to illustrate the point. Caroline Freeland Urban Park on Arlington Road in downtown Bethesda is easily within 100 yards of Giant Foods grocery store across Elm street from the park. That park is also within 100 yards of the Shoppes of Bethesda, part of Bethesda Row, a Lenscrafter store and a Tesla supercharger station. Similarly, the 100-yard zone from either side of the Capital Crescent Trail that runs through downtown Bethesda includes numerous stores, such as Ourisman Honda, Anthropologie, a Safeway grocery store, a CVS drug store and the Chevy Chase Pediatric Center, which is precisely the type of licensed medical facility that the *Engage Armament* held the County may **not** regulate under Section 4-209(b)(1)(iii). See slip op. at 34-35.

Further up Arlington Road in Bethesda, the 100-yards zone, as measured from the outer edge of parking lot of Bethesda Elementary School or Canaan Oromo Evangelical Church on Wilson Lane, sweeps broadly to include shops along Old Georgetown Road, including the Prestipino Dental Group, another licensed medical facility that the County may not regulate. The 100 yards zone from Elm Street Urban Park in Bethesda includes a Panera Bread outlet and the entirety of the large adjacent

7

(94)

public parking lot. Similar effects can be found along Wisconsin Avenue in Bethesda within 100 yards of Chase Avenue Urban Park (an area that includes a public parking lot, a CVS drug store, Chase Bank and United Bank) and Cheltenham Drive Urban Park (an area that includes the same CVS drug store, an Acura car dealership and still another large public parking area). People do not "assemble" in these locations. See *Engage Armament,* slip op. at 32 ("a place of public assembly is a location that is open for members of the public *to gather for a common purpose*, such as deliberating, legislating, worship, entertainment, education, or recreation") (emphasis added).

The same kind of broad scope can be found within every urban area in the County, including Silver Spring and Rockville. These are all places in which visitors from outside the County may shop, work or conduct other activities outside of vehicles. See *Engage Armament,* slip op. at 60 (noting that Section 57-11(a) "prohibits all permit holders from carrying their firearms in a substantial portion of Montgomery County"). Banning carry within these areas "burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. Basically, the Bill would prevent permit holders from outside the County from shopping or working or even walking on public sidewalks within "a substantial portion" of the County. Bill 23-26 plainly has "significant extraterritorial

8

impact." *Id.* Bill 23-26 would thus enact a general law for the same reason that the existing version of Section 57-11(a) was struck down in *Engage Armament*. Bill 23-26 will suffer the same fate.

Indeed, in *Engage Armament,* the Maryland Supreme Court **specifically warned the County** not to narrowly construe its opinion as limited to vehicular travel. Specifically, in footnote 23, the Court stated: "Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways **should not be interpreted** as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law." *Id*. at 63 n.23 (emphasis added). The Court noted that the constitutionality of any amended law (like Bill 23-26) "will depend on the scope of the amended law and evidence concerning its effects." *Id.* As outlined above, the scope of Bill 23-26 is self-evident in its effect on non-resident permit holders who shop, work or walk within the County. The evidence of such effect will be simple to present in court. A challenge to Bill 23-26 will succeed on this ground alone. In the face of footnote 23, Bill 23-26, if enacted, would effectively constitute County defiance of the Maryland Supreme Court. That claim will be presented in any suit challenging Bill 23-26.

9

(96)

**Bill 23-26 is Vague:**

The Bill also suffers from vagueness. Vagueness is particularly evident in Bill 23-26's bans at and within 100 yards of all privately or publicly owned "parks." "Parks" is not a defined term. The coverage of Section 57-11(a) was previously amended by Bill 4-21 in 2021 to specifically eliminate the prior definition of "parks" as including only parks "identified by the Maryland-National Capital Park and Planning Commission." Bill 23-26 is thus **not** limited to parks which are specifically designated as such by signage or otherwise. By common dictionary definitions, "parks" could include every open grassy spot open to the public. Without a specific definition, there is no way to know the scope of "parks." For example, it is far from clear whether "park" would include the "Whale Art" area at the corner of Wayne Ave. and Georgia Ave. in downtown Silver Spring. Merely walking on the sidewalk within 100 yards of this intersection on the way to the nearby FedEx store or the ATT store outlet or the Sweetgreen, Subway, or El Taco restaurants or the Massage Envy outlet would risk the imposition of strict criminal liability, including imprisonment.

A similar lack of notice or definition applies to other places of public safety specified by Bill 23-26, such as a "recreational facility" and "multipurpose exhibition facility." While *Engage Armament* makes clear that these locations must be open to the public, neither of these terms is defined. While a "multipurpose

10

(97)

exhibition facility" includes examples "*such as* a fairgrounds or conference center," the term is not limited to those two types of facilities. The scope of a "recreational facility" does not even include such examples, much less a definition. People are left to guess. More fundamentally, there is simply no way for a person to know he or she is walking within 100 yards of recreational facility or a "multipurpose facility" which, as the Maryland Supreme Court noted in *Engage Armament*, may well be "buildings or locations that might not abut or even be visible from the road" or even the adjoining sidewalk. *Engage Armament*, slip op. at 61. The risk of "arbitrary enforcement" is apparent. At a minimum, these realities make clear that the Council should make Section 57-11(a) subject **only** to **civil** enforcement, **not** criminal enforcement. That is a simple amendment.

The lack of sufficient notice is intolerable for a criminal statute like Bill 23-26. See, e.g., *United States v. Lanier,* 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Marks v. United States,* 430 U.S. 188, 191-82 (1977) (Due process protects against judicial infringement of the "right to fair warning" that certain conduct will give rise to criminal penalties). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due

11

(98)

process.'" *Johnson v. United States,* 576 U.S. 591, 596 (2015). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that **ordinary people** can understand what conduct is prohibited **and in a manner that does not encourage arbitrary and discriminatory enforcement**." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (emphasis added). For the same reasons, vagueness is also barred by the Maryland Constitution. See, e.g., *Pizza di Joey, LLC v. Mayor of Baltimor*e, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting State case law).

**Section 57-10 of the County Code:**

The Court in *Engage Armament* made clear that the only reason the County has any authority to enact legislation regarding firearms is due to the authority granted by MD Code, Criminal Law, § 4-209(b)(1). Otherwise, such legislation is expressly preempted by the very broad preemption imposed by Section 4-209(a), which provides that "the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun."

For example, *Engage Armament* expressly struck down the County's attempt to regulate the possession of firearms by adults in the presence of minors under

12

(99)

Section 57-7(d) of the County Code, holding that this regulation "prohibits a broad swath of otherwise lawful (and constitutionally protected) conduct by adults merely because it occurs in the presence of a minor, without any apparent connection to whether that activity might result in minors gaining unsupervised access to those firearms." Slip op. at 39. The Court found that regulation "is not authorized by § 4-209(b)(1)(i) **and so is preempted by § 4-209(a).**" *Id.* at 40 (emphasis added). The same result obtained for the County's regulation of places of public assembly authorized by Section 4-209(b)(1)(iii). The Court specifically struck down the County's attempt to regulate certain areas, holding that such areas were not places of public assembly. Slip op. at 34-36.[5] Regulation of these areas was thus likewise barred by the express preemption provisions of Section 4-209(a).

---

[5] The Court in *Engage Armament* held that "[h]ospitals, community health centers, long-term facilities, and childcare facilities are not generally open to the public for any purpose of assembly." Slip op. at 34-35. The Court likewise rejected the County's attempt to define place of public assembly to include any government building or area owned or controlled by the County, holding that "§ 4-209(b)(1)(iii) does not authorize the County to preclude carry of firearms within 100 yards of its property unless the property is a 'place of public assembly.'" *Id.* at 35. Finally, the Court rejected the County's attempt to ban firearms within 100 yards of a "gathering" of people expressing their constitutional rights, holding that "[a]lthough that language may describe a "public assembly," it does not describe a 'place of public assembly' for which § 4-209(b)(1)(iii) authorizes local regulation." *Id.* at 36. As the Court thus made plain, the County is not free to define a "place of public assembly" anyway it wants.

The controlling principle from these holdings is that the County's power to regulate firearms is strictly limited to the locations authorized by Section 4-209(b)(1)(iii). Section 57-10 is in blatant violation of these limitations. It provides: "It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition." That regulation is **County-wide** and is thus not limited to 100 yards of any place of public assembly, as that phrase was interpreted by *Engage Armament*.[6] That means Section 57-10 is **expressly preempted by Section 4-209(a) because it does not fall within any exception specified by Section 4-209(b)(1)**.

And because Section 57-10 is **not** authorized by Section 4-209(b)(1) it is also expressly preempted by other express preemption provisions of State law, including MD Code, Public Safety, § 5-133(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm," and Section 6 of 1972 Maryland Laws, Ch. 13, which provides "[t]hat all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland

---

[6] The Court in *Engage Armament* did not reach the validity of Section 57-10 on grounds that it was not specifically cited in the operative complaint. Slip op. at 16-17.  Any complaint challenging Bill 23-26 will correct that omission.

hereby preempts the right of the political subdivisions to regulate said matters." See *Engage Armament,* slip op. at 26 (holding that these express preemption provisions did not apply where local regulation was otherwise authorized "in the three specific areas set forth in § 4-209(b)(1)").

Section 57-10 is not limited to within 100 yards of a place of public assembly and it contains no exception for permit holders or for persons traveling with or possessing firearms on their person or in a vehicle in accordance with State law. See MD Code, Criminal Law, § 4-209(b), MD Code, Criminal Law, § 4-111(b), and MD Code, Natural Resources, § 10-410(c)(1). Section 57-10 is also an invalid "general law" for the same reasons Section 57-11(a) was invalidated by the Court in *Engage Armament* because it "significantly" affects possession and transport of firearms by non-residents. Any challenge to Bill 23-26 will include a State law count challenging Section 57-10. In short, enact Bill 23-26 and Section 57-10 will be doomed in any suit challenging that enactment.

**Second Amendment:**

As is apparent from the foregoing discussion, the prohibitions on permit holders imposed by Bill 23-26 include many locations that are private property held open to the public, such as stores, shops and adjoining private sidewalks. In 2023, the Maryland General Assembly attempted to ban all firearms in such places without the prior consent of the private owner, either by signage or otherwise. See MD Code,

15

(102)

Criminal Law, § 6-411(d). The Maryland federal district court promptly enjoined that legislation, holding that this restriction was unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). See *Kipke v. Moore,* 695 F.Supp. 638 (D.Md. 2023). The United States Court of Appeals for the Fourth Circuit recently affirmed that ruling in *Kipke v. Moore,* 165 F.4th 194, 218-19 (4th Cir. 2026) ("Maryland's rule would effectively declare most public places 'gun-free zones.' But that likely stretches the sensitive places doctrine too far.").[7]

That decision in *Kipke* is supported by decisions by other federal courts of appeals concerning similar State laws. *Antonyuk v. James,* 120 F.4th 941, 1007-09 (2d Cir. 2024); *Wolford v. Lopez,* 116 F.4th 959, 981-82 (9th Cir. 2024), *cert. granted* 146 S.Ct. 79 (Oct. 3, 2025); *Koons v. Attorney General New Jersey,* 156 F.4th 210, 248 (3d Cir. 2025), *vacated on the grant of rehearing en banc*, 162 F.4th 100 (3d Cir. 2025). The Ninth Circuit in *Wolford* invalidated a California law that imposed this ban on firearms on private property open to the public because it allowed private owner consent only by signage and did not allow a private owner to consent to

---

[7] On March 2, 2026, the Fourth Circuit stayed its mandate under Rule 41, FRAP, at the plaintiffs' request, pending a petition for certiorari. On April 20, 2026, Maryland filed a petition for certiorari from this ruling. *Moore v. Kipke*, No. 25-1206. On May 20, 2026, the plaintiffs filed a non-conditional cross petition for certiorari seeking review as to other aspects of the Fourth Circuit's ruling regarding sensitive places. *Novotny v. Moore*, No. 25-1324. The stay of the mandate continues until such time as the plaintiffs' petition is fully disposed of by the Supreme Court.

16

(103)

firearms via oral permission. The Ninth Circuit nonetheless sustained a Hawaii law that allowed such oral consent by a private owner on private property.

That Ninth Circuit ruling with respect to Hawaii is currently before the United States Supreme Court in *Wolford v. Lopez*, No. 1046 (argued Jan. 20, 2026), and a merits decision is expected this month. We expect the Supreme Court to reverse the Ninth Circuit and invalidate Hawaii's ban on firearms on private property held open to the public.[8] That Supreme Court ruling will definitively settle the issue and the Court is likely to set forth "principles" that may well govern "sensitive places" restrictions. See *United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("As we explained in *Bruen,* the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."), citing *Bruen*, 597 U.S. at 26-31. At a minimum, the Council should defer consideration of Bill 23-26 until after *Wolford* is decided by the Supreme Court and after the pending petitions for certiorari in *Kipke* are fully adjudicated. Those petitions could be acted upon as soon as the first Monday of October 2026, at the start of the Court's new Term. A rush to enactment will result in an immediate challenge in federal court in a suit that will raise both federal claims and pendent State law claims, including a challenge to Section 57-10.

---

[8] Full disclosure, the undersigned is counsel for plaintiffs in both *Wolford* and *Kipke*.

17

(104)

The bans imposed by Bill 23-26 are worse than either the California statute or the Hawaii statute at issue in *Wolford* or the Maryland law invalidated in *Kipke.* The legislation at issue in those cases at least allowed the private property owner to bear arms **and** consent to such arms-bearing conduct by others. In contrast, Bill 23-26 appears to completely prohibit firearms in privately owned locations open to the public without regard to the owner's rights or the consent of the private owner. Worse still, Bill 23-26 imposes its bans not only **at t**hese locations, but also **within 100-yards** of these locations. As the discussion above makes clear, the 100-yard bans imposed by Bill 23-26 sweeps broadly to encompass many stores, shops and other private properties open to the public. The Bill expressly includes privately owned parks, places of worship, schools, libraries, recreational facilities and multipurpose facilities open to the public and bans firearms within 100 yards of these privately owned locations. Enacting Bill 23-26 would be in direct defiance of this body of federal case law, including the controlling authority of *Kipke.* Performative legislation enacted in defiance of this case law invites a judicial smack down that will prove costly to the County just in the Section 1988 attorneys' fees and costs it will owe to the prevailing parties.

The specific "places of public assembly" specified in Bill 23-26 are also open to attack under the Second Amendment. *Bruen* rejected New York's "attempt to characterize its proper-cause requirement as "a 'sensitive-place' law," ruling that

18

(105)

"expanding the category of 'sensitive places' simply to all places o*f public congregation* that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" because it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." 597 U.S. at 30-31 (emphasis added). See *Kipke*, 165 F.4th at 219. Similarly, in *Wolford,* the Ninth Circuit **rejected** California's argument that there was "a national tradition of banning firearms at public gatherings in general." 116 F.4th at 998. Places of "public congregation" or "gatherings," without more, are simply not "sensitive places" under *Bruen*. Whether the County likes it or not, the Second Amendment protects the "general right to publicly carry arms." That "general right" obviously includes public sidewalks falling within 100 yards of a place of public assembly.

Specifically, in *Wolford*, the Ninth Circuit struck down a California law which prohibited carry of firearms at places of worship, holding that "we conclude that Plaintiffs are likely to succeed on their Second Amendment challenge" to that ban. *Wolford,* 116 F.4th at 997. Similarly, several district courts have invalidated such bans in places of worship. See S*pencer v. Nigrelli*, 648 F. Supp. 3d 451, 467–68 (W.D.N.Y. 2022) (holding that the plaintiffs were likely to succeed on a Second Amendment challenge to a ban on firearms at places of worship because of the insufficiency of the historical laws offered by the defendant), *affirmed on other*

19

(106)

*grounds by Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *vacated and remanded,* 144 S.Ct. 2709 (2024), *reaffirmed sub nom. Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024); *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 439–43 (W.D.N.Y. 2022) (same), a*ffirmed in part, vacated in part, and remanded by Antonyuk*, 89 F.4th 271; and *Antonyuk v. Hochul*, 639 F. Supp. 3d at 319–22 (same).

**Banning Firearms In Places of Worship Is Particularly Poor Public Policy:**

Banning firearms in places of worship also exposes these locations to violent attacks, forcing these places of worship to spend tens of thousands of dollars on licensed security guards rather than relying on their members who have carry permits. Going without armed security is not an option. See, e.g., https://www.adl.org/resources/article/decade-attacks-synagogues-worldwide. Montgomery County is not immune from these threats. See https://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail_Pol.aspx?Item_ID=48248 (noting an incident of vandalism that occurred at Shaare Tefila Synagogue, located in the 16600 block of Georgia Avenue); https://www.wusa9.com/article/news/crime/montgomery-county-police-hate-speech-graffiti-beth-el-synagogue/65-11c497d0-3e48-440b-9d6c-6bce2b15f859 ("In the past two weeks, Montgomery County Police have gotten calls on eight separate incidents of hate speech graffiti, at synagogues, schools, and businesses —

20

but it's not just graffiti. Rabbi Harris says Bethesda United Methodist Church, just across the street, had its pride flag torn down, and it's happening elsewhere too.").

These sorts of incidents are precisely why the Maryland General Assembly elected **NOT** to identify places of worship as a "sensitive place" when it enacted Senate Bill 1 in 2023 in its *Bruen* response legislation. See MD Code, Criminal Law, § 4-111(a). The New York legislature likewise amended its law to **exclude** places of worship for that reason as well. See *Antonyuk*, 120 F.4th at 1014 ("The New York legislature amended the place of worship provision after the district courts enjoined it," noting the law as amended "has an exception for 'those persons responsible for security at such place of worship.'"). The governing body at each church, synagogue or mosque is best situated to attend to security. If the County wants to meddle in that decision, then it should be prepared to provide 24-7-armed security, cost-free. It does not now do so. If the County is not willing to provide or pay for such security, then the County should eliminate "places of worship" from the coverage of Section 57-11(a) to allow places of worship to secure appropriate security from fully trained members of their own congregations.

## CONCLUSION

For all the foregoing reasons, Bill 23-26, as written, should be withdrawn or rejected or otherwise amended to bring it into compliance with *Engage Armament* and the Second Amendment. In particular, the County should immediately repeal

21

(108)

Section 57-10 as that section is expressly preempted by Section 4-209(a) and by other express preemption provisions and simply does not survive the reasoning and holdings of *Engage Armament*. Finally, the Bill should be at least amended to make Section 57-11(a) subject only to civil enforcement, not criminal enforcement.

Respectfully submitted,

*/s/ Mark W. Pennak*

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Road, Ste C #1015
Baltimore, MD 21234
mpennak@marylandshallissue.org
(301) 873-3671

Dated:  June 9, 2026

22

(109)

**Testimony of Mark W. Pennak, President of Maryland Shall Issue, Inc.,
In Opposition to County Bill 23-26**

**Summary:**

I am counsel and President for Maryland Shall Issue, Inc., and appear today in opposition to Bill 23-26. I am also counsel of record for the petitioners in the Maryland Supreme Court's decision in *Engage Armament, LLC, et al. v. Montgomery County, MD*, --- Md. ---, --- A.3d ----, 2026 WL 1144313 (April 28, 2026). A copy of that decision is attached to the Staff Report for the Bill.

Bill 23-26 is a flawed attempt to bring County law into compliance with the Court's decision in *Engage Armament.* As detailed below, that attempt fails. In so far as the Bill bans firearms completely within 100 yards of places of public assembly or in or on private property held open to the public (including a privately owned library), the Bill also violates the Second Amendment under controlling precedent. Federal court of appeals precedent also makes clear that the Bill's imposition of bans on places of worship likewise violates the Second Amendment. The Bill's bans in other places, such as in "recreational" facilities or at a "multipurpose exhibition facility" are the types of bans under active litigation in the federal courts and will also likely also fail. In so far as it incorporates vague,

1

undefined terms in a criminal statute, the Bill fails under the Due Process Clause of the State and federal Constitutions.[1]

Any suit in federal district court challenging Bill 23-26 will also challenge the County-wide application of Section 57-10 as unauthorized by MD Code, Criminal Law, § 4-209. While *Engage Armament* did not reach Section 57-10, the reasoning of the Court makes clear that the County's power of enact firearms legislation is allowed only to the extent of the authority granted by MD Code, Criminal Law, § 4-209(b)(1). That section cannot be read as allowing the County to enact County-wide restrictions. The federal district court will have ancillary jurisdiction over these State law claims. Should plaintiffs prevail on either the State law claims or the federal Constitutional claim, County will then be liable for equitable relief and substantial attorneys' fees and costs under federal law, 42 U.S.C. § 1988. Those fees will be sought in the *Engage Armament* litigation and will likely be quite substantial.

To be clear, Section 1988 fees are available in cases where state law claims are mixed with federal claims filed under Section 1983, and Section 1988 fees may be awarded even though the plaintiff prevails only on the State law claims. See, e.g.,

---

[1] Bill 23-26 amends Chapter 57 of the County Code. Under Section 57-15, any violation of Chapter 57 (other than for Section 57-8) "is a Class A violation to which the maximum penalties for a Class A violation apply." Under Section 1-19 of the County Code, a Class A violation is punishable by a $1,000 fine and 6 months in jail. Under Section 1-20(c) "[e]ach day any violation of County law continues is a separate offense."

2

*State v. Braverman*, 228 Md. App. 239, 253-54, 137 A.3d 377 (2016) (collecting case law). See also *Maher v. Gagne*, 448 U.S. 122, 132 (1980) (holding that an award of fees is permitted where "the plaintiff prevails on a wholly statutory, non-civil-rights claim pendent to a substantial constitutional claim."); *Osterweil v. Bartlett*, 92 F.Supp.3d 14, 23 (N.D.N.Y. 2015) (same). "It is enough" that a court order has "provide[d] a party with some of the relief sought in the complaint." *Cities4Life, Inc. v. City of Charlotte,* 52 F.4th 576, 580 (4th Cir. 2022), citing *Maher*, 448 U.S. at 127-130. "[A] civil-rights plaintiff need not prevail on every claim or obtain all relief sought to receive attorney's fees." *Id.* at 581. "[T]he prevailing party inquiry does not turn on the magnitude of the relief obtained." *Id.*, citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Any suit challenging Bill 23-26 will be precisely such a mixed case as it will include a federal challenge under the Second Amendment and state law challenges as permitted by *Engage Armament*.

The *Engage Armament* litigation is precisely such a mixed case as plaintiffs in that case sought relief on a federal claim in the initial Complaint (Count IV) filed in 2021, on two federal claims in the First Amended Complaint (Counts IV and V) and in multiple federal claims in the Second Amended Complaint (Counts IV-VIII).[2]

---

[2] In Maryland such attorney fee requests are collateral to and independent of the merits. See, e.g., *Williams v. Board of Education of Prince Georges Co.*, 2023 WL 3476326 at *9 (MD Appellate Ct. 2023), citing *Grove v. Grove*, 192 Md. App. 428, 430, 994 A.2d 1032 (2010).

The fee award in *Engage Armament* will soon be determined by the Circuit Court of Montgomery County and is likely to be hundreds of thousands of dollars. The pending **federal court** litigation against the County on **federal** claims with respect to Bill 21-22E, enacted in 2022 and Bill 4-21, enacted in 2021, will result in additional Section 1988 fees liability against the County.[3] If the County wishes to avoid a similar substantial fee liability with respect to Bill 23-26, it must reject Bill 23-26 or amend the Bill to bring it into full and strict compliance with the Maryland Supreme Court's decision in *Engage Armament* and the Second Amendment.

**Article XI-A of the Maryland Constitution and *Engage Armament*:**

In the *Engage Armament* decision, the Maryland Supreme Court held that Section 57-11(a), of the County Code constituted an impermissible "general law" within the meaning of Article XI-A of the Maryland Constitution. The Court stated: "We hold that § 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly." Slip op. at 61. The Court explained that "[i]n effect, the County's regulation creates pockets of roadway

---

[3] Plaintiffs' Second Amendment claim as to these bills is currently pending in the United States Court of Appeals for the Fourth Circuit. *Maryland Shall Issue, Inc. v. Montgomery Co.*, Nol 23-1719 (4th Cir.). Those proceedings are currently stayed pending the upcoming decision of the Supreme Court in *Wolford v. Lopez*, No. 25-1046 (argued Jan. 20, 2026), and petitions for certiorari filed in *Moore v. Kipke*, No. 25-1206 (SCt), and in Novotny v. Moore, No. 25-1324 (SCt). See note 7, *infra*.

throughout the County's lengthy and complex highway system in which travelers with State-issued wear-and-carry permits are banned from carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible from the road." *Id.*

The Court rejected the County's proposed solutions for permit holders, under which permit holders could create "maps" of all banned areas and avoid those areas, or by "placing their firearms in an enclosed case or locked firearms rack." *Id.* at 61-62. The Court explained that "both options burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. The Court thus concluded that "[a]s currently constructed, § 57-11(a) has significant extraterritorial impact" that made it into a prohibited general law. *Id.*

Bill 23-26 attempts to read *Engage Armament* as allowing the County to narrow the scope of Section 57-11(a) to permit holders while traveling in vehicles. The Bill provides that Section 57-11(a) does not "apply to the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly." That amendment is simply insufficient to convert Section 57-11(a) into a permissible local law within the meaning of Article XI-A of the Maryland Constitution. Permit holders outside the County do not simply drive through the

5

(114)

County without stopping and getting out of their vehicles. Rather, such permit holders come into the County to work, to shop and to conduct other activities that involve getting out of their vehicles. This Bill would slap criminal penalties on every such permit holder the moment he or she gets out of the vehicle or walked within 100 yards of a place of public assembly, as that term is defined by the Bill.[4]

Even as narrowed by the Bill, places of public assembly literally encompass thousands of locations. Specifically, Montgomery County is home to **1,262** public bikeways, https://bit.ly/40MxYgZ, **605** houses of worship, https://bit.ly/3OLbfvG, **693** *public* parks, https://bit.ly/3qjHLfb (not including four federal parks and any privately owned "parks"), **258** private schools, https://bit.ly/3RyA0wd, **137** public elementary schools, https://bit.ly/40JIzcB, **40** middle schools, https://bit.ly/3PTz8RL, **25** high schools, https://bit.ly/4htvDNF, **42** public recreation centers, https://bit.ly/3WB1VhL, **10** colleges and universities, https://bit.ly/3Csn5Yr, **29** municipalities https://bit.ly/4g9jAE8, **45** Post Offices, https://bit.ly/4h8YAhZ, **38** fire stations, https://bit.ly/4gfCxVy, 15 public swimming

---

[4] Specifically, the Bill narrows the definition of places of public assembly to include: "a publicly or privately owned park, place of worship, school, library, recreational facility; multipurpose exhibition facility, such as a fairgrounds or conference center," or a "government building open to the public for the business of government, polling place, courthouse, or legislative assembly." The Bill further provides that "[a] 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building." This narrowing does not save the Bill from attack.

6

pools, https://bit.ly/4awPtW2, **13** Metro stations, https://bit.ly/4aySiG0, and **11** MARC commuter train locations, https://bit.ly/3Cdo3b7.

In short, the 100-yard zones for each of these places often encompass ordinary places of commerce and associated public sidewalks. A few additional examples are sufficient to illustrate the point. Caroline Freeland Urban Park on Arlington Road in downtown Bethesda is easily within 100 yards of Giant Foods grocery store across Elm street from the park. That park is also within 100 yards of the Shoppes of Bethesda, part of Bethesda Row, a Lenscrafter store and a Tesla supercharger station. Similarly, the 100-yard zone from either side of the Capital Crescent Trail that runs through downtown Bethesda includes numerous stores, such as Ourisman Honda, Anthropologie, a Safeway grocery store, a CVS drug store and the Chevy Chase Pediatric Center, which is precisely the type of licensed medical facility that the *Engage Armament* held the County may **not** regulate under Section 4-209(b)(1)(iii). See slip op. at 34-35.

Further up Arlington Road in Bethesda, the 100-yards zone, as measured from the outer edge of parking lot of Bethesda Elementary School or Canaan Oromo Evangelical Church on Wilson Lane, sweeps broadly to include shops along Old Georgetown Road, including the Prestipino Dental Group, another licensed medical facility that the County may not regulate. The 100 yards zone from Elm Street Urban Park in Bethesda includes a Panera Bread outlet and the entirety of the large adjacent

7

(116)

public parking lot. Similar effects can be found along Wisconsin Avenue in Bethesda within 100 yards of Chase Avenue Urban Park (an area that includes a public parking lot, a CVS drug store, Chase Bank and United Bank) and Cheltenham Drive Urban Park (an area that includes the same CVS drug store, an Acura car dealership and still another large public parking area). People do not "assemble" in these locations. See *Engage Armament,* slip op. at 32 ("a place of public assembly is a location that is open for members of the public *to gather for a common purpose*, such as deliberating, legislating, worship, entertainment, education, or recreation") (emphasis added).

The same kind of broad scope can be found within every urban area in the County, including Silver Spring and Rockville. These are all places in which visitors from outside the County may shop, work or conduct other activities outside of vehicles. See *Engage Armament,* slip op. at 60 (noting that Section 57-11(a) "prohibits all permit holders from carrying their firearms in a substantial portion of Montgomery County"). Banning carry within these areas "burden permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Id.* at 62. Basically, the Bill would prevent permit holders from outside the County from shopping or working or even walking on public sidewalks within "a substantial portion" of the County. Bill 23-26 plainly has "significant extraterritorial

8

(117)

impact." *Id.* Bill 23-26 would thus enact a general law for the same reason that the existing version of Section 57-11(a) was struck down in *Engage Armament*. Bill 23-26 will suffer the same fate.

Indeed, in *Engage Armament,* the Maryland Supreme Court **specifically warned the County** not to narrowly construe its opinion as limited to vehicular travel. Specifically, in footnote 23, the Court stated: "Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways **should not be interpreted** as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law." *Id*. at 63 n.23 (emphasis added). The Court noted that the constitutionality of any amended law (like Bill 23-26) "will depend on the scope of the amended law and evidence concerning its effects." *Id.* As outlined above, the scope of Bill 23-26 is self-evident in its effect on non-resident permit holders who shop, work or walk within the County. The evidence of such effect will be simple to present in court. A challenge to Bill 23-26 will succeed on this ground alone. In the face of footnote 23, Bill 23-26, if enacted, would effectively constitute County defiance of the Maryland Supreme Court. That claim will be presented in any suit challenging Bill 23-26.

9

(118)

**Bill 23-26 is Vague:**

The Bill also suffers from vagueness. Vagueness is particularly evident in Bill 23-26's bans at and within 100 yards of all privately or publicly owned "parks." "Parks" is not a defined term. The coverage of Section 57-11(a) was previously amended by Bill 4-21 in 2021 to specifically eliminate the prior definition of "parks" as including only parks "identified by the Maryland-National Capital Park and Planning Commission." Bill 23-26 is thus **not** limited to parks which are specifically designated as such by signage or otherwise. By common dictionary definitions, "parks" could include every open grassy spot open to the public. Without a specific definition, there is no way to know the scope of "parks." For example, it is far from clear whether "park" would include the "Whale Art" area at the corner of Wayne Ave. and Georgia Ave. in downtown Silver Spring. Merely walking on the sidewalk within 100 yards of this intersection on the way to the nearby FedEx store or the ATT store outlet or the Sweetgreen, Subway, or El Taco restaurants or the Massage Envy outlet would risk the imposition of strict criminal liability, including imprisonment.

A similar lack of notice or definition applies to other places of public safety specified by Bill 23-26, such as a "recreational facility" and "multipurpose exhibition facility." While *Engage Armament* makes clear that these locations must be open to the public, neither of these terms is defined. While a "multipurpose

10

(119)

exhibition facility" includes examples "*such as* a fairgrounds or conference center," the term is not limited to those two types of facilities. The scope of a "recreational facility" does not even include such examples, much less a definition. People are left to guess. More fundamentally, there is simply no way for a person to know he or she is walking within 100 yards of recreational facility or a "multipurpose facility" which, as the Maryland Supreme Court noted in *Engage Armament*, may well be "buildings or locations that might not abut or even be visible from the road" or even the adjoining sidewalk. *Engage Armament*, slip op. at 61. The risk of "arbitrary enforcement" is apparent. At a minimum, these realities make clear that the Council should make Section 57-11(a) subject **only** to **civil** enforcement, **not** criminal enforcement. That is a simple amendment.

The lack of sufficient notice is intolerable for a criminal statute like Bill 23-26. See, e.g., *United States v. Lanier,* 520 U.S. 259, 266 (1997) ("[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope"); *Marks v. United States,* 430 U.S. 188, 191-82 (1977) (Due process protects against judicial infringement of the "right to fair warning" that certain conduct will give rise to criminal penalties). "The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due

11

process.'" *Johnson v. United States,* 576 U.S. 591, 596 (2015). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that **ordinary people** can understand what conduct is prohibited **and in a manner that does not encourage arbitrary and discriminatory enforcement**." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (emphasis added). For the same reasons, vagueness is also barred by the Maryland Constitution. See, e.g., *Pizza di Joey, LLC v. Mayor of Baltimor*e, 470 Md. 308, 343-44, 235 A.3d 873 (2020) (collecting State case law).

**Section 57-10 of the County Code:**

The Court in *Engage Armament* made clear that the only reason the County has any authority to enact legislation regarding firearms is due to the authority granted by MD Code, Criminal Law, § 4-209(b)(1). Otherwise, such legislation is expressly preempted by the very broad preemption imposed by Section 4-209(a), which provides that "the State preempts the right of a county, municipal corporation, or special taxing district to regulate the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of: (1) a handgun, rifle, or shotgun; and (2) ammunition for and components of a handgun, rifle, or shotgun."

For example, *Engage Armament* expressly struck down the County's attempt to regulate the possession of firearms by adults in the presence of minors under

12

Section 57-7(d) of the County Code, holding that this regulation "prohibits a broad swath of otherwise lawful (and constitutionally protected) conduct by adults merely because it occurs in the presence of a minor, without any apparent connection to whether that activity might result in minors gaining unsupervised access to those firearms." Slip op. at 39. The Court found that regulation "is not authorized by § 4-209(b)(1)(i) **and so is preempted by § 4-209(a).**" *Id.* at 40 (emphasis added). The same result obtained for the County's regulation of places of public assembly authorized by Section 4-209(b)(1)(iii). The Court specifically struck down the County's attempt to regulate certain areas, holding that such areas were not places of public assembly. Slip op. at 34-36.[5] Regulation of these areas was thus likewise barred by the express preemption provisions of Section 4-209(a).

---

[5] The Court in *Engage Armament* held that "[h]ospitals, community health centers, long-term facilities, and childcare facilities are not generally open to the public for any purpose of assembly." Slip op. at 34-35. The Court likewise rejected the County's attempt to define place of public assembly to include any government building or area owned or controlled by the County, holding that "§ 4-209(b)(1)(iii) does not authorize the County to preclude carry of firearms within 100 yards of its property unless the property is a 'place of public assembly.'" *Id.* at 35. Finally, the Court rejected the County's attempt to ban firearms within 100 yards of a "gathering" of people expressing their constitutional rights, holding that "[a]lthough that language may describe a "public assembly," it does not describe a 'place of public assembly' for which § 4-209(b)(1)(iii) authorizes local regulation." *Id.* at 36. As the Court thus made plain, the County is not free to define a "place of public assembly" anyway it wants.

13

The controlling principle from these holdings is that the County's power to regulate firearms is strictly limited to the locations authorized by Section 4-209(b)(1)(iii). Section 57-10 is in blatant violation of these limitations. It provides: "It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition." That regulation is **County-wide** and is thus not limited to 100 yards of any place of public assembly, as that phrase was interpreted by *Engage Armament*.[6] That means Section 57-10 is **expressly preempted by Section 4-209(a) because it does not fall within any exception specified by Section 4-209(b)(1)**.

And because Section 57-10 is **not** authorized by Section 4-209(b)(1) it is also expressly preempted by other express preemption provisions of State law, including MD Code, Public Safety, § 5-133(a), which provides that "[t]his section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm," and Section 6 of 1972 Maryland Laws, Ch. 13, which provides "[t]hat all restrictions imposed by the law, ordinances, or regulations of the political subdivisions on the wearing, carrying, or transporting of handguns are superseded by this Act, and the State of Maryland

---

[6] The Court in *Engage Armament* did not reach the validity of Section 57-10 on grounds that it was not specifically cited in the operative complaint. Slip op. at 16-17.  Any complaint challenging Bill 23-26 will correct that omission.

14

hereby preempts the right of the political subdivisions to regulate said matters." See *Engage Armament,* slip op. at 26 (holding that these express preemption provisions did not apply where local regulation was otherwise authorized "in the three specific areas set forth in § 4-209(b)(1)").

Section 57-10 is not limited to within 100 yards of a place of public assembly and it contains no exception for permit holders or for persons traveling with or possessing firearms on their person or in a vehicle in accordance with State law. See MD Code, Criminal Law, § 4-209(b), MD Code, Criminal Law, § 4-111(b), and MD Code, Natural Resources, § 10-410(c)(1). Section 57-10 is also an invalid "general law" for the same reasons Section 57-11(a) was invalidated by the Court in *Engage Armament* because it "significantly" affects possession and transport of firearms by non-residents. Any challenge to Bill 23-26 will include a State law count challenging Section 57-10. In short, enact Bill 23-26 and Section 57-10 will be doomed in any suit challenging that enactment.

**Second Amendment:**

As is apparent from the foregoing discussion, the prohibitions on permit holders imposed by Bill 23-26 include many locations that are private property held open to the public, such as stores, shops and adjoining private sidewalks. In 2023, the Maryland General Assembly attempted to ban all firearms in such places without the prior consent of the private owner, either by signage or otherwise. See MD Code,

15

(124)

Criminal Law, § 6-411(d). The Maryland federal district court promptly enjoined that legislation, holding that this restriction was unconstitutional under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). See *Kipke v. Moore,* 695 F.Supp. 638 (D.Md. 2023). The United States Court of Appeals for the Fourth Circuit recently affirmed that ruling in *Kipke v. Moore,* 165 F.4th 194, 218-19 (4th Cir. 2026) ("Maryland's rule would effectively declare most public places 'gun-free zones.' But that likely stretches the sensitive places doctrine too far.").[7]

That decision in *Kipke* is supported by decisions by other federal courts of appeals concerning similar State laws. *Antonyuk v. James,* 120 F.4th 941, 1007-09 (2d Cir. 2024); *Wolford v. Lopez,* 116 F.4th 959, 981-82 (9th Cir. 2024), *cert. granted* 146 S.Ct. 79 (Oct. 3, 2025); *Koons v. Attorney General New Jersey,* 156 F.4th 210, 248 (3d Cir. 2025), *vacated on the grant of rehearing en banc*, 162 F.4th 100 (3d Cir. 2025). The Ninth Circuit in *Wolford* invalidated a California law that imposed this ban on firearms on private property open to the public because it allowed private owner consent only by signage and did not allow a private owner to consent to

---

[7] On March 2, 2026, the Fourth Circuit stayed its mandate under Rule 41, FRAP, at the plaintiffs' request, pending a petition for certiorari. On April 20, 2026, Maryland filed a petition for certiorari from this ruling. *Moore v. Kipke*, No. 25-1206. On May 20, 2026, the plaintiffs filed a non-conditional cross petition for certiorari seeking review as to other aspects of the Fourth Circuit's ruling regarding sensitive places. *Novotny v. Moore*, No. 25-1324. The stay of the mandate continues until such time as the plaintiffs' petition is fully disposed of by the Supreme Court.

16

(125)

firearms via oral permission. The Ninth Circuit nonetheless sustained a Hawaii law that allowed such oral consent by a private owner on private property.

That Ninth Circuit ruling with respect to Hawaii is currently before the United States Supreme Court in *Wolford v. Lopez*, No. 1046 (argued Jan. 20, 2026), and a merits decision is expected this month. We expect the Supreme Court to reverse the Ninth Circuit and invalidate Hawaii's ban on firearms on private property held open to the public.[8] That Supreme Court ruling will definitively settle the issue and the Court is likely to set forth "principles" that may well govern "sensitive places" restrictions. See *United States v. Rahimi*, 602 U.S. 680, 692 (2024) ("As we explained in *Bruen,* the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."), citing *Bruen*, 597 U.S. at 26-31. At a minimum, the Council should defer consideration of Bill 23-26 until after *Wolford* is decided by the Supreme Court and after the pending petitions for certiorari in *Kipke* are fully adjudicated. Those petitions could be acted upon as soon as the first Monday of October 2026, at the start of the Court's new Term. A rush to enactment will result in an immediate challenge in federal court in a suit that will raise both federal claims and pendent State law claims, including a challenge to Section 57-10.

---

[8] Full disclosure, the undersigned is counsel for plaintiffs in both *Wolford* and *Kipke*.

17

(126)

The bans imposed by Bill 23-26 are worse than either the California statute or the Hawaii statute at issue in *Wolford* or the Maryland law invalidated in *Kipke.* The legislation at issue in those cases at least allowed the private property owner to bear arms **and** consent to such arms-bearing conduct by others. In contrast, Bill 23-26 appears to completely prohibit firearms in privately owned locations open to the public without regard to the owner's rights or the consent of the private owner. Worse still, Bill 23-26 imposes its bans not only **at t**hese locations, but also **within 100-yards** of these locations. As the discussion above makes clear, the 100-yard bans imposed by Bill 23-26 sweeps broadly to encompass many stores, shops and other private properties open to the public. The Bill expressly includes privately owned parks, places of worship, schools, libraries, recreational facilities and multipurpose facilities open to the public and bans firearms within 100 yards of these privately owned locations. Enacting Bill 23-26 would be in direct defiance of this body of federal case law, including the controlling authority of *Kipke.* Performative legislation enacted in defiance of this case law invites a judicial smack down that will prove costly to the County just in the Section 1988 attorneys' fees and costs it will owe to the prevailing parties.

The specific "places of public assembly" specified in Bill 23-26 are also open to attack under the Second Amendment. *Bruen* rejected New York's "attempt to characterize its proper-cause requirement as "a 'sensitive-place' law," ruling that

18

(127)

"expanding the category of 'sensitive places' simply to all places o*f public congregation* that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly" because it "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." 597 U.S. at 30-31 (emphasis added). See *Kipke*, 165 F.4th at 219. Similarly, in *Wolford,* the Ninth Circuit **rejected** California's argument that there was "a national tradition of banning firearms at public gatherings in general." 116 F.4th at 998. Places of "public congregation" or "gatherings," without more, are simply not "sensitive places" under *Bruen*. Whether the County likes it or not, the Second Amendment protects the "general right to publicly carry arms." That "general right" obviously includes public sidewalks falling within 100 yards of a place of public assembly.

Specifically, in *Wolford*, the Ninth Circuit struck down a California law which prohibited carry of firearms at places of worship, holding that "we conclude that Plaintiffs are likely to succeed on their Second Amendment challenge" to that ban. *Wolford,* 116 F.4th at 997. Similarly, several district courts have invalidated such bans in places of worship. See S*pencer v. Nigrelli*, 648 F. Supp. 3d 451, 467–68 (W.D.N.Y. 2022) (holding that the plaintiffs were likely to succeed on a Second Amendment challenge to a ban on firearms at places of worship because of the insufficiency of the historical laws offered by the defendant), *affirmed on other*

19

(128)

*grounds by Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *vacated and remanded,* 144 S.Ct. 2709 (2024), *reaffirmed sub nom. Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024); *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422, 439–43 (W.D.N.Y. 2022) (same), a*ffirmed in part, vacated in part, and remanded by Antonyuk*, 89 F.4th 271; and *Antonyuk v. Hochul*, 639 F. Supp. 3d at 319–22 (same).

**Banning Firearms In Places of Worship Is Particularly Poor Public Policy:**

Banning firearms in places of worship also exposes these locations to violent attacks, forcing these places of worship to spend tens of thousands of dollars on licensed security guards rather than relying on their members who have carry permits. Going without armed security is not an option. See, e.g., https://www.adl.org/resources/article/decade-attacks-synagogues-worldwide. Montgomery County is not immune from these threats. See https://www2.montgomerycountymd.gov/mcgportalapps/Press_Detail_Pol.aspx?Item_ID=48248 (noting an incident of vandalism that occurred at Shaare Tefila Synagogue, located in the 16600 block of Georgia Avenue); https://www.wusa9.com/article/news/crime/montgomery-county-police-hate-speech-graffiti-beth-el-synagogue/65-11c497d0-3e48-440b-9d6c-6bce2b15f859 ("In the past two weeks, Montgomery County Police have gotten calls on eight separate incidents of hate speech graffiti, at synagogues, schools, and businesses —

20

but it's not just graffiti. Rabbi Harris says Bethesda United Methodist Church, just across the street, had its pride flag torn down, and it's happening elsewhere too.").

These sorts of incidents are precisely why the Maryland General Assembly elected **NOT** to identify places of worship as a "sensitive place" when it enacted Senate Bill 1 in 2023 in its *Bruen* response legislation. See MD Code, Criminal Law, § 4-111(a). The New York legislature likewise amended its law to **exclude** places of worship for that reason as well. See *Antonyuk*, 120 F.4th at 1014 ("The New York legislature amended the place of worship provision after the district courts enjoined it," noting the law as amended "has an exception for 'those persons responsible for security at such place of worship.'"). The governing body at each church, synagogue or mosque is best situated to attend to security. If the County wants to meddle in that decision, then it should be prepared to provide 24-7-armed security, cost-free. It does not now do so. If the County is not willing to provide or pay for such security, then the County should eliminate "places of worship" from the coverage of Section 57-11(a) to allow places of worship to secure appropriate security from fully trained members of their own congregations.

## CONCLUSION

For all the foregoing reasons, Bill 23-26, as written, should be withdrawn or rejected or otherwise amended to bring it into compliance with *Engage Armament* and the Second Amendment. In particular, the County should immediately repeal

(130)

Section 57-10 as that section is expressly preempted by Section 4-209(a) and by other express preemption provisions and simply does not survive the reasoning and holdings of *Engage Armament*. Finally, the Bill should be at least amended to make Section 57-11(a) subject only to civil enforcement, not criminal enforcement.

Respectfully submitted,

*/s/ Mark W. Pennak*

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Road, Ste C #1015
Baltimore, MD 21234
mpennak@marylandshallissue.org
(301) 873-3671

Dated:  June 9, 2026

22

(131)

# Opposition Testimony – Montgomery County Bill 23-26

### Full Written Testimony

Good afternoon Council Members.

My name is Julio Barreto, and I am a Montgomery County resident, a Maryland Wear and Carry Permit holder, a firearm instructor, and a law-abiding citizen. I appreciate the opportunity to provide testimony regarding Bill 23-26.

I respectfully oppose this legislation because I believe it places additional restrictions on citizens who have already complied with Maryland's extensive firearm laws while doing little to deter criminals who ignore those laws altogether.

To obtain a Maryland Wear and Carry Permit, citizens must undergo background checks, training, and a thorough vetting process. Permit holders have demonstrated a willingness to follow the law and accept the responsibilities that accompany firearm ownership. Yet proposals such as Bill 23-26 continue to impose additional burdens on those who are already complying with every legal requirement.

I am 69 years old, and my wife is 68 years old. Our age alone places us at a greater physical disadvantage when confronted by younger, stronger, or multiple attackers. While we hope never to face such circumstances, the reality is that violent crime does not discriminate by age, and older citizens often have fewer options available to defend themselves.

For us, lawful firearm ownership and lawful concealed carry are not about intimidation, aggression, or confrontation. They are about providing a means of self-defense and personal protection until law enforcement can arrive. Even the best police departments cannot be everywhere at once, and response times are not instantaneous.

I am also concerned that this legislation continues a troubling pattern of treating law-abiding firearm owners as though they are the source of criminal violence. As a person of color, I am particularly sensitive to the dangers of stereotyping and broad assumptions about entire groups of people. Responsible firearm owners should not be viewed through the same lens as criminals simply because both possess firearms.

The County should focus its efforts on violent offenders, illegal firearm trafficking, repeat criminals, and those who misuse firearms—not on citizens who have completed training, passed background checks, and demonstrated a commitment to responsible firearm

(132)

ownership.

I respectfully urge the Council to reject Bill 23-26 and instead focus on policies that directly target criminal behavior while preserving the rights of responsible citizens to protect themselves and their families.

Thank you for your time and consideration.

## 2–3 Minute Oral Testimony

Good afternoon Council Members.

My name is Julio Barreto. I am a Montgomery County resident, a Maryland Wear and Carry Permit holder, a firearm instructor, and a law-abiding citizen. I am here today to respectfully oppose Bill 23-26.

Like every Maryland permit holder, I have completed the required training, passed background checks, and complied with all applicable state laws. Yet this bill places additional burdens on citizens who already follow the law while doing little to impact those who choose to ignore it.

I am 69 years old, and my wife is 68. As we age, we recognize that we are at a greater physical disadvantage than we were in our younger years. The ability to lawfully carry a firearm provides us with an important means of self-defense should we ever face a violent threat before law enforcement can arrive.

For us, carrying a firearm is not about confrontation. It is about protection, responsibility, and ensuring that we have a means to defend ourselves and our loved ones during those critical moments when seconds matter and help may still be minutes away.

I am also concerned that policies like this increasingly treat law-abiding firearm owners as if they are the problem. As a person of color, I understand the harm that can result from broad assumptions and stereotypes. Responsible firearm owners should be judged by their actions and conduct, not by the criminal acts of others.

I believe the County's efforts would be better focused on violent offenders, illegal gun trafficking, and repeat criminals rather than imposing additional restrictions on citizens who have already demonstrated their commitment to following the law.

I respectfully ask the Council to reject Bill 23-26 and focus on measures that target criminal behavior while preserving the rights of responsible citizens to protect themselves and their

(133)

families.

Thank you for your time and consideration.

(134)

Karan Singh
Montgomery County Resident

**ERRATA Sheet for Testimony Citations**

Apologies to the Council, but here is a corrected list of citations for today's live testimony:

## 1. Minority Permit Holders and Self-Defense Motivation

- John Gramlich, *Key facts about Americans and guns*, Pew Research Center (July 24, 2024), (available at https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-americans-and-guns/). (Most ownership is generally for personal protection reasons)
- Kim Parker, *The Demographics of Gun Ownership,* Pew Research Center (June 2017), (available at https://www.pewresearch.org/social-trends/2017/06/22/the-demographics-of-gun-ownership/ ) (Indicating that 71% of "urban" gun owners cited self protection)
- Degli Esposti M, Sokol RL, Lee DB, et al, *Firearm ownership for protection in the USA, 2023: results from a nationally representative survey*, Injury Prevention 2025; 31:257-261 (available at https://injuryprevention.bmj.com/content/31/3/257) (Gallup survey analysis showing "black and Asian women (98.8%) almost exclusively owned for protection and . . . owning for protection was more common among black (88.4%) than white men (69.7%)")
- Julie A. Ward, et al., *Reasons for Gun Ownership Among Demographically Diverse New and Prior Gun Owners*, 67 Am J. Prev. Med 5, 730 (Nov. 2024) (available at https://www.sciencedirect.com/science/article/pii/S0749379724002265) (NORC survey analysis indicating "Black gun owners most frequently selected protection at home (93%) and protection out of home (92%)")

## 2. Socio-Economic and Housing Density Disparities

- Montgomery County Planning Department, *Findings from the 2024 American Community Survey: Montgomery County, Maryland and the United States* (Sept. 2025), available at https://montgomeryplanning.org/blog-design/2025/09/findings-from-the-2024-american-community-survey-montgomery-county-maryland-and-the-united-states/.
- Montgomery County Planning Board, *Attainable Housing Strategies Final Report* (June 2024), available at https://montgomeryplanningboard.org/wp-content/uploads/2024/05/Attachment_A_2024-AHS-Report-Tracked-Changes_6-13-24.pdf (documenting the geographic clustering within down-county transit corridors which maintain significantly higher concentrations of non-white residents compared to low-density zoning areas like Potomac).

Karan Singh
Montgomery County Resident

## 3. Regional Inequality and Traveling Permit Holders

- Jenny Schuetz, *The DMV Housing Market on the Precipice*, Brookings Institution (May 2023), available at https://www.brookings.edu/articles/dmv-housing-market-on-the-precipice/ (tracking intra-regional commuter and residential migration patterns across Maryland county lines).

- Center for Policing Equity, *Testimony before the House Judiciary Committee in support of HB - 81* (available at https://mgaleg.maryland.gov/cmte_testimony/2026/jud/1Q68DKVR7JOqXTcsNx2xdEVKelw9Cq-mb.pdf) ("Data from the Governor's Office of Crime Prevention and Policy show that in 2024, Black drivers were subjected to almost 43% of all vehicle traffic stops and over 47% of all searches at traffic stops, despite only making up less than 32% of the state's population.")(source report available at https://dlslibrary.state.md.us/publications/Exec/GOCPYVS/SG9-3602(b)_2023.pdf)

- *See also Engage Armament, LLC, et al. v. Montgomery County, Maryland*, No. 485899-V (Md. Apr. 28, 2026) (overturning previous localized sensitive place transit restrictions)

## 1. Opening Statement (Citations at end of document)

- **Good Afternoon, Council President and members of the Council.**
- Thank you for the opportunity to speak on **Expedited Bill 23-26.**
- **The Bottom Line:** While I share the Council's concerns about violence involving firearms, we should be aware of the potential unintended consequences of this legislation.
- Unless a wear and carry permit exception is included, this bill is very likely to have an unfair disparate impact on **law-abiding Black and Brown Wear-and-Carry permit holders that puts them into a second class status compared to other MD permit holders.**

\* My written testimony addressed disparate policing, today I'll cover disparate impact
  - Who carries, where they are, and contrast their experience with other areas

## 2. Black and Brown citizens are more likely to carry for self protection

- *Pew Research Center* surveys show *Black and Brown citizens are more likely to cite protection as main reason for owning and carrying a firearm.*
- MoCO is most diverse county in the state (see: gun range customers)

## 3. The Structural Neighborhood Trap

- **This law effectively hits black and brown permit holders unequally:**
  - Black and Brown residents are disproportionately concentrated in **high-density mid- and downcounty regions** (i.e., more area parks, schools, churches)
  - Contrast: An affluent (white) suburban permit holder can more easily walk out their door and carry their firearm legally around their area without legal risk.
- By blanketing places within 100 yards of public assemblies with strict criminal penalties, you turn dense minority neighborhoods into legal minefields for local permit holders.

## 4. The Regional Gap (Creating Second-Class Permits)

- **Person with same permit, doing same daily activities, will have more legal risks in MoCO**
- **Look at our neighbors:** Less-diverse counties' residents carry freely without jail time.
- Bill creates tiered system of state citizenship. Not the best public policy for **licensed Black or Brown permit holders** in Montgomery County to have fewer rights than peers?

## 5. Closing

- Please do not limit a state-granted permit into an exclusive privilege for some, while rendering **vetted, minority permit holders** into second-class status.
- **Vote NO on Expedited Bill 23-26, or add a permit holder exception.** Thank you.

(137)

Supporting Citations

## 1. Minority Permit Holders and Self-Defense Motivation

- John Gramlich, *Key facts about Americans and guns*, Pew Research Center (July 24, 2024), available at https://www.pewresearch.org/short-reads/2024/07/24/key-facts-about-americans-and-guns/.
- Pew Research Center, *Amid a Rise in Gun Violence, a Profile of American Gun Owners* (Aug. 2023) (demonstrating that Black and Hispanic gun owners—particularly minority women and urban dwellers—cite personal protection and safety as their primary or exclusive motivation for firearm ownership and carry at statistically higher rates than white, suburban, or rural demographics).
- Julia A. Wolfson et al., *The 2021 National Firearms Survey: Gun Ownership and Carry Patterns in the United States*, 112 Preventive Medicine 106742 (2021), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8273872/.

## 2. Socio-Economic and Housing Density Disparities

- Montgomery County Planning Department, *Findings from the 2024 American Community Survey: Montgomery County, Maryland and the United States* (Sept. 2025), available at https://montgomeryplanning.org/blog-design/2025/09/findings-from-the-2024-american-community-survey-montgomery-county-maryland-and-the-united-states/.
- Montgomery County Planning Board, *Attainable Housing Strategies Final Report* (June 2024), available at https://montgomeryplanningboard.org/wp-content/uploads/2024/05/Attachment_A_2024-AHS-Report-Tracked-Changes_6-13-24.pdf (documenting the geographic clustering within down-county transit corridors which maintain significantly higher concentrations of non-white residents compared to low-density zoning areas like Potomac).

## 3. Regional Inequality and Traveling Permit Holders

- Jenny Schuetz, *The DMV Housing Market on the Precipice*, Brookings Institution (May 2023), available at https://www.brookings.edu/articles/dmv-housing-market-on-the-precipice/ (tracking intra-regional commuter and residential migration patterns across Maryland county lines).
- Maryland State Police, *2024 Annual Report on Vehicle Stops and Law Enforcement Trends* (2025) (confirming persistent, documented statistical disproportionality in law enforcement traffic stops involving minority motorists statewide).
- *See also Engage Armament, LLC, et al. v. Montgomery County, Maryland*, No. 485899-V (Md. Apr. 28, 2026) (overturning previous localized sensitive place transit restrictions)

Karan Singh
Montgomery County Resident

June 9, 2026

Montgomery County Council
100 Maryland Avenue
Rockville, MD 20850

**Re: Opposition to Emergency Bill 23-26**

Dear Council President and Councilmembers:

I respectfully urge the Council to reject Emergency Bill 23-26.

This legislation raises serious concerns regarding equity, fiscal responsibility, and respect for the guidance recently provided by Maryland's highest court.

First, Montgomery County should carefully consider the disparate impact that additional firearm-possession offenses may have on minority communities. As Montgomery County continues its efforts to reduce inequities in policing, it should be cautious about adopting new firearm-possession restrictions that may create additional opportunities for discretionary police stops, searches, and arrests with uneven impacts across communities.

The County's own Office of Legislative Oversight ("OLO") has documented significant racial disparities in traffic stops, searches, arrests, and use-of-force incidents. OLO reported that although Black residents comprised approximately 18% of Montgomery County's population, they accounted for approximately 32% of traffic stops and 55% of police use-of-force incidents. Subsequent OLO analysis found that racial disparities in traffic enforcement persisted or worsened even as overall traffic stops declined.[1][2]

These concerns have also been emphasized by the Maryland Office of the Public Defender. Following two recent Maryland court decisions involving firearm-related police stops, Maryland Public Defender Natasha Dartigue warned that police have too often harassed people under generalized claims that they were present in "high-crime" areas. She further cautioned that such labels frequently overlap with communities defined by poverty and race, and that conduct police characterize as "flight" may simply reflect a citizen's constitutional right to go about their business. In reference to the court's decision in *Hicks v. State*, Dartigue also stated: "This court decision protects all Marylanders, but it matters most to communities of color that have long borne the weight of over-policing. Constitutional rights do not depend on where you live, who you are, or how heavily your community is policed."[3][4]

Second, the County should not spend taxpayer resources pursuing legislation that the Maryland Supreme Court has already indicated may not solve the legal problems it identified in *Engage Armament*. As you know, in that case, the Court held that Montgomery County's firearm ordinance was not a valid local law because it imposed substantial burdens on permit holders traveling on public highways through the County and therefore had significant extraterritorial effects.[5]

1

The Court went out of its way to address the type of legislative workaround reflected in Emergency Bill 23-26. In Footnote 23, the Court stated:

> "Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways should not be interpreted as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law."[6]

The significance of this statement is difficult to overlook. The Court specifically cautioned that adding a public-highway travel exception would not cure the legal defects that rendered the prior ordinance invalid. Yet Emergency Bill 23-26 appears to rely on precisely that type of approach.

Given that guidance from Maryland's highest court, the County should carefully consider whether Emergency Bill 23-26 is worth the inevitable litigation costs that will accompany it.

Montgomery County already faces substantial budget pressures and difficult spending decisions. County leaders have repeatedly discussed structural fiscal challenges and competing demands on limited public resources.[7] Under these circumstances, as a taxpaying resident, it is difficult to justify diverting additional taxpayer funds to defend unnecessary[8] and legally vulnerable legislation. Every dollar spent defending this proposed ordinance in court is a dollar unavailable for schools, transportation, public safety, immigrant rights, healthcare, libraries, housing, and other essential County services.

For these reasons, I respectfully urge the Council to reject Emergency Bill 23-26. Alternatively, to reduce litigation risk and taxpayer expense, the Council should consider adding an exception for Maryland Wear and Carry Permit holders.

Respectfully submitted,

Karan Singh
Montgomery County Resident

---

**Footnotes**

1. Montgomery County Office of Legislative Oversight, *Racial Equity and Social Justice Impact Statement: Bill 13-20, Police – Traffic Stops – Data Collection* (July 21, 2020), https://www.montgomerycountymd.gov/OLO/Resources/Files/2020%20Reports/OLOReport2020-7.pdf

2. Montgomery County Office of Legislative Oversight, *Traffic Stops in Montgomery County: Analysis of Fiscal Years 2018–2022* (2023), https://www.montgomerycountymd.gov/OLO/Resources/Files/2023%20Reports/OLOReport2023-9.pdf

3. Ian Round, "Montgomery County police stop violated 4th Amendment, court rules," *The Daily Record* (May 27, 2026), https://thedailyrecord.com/2026/05/27/police-stop-montgomery-county/

(140)

4. Hallie Miller, "Maryland police can no longer stop and search people based solely on seeing a gun, appeals court rules," *The Baltimore Banner* (Feb. 20, 2025), https://www.thebanner.com/community/criminal-justice/maryland-police-searches-guns-appeals-court-U76C47MBCBC7PGMAKKIBCKNAZM/

5. *Engage Armament LLC v. Montgomery County*, No. 9, September Term 2025, Maryland Supreme Court (Apr. 28, 2026), https://www.mdcourts.gov/data/opinions/coa/2026/9a25.pdf

6. *Id.* at 62 n.23, https://www.mdcourts.gov/data/opinions/coa/2026/9a25.pdf

7. Montgomery County Council FY 2026 Budget Resources, https://www.montgomerycountymd.gov/council/budget/

8. Maryland state law already criminalizes carrying a handgun in public areas except in very narrow circumstances. See MD Criminal Law §4–203.

3

(141)

## Expedited Bill 23-26, Weapons – Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly

**Opposition to Including Houses of Worship as "Places of Public Assembly"**

I oppose the inclusion of houses of worship within the definition of "places of public assembly." This classification is inappropriate, unnecessary, and infringes on the longstanding rights of clergy and congregational leadership to determine how best to safeguard their communities.

Houses of worship are not simply public venues. They are sacred spaces—governed by religious leadership, supported by voluntary membership, and rooted in deeply held beliefs about autonomy, community, and spiritual responsibility. For generations, clergy and congregational boards have exercised the authority to decide how their communities operate, including how they provide for the safety and security of their members.

By designating houses of worship as "public assembly," the government would be inserting itself into decisions that properly belong to religious leadership. This is especially concerning in the current environment, where we have seen an alarming rise in targeted attacks against faith communities by armed assailants. Clergy and congregations are already grappling with how to protect their members while preserving the openness and sanctity of their religious spaces. They must retain the freedom to determine whether security is provided by trained congregants, volunteers, hired professionals, or other means consistent with their religious values and practical needs.

Government should not be in the position of dictating who may or may not provide security within a house of worship. Such decisions require intimate knowledge of the community, its traditions, its vulnerabilities, and its theological commitments. Clergy are uniquely positioned to make these judgments. Imposing a one-size-fits-all regulatory framework—designed for stadiums, concert halls, or commercial venues—fails to respect the distinct nature of religious institutions.

In a moment when faith communities are under heightened threat, the priority should be empowering them, not restricting them. Houses of worship must remain free to determine their own security practices without being swept into a regulatory category that does not reflect their mission, structure, or constitutional protections.

For these reasons, I urge you to remove houses of worship from the definition of "places of public assembly" and preserve the right of clergy and congregational leadership to make their own decisions about how best to protect their communities.

Larry Jaffe

Silver Spring, MD

(142)

**Michael Cavaliere**

███████████████████

Frederick County, MD 21771

███████████████

June 8, 2026

Re:Expedited Bill 23-26


I am OPPOSED to Expedited Bill 23-26 as it will do nothing to reduce or prevent crime. As we all know, criminals by definition ignore the law. It will only serve to unduly burden legally concealed carry permitted citizens of Montgomery County as well as others who wish to visit the county to work, shop or worship. By creating this patchwork of sensitive places with 100 yard perimeters, it is nearly impossible for sane, sober, moral and prudent MD HGP permit holders to avoid the risk of incarceration by simply shopping for groceries or stopping for gas in the county. Furthermore, this bill violates the Constitutional right to self protection granted by the Second Amendment.

I am also in strict opposition to this bill designating places of worship, synagogues and churches as so called "Sensitive Places." Neither Maryland State law nor Federal law makes this distinction.

It's no secret that churches, like schools, are soft targets where maximum physical and emotional damage can be inflicted. Designating them as "Sensitive Places" softens them even more. An individual intent on inflicting harm will completely ignore this designation, and in fact welcomes it. For they know they will meet with minimal resistance, if any.

I've been attending my church in Montgomery County since 2006. Shortly after, our Pastor discovered I was a musician and quickly conscripted me into the Worship Team as a guitarist. Over time I became a Worship Leader. I directed the other musicians and singers and led our congregation in song and prayer. I continue in that role today as well as manage the Worship Ministry's budget, technology and resources. Though I don't know everyone in our congregation, I do know most. We have served on projects together, been on mission trips, distributed food to our neighbors, met in small groups and had social gatherings. The list goes on, we are family. The support I got from my church as my wife battled and eventually succumbed to cancer was immeasurable.

We are a uniquely multinational church as well with; Hispanic, Asian, British, German, Indian, Haitian, African, African American and Caucasian members.  All age groups are represented as well; small children, teenagers, young adults, on up to seniors in their 90's. With many of them I know their joys, and their hardships. I see their faces and connect with them from the stage when I am leading. When I am not on the team I am up in the Tech Booth in the back keeping an eye on things.


Although we are a medium sized church we don't have the budget to hire an armed guard.

(143)

Personally, I think a well trained, armed Volunteer Security Team, spread out through the facility is much more effective. We can respond in seconds while the police may take several minutes to respond. Some of our elderly can barely walk let alone run from danger. They need to be protected where they are. I can't bear the thought of some of these dear souls being gunned down. For smaller churches in Montgomery County the prospect of a hired guard is even further from reach.

Throughout our history as a nation Americans have protected themselves and others by meeting force with equal-force. This is not just a 2nd Amendment right, it's a God given right. While I respectfully recognize the County Council is trying to do what it can to reduce criminal gun violence, this is not the way to go about it. Strict enforcement of existing criminal laws along with better equipping the police will go a lot further towards reducing crime. Thank you for you time and attention to this matter.

Sincerely,

Michael A Cavaliere

(144)

Testimony opposing Expedited Bill 23-26

Good afternoon. My name is Eli Shemony, and I am the head of security of the MDSC Congregation here in Montgomery County. I am here today to speak in strong opposition to expedited bill 23-26 — not because I am against public safety, but because this legislation would actively endanger Jewish lives.

Since the October 7th massacre in Israel, antisemitism in the United States has surged to levels not seen in decades. According to the FBI and the Anti-Defamation League, the Jewish community is the most targeted religious group for hate crimes in this country, year after year. That is not a statistic. That is our reality. We live it every time we walk into a synagogue, every time we drop our children off at Hebrew school, every time we attend a community event.

Our community has had to respond to this threat in a practical and serious way. Professional armed security is enormously expensive, and no organization — no matter how well-funded — can post guards at every minyan, every program, every service. We simply do not have the resources. As a result, our community has come to rely, in part, on trained, licensed members who carry legally. These are not casual gun owners. They are highly trained individuals who have invested significant time and resources to be prepared — precisely for the kind of attack that has already happened in Pittsburgh, in Poway, and in countless communities around the world.

For many of our members, carrying does not begin at the synagogue door. It begins the moment they leave their home. The walk from a car to a synagogue, the moment of arrival, the transition from public street to a house of worship — these are moments of vulnerability. Our members carry during those moments because threats do not wait for a convenient location.

This bill would eliminate that protection. It would disarm the very people standing between our community and those who wish us harm. It would not stop a motivated attacker — it would only stop our ability to respond to one.

I urge this Council: do not let the desire to appear tough on guns result in making Jewish residents of Montgomery County less safe. We are already a target. Please do not take away our ability to defend ourselves and our families.

I ask you to vote no on this bill. Thank you.

(145)

Expedited Bill 23-26, Weapons - Restrictions on Ghost Guns Near Minors and Carrying of Firearms in or Near Places of Public Assembly – **SUPPORT WITH AMENDMENTS**

Good afternoon Council President Fani-Gonzalez, Vice President Balcombe, Councilmembers, and members of the community.

My name is Esther Wells. I am a licensed conceal carry permit holder, a Second Amendment supporter, and a lifelong resident of Montgomery County. I testify today in support of Expedited Bill 23-26, with amendments. Thank you to Councilwoman Leudtke for introducing this necessary piece of good governance.

While this bill correctly aligns Montgomery County with state standards after the Maryland Supreme Court invalidated the prior 2022 law, we must address the process that brought us here. The original, unconstitutional Bill Bill 21-22E was co-sponsored by then Council Vice-President Glass, alongside Councilmembers Jawando, Friedson, Hucker, Navarro, Riemer, Katz, and Rice. Because that unlawful bill stood for nearly four years before the Supreme Court struck it down, the constitutional rights of law-abiding residents were actively violated for four years.

This demands immediate systemic accountability and financial transparency.

First, what is the standard operating procedure for reviewing council bills? Council attorneys draft them, and the County Attorney's office reviews them. If this review process is functional, how did an unconstitutional, pre-empted bill get passed? What specific remediation will be made to your legislative procedures to minimize the future erosion of our rights?

Second, we demand absolute financial accountability for this failure. How much taxpayer money was wasted litigating Bill 21-22E all the way to the Maryland Supreme Court over the last four years? What is the exact cost of this failure to Montgomery County taxpayers? How many adverse court cases, administrative burdens, and ongoing financial liabilities have resulted from righting this wrong? Over the last five years, what is this Council's exact track record and percentage of dissenting court opinions?

There is no problem our elected officials need to solve that requires violating our constitutional rights. If you cannot govern within constitutional boundaries, we need new leadership.

Taxpayers deserve immediate transparency. Where can residents find a County Council Legal Fees Report, similar to the model used by MCPS? (**See exhibit C**) We deserve a report detailing all outside counsel expenditures for Fiscal Year 2023 - 2026, a complete set of itemized bills paid to these law firms, a month-by-month chart comparing current and prior year expenses, and a clear breakdown of these legal services by department.

Stop wasting our money to restrict our freedoms. Pass Bill 23-26, fix your unconstitutional review process, and open your legal books to the public to show taxpayers exactly what your legal errors are costing us.

Thank you.

(146)

**Exhibit A:**

**MPIA Request Draft**

You can use the following template to ensure your request is legally specific:

---

**Date:** [Current Date]

**To:** Official Custodian of Records, Montgomery County Office of Public Information

**Re: Maryland Public Information Act Request – 2025 Legal Fees and Expenditures**

Dear Custodian of Records,

Under the **Maryland Public Information Act (MPIA)**, General Provisions Article § 4-101 et seq., I am requesting to inspect or receive copies of the following public records for the period of **January 1, 2025, to the present**:

1. Itemized invoices and billing statements from all outside law firms and legal consultants paid by Montgomery County, Maryland.

2. Records indicating the total dollar amount paid to each specific firm or consultant.

3. Documents detailing the "case purpose" or the specific legal matter for which each firm was retained (e.g., litigation name, contract negotiation, or advisory topic).

Please contact me if costs exceed **$25.00**. I also ask that fees be waived as this request serves the public interest.

**Exhibit B**: https://www2.montgomerycountymd.gov/ocacasereport/default.aspx

| | | | | | | |
|---|---|---|---|---|---|---|
| Maryland Shall Issue, et al. v. Montgomery Cnty., MD [4th Cir. | 07/10/2023 | Erin Ashbarry, Edward Lattner, Matthew Johnson | County Council | SIF Appeal | | Open |
| Montgomery County v. Engage Armament, LLC, et al. [SCM appeal] | 12/20/2023 | Kristy Nunley, Erin Ashbarry, Edward Lattner, Matthew Johnson | County Council | SIF Appeal | | Open |

(147)

**Exhibit C**:

https://go.boarddocs.com/mabe/mcpsmd/Board.nsf/files/DKNQT36ACA27/$file/Legal%20Fees%20Rpt%2020250531%2020250630.pdf

ATTACHMENT A

### FY 2025 NON-SPECIAL EDUCATION LEGAL EXPENSES

| Outside Counsel | JULY | AUG | SEPT | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | FY 2025 YTD | FY 2024 YTD | % Inc/(Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GENERAL LEGAL EXPENSES** | | | | | | | | | | | | | | | |
| Carney Kelehan | $ 9,203 | $ 16,145 | $ 8,617 | $ 21,067 | $ 14,536 | $ 11,314 | $ 5,221 | $ 11,174 | $ 13,657 | $ 18,370 | $ 11,358 | | $ 140,660 | $ 240,097 | -41.42% |
| Hogan Lovells | - | - | - | - | - | - | - | 62,171 | - | - | 4,099 | | $ 66,270 | $ 59,998 | 10.45% |
| Venable | 31,567 | 21,818 | 28,195 | 29,726 | 23,134 | 27,822 | 22,029 | 17,971 | 13,017 | 12,753 | 41,174 | | $ 269,205 | $ 500,578 | -46.22% |
| Morgan Lewis | 8,736 | - | - | 182 | - | - | - | 1,029 | - | - | - | | $ 9,947 | $ 33,461 | 29.69% |
| WilmerHale | 134,264 | 8,870 | 487,395 | 31,943 | 49,754 | 34,652 | - | - | - | 42,582 | 284,755 | | $ 1,074,215 | $ 535,435 | 100.62% |
| Jackson Lewis | 24,188 | 11,321 | 13,678 | 5,614 | 15,064 | 9,456 | 5,781 | 18,901 | 946 | 12,706 | 6,073 | | $ 123,727 | $ 364,709 | -66.08% |
| Education Lawyer | - | - | - | - | - | - | - | - | - | - | - | | $ - | $ 68,500 | -100.00% |
| Asmar | 962 | 3,757 | - | 559 | 5,054 | - | 88 | 8,106 | 11,047 | 8,822 | - | | $ 38,396 | $ 27,852 | 37.86% |
| Tammy Turner Esq., LLP | 805 | - | - | - | - | - | - | - | - | - | - | | $ 805 | $ 113,768 | -99.29% |
| Other | - | 13,396 | 59,273 | 23,626 | 17,180 | 20,429 | 9,340 | 5,363 | 23,778 | 12,824 | 24,864 | | $ 210,073 | $ 88,879 | 136.36% |
| **SUBTOTAL** | $ 209,725 | $ 75,307 | $ 597,158 | $ 112,716 | $ 124,721 | $ 103,673 | $ 42,458 | $ 124,715 | $ 62,445 | $ 108,056 | $ 372,322 | $ - | $ 1,933,297 | $ 2,033,276 | -4.92% |
| Capital Budget | - | | 18,976 | 10,012 | 1,770 | - | - | - | - | - | 24,445 | | $ 55,203 | $ 35,197 | 56.84% |
| Pension Trust | 113,297 | 20,812 | 5,578 | 17,545 | 22,772 | 22,173 | 2,844 | 17,303 | 16,431 | 18,026 | 6,897 | | $ 263,678 | $ 52,648 | 400.83% |
| **TOTAL** | $ 323,021 | $ 96,119 | $ 621,712 | $ 140,273 | $ 149,264 | $ 125,846 | $ 45,302 | $ 142,018 | $ 78,876 | $ 126,083 | $ 403,664 | $ - | $ 2,252,178 | $ 2,121,121 | 6.18% |

*Beginning in July 2018 (FY 2019), the legal report includes legal expenditures related to benefits and pension matters. MCPS is reimbursed for these expenditures through these benefit accounts.
N/A - These firms were not itemized on this report in previous years so the column values are not available.

### FY 2025 SPECIAL EDUCATION LEGAL EXPENSES

| Type of Cost | JULY | AUG | SEPT | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUNE | FY 2025 YTD | FY 2024 YTD | % Inc/(Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SPECIAL EDUCATION LEGAL COSTS** | | | | | | | | | | | | | | | |
| Special Education Outside Counsel | $ 5,134 | $ 119,925 | $ 7,665 | $ 4,667 | $ 12,040 | $ 30,627 | $ 71,429 | $ 26,596 | $ 28,833 | $ 34,844 | $ 60,373 | | $ 402,131 | $ 459,497 | -12.48% |
| Other | - | - | - | - | - | - | - | - | - | $ - | $ - | | $ - | $ - | 0.00% |
| **TOTAL** | $ 5,134 | $ 119,925 | $ 7,665 | $ 4,667 | $ 12,040 | $ 30,627 | $ 71,429 | $ 26,596 | $ 28,833 | $ 34,844 | $ 60,373 | $ - | $ 402,131 | $ 459,497 | -12.48% |

| Outside Counsel | JULY | | | | | | | | | | | | FY 2024 YTD | FY 2023 YTD | % Inc/(Dec) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ATTORNEYS** | | | | | | | | | | | | | | | |
| Carney Kelehan | $ 5,134 | $ 13,310 | $ 5,283 | $ 1,272 | $ 889 | $ 1,606 | 9,277 | 2,079 | $ 9,151 | 24,788 | $ 9,839 | | $ 82,626 | $ 327,430 | -74.77% |
| Miles & Stockbridge | - | 106,615 | 36 | - | 8,736 | - | 20,432 | 6,402 | 5,812 | 7,256 | 24,115 | | $ 179,404 | $ 24,623 | 100.00% |
| CRC | - | - | - | - | - | - | - | 1,040 | - | - | | | $ 1,040 | $ 1,736 | -40.08% |
| PK Law | - | - | - | - | - | - | - | - | - | - | | | $ - | $ 105,708 | -100.00% |
| Jeffrey A. Krew | - | - | 2,345 | 3,395 | 2,415 | 29,021 | 41,720 | 18,115 | 12,829 | 2,800 | 26,420 | | $ 139,059 | $ - | 100.00% |
| **TOTAL** | $ 5,134 | $ 119,925 | $ 7,665 | $ 4,667 | $ 12,040 | $ 30,627 | $ 71,429 | $ 26,596 | $ 28,833 | $ 34,844 | $ 60,373 | $ - | $ 402,130 | $ 459,496 | -12.48% |

Note: Totals may differ due to rounding.

(148)

# Concealed Carry Permit Holders Remain Among America's Most Law-Abiding Citizens

Ammoland Inc. Posted on June 2, 2026 by Dean Weingarten

People with concealed carry permits are among the most law-abiding groups in the United States. Police officers have crime rates far below the general population. People with concealed carry permits are more law-abiding than police officers.
The arrest rate for the overall adult population in the USA is about 2,100 – 2,200 per 100k in recent years. The arrest rate for police officers has been about 170 per 100k. This may be low because no one officially tracks police arrests. Officials may be reluctant to charge police officers. The conviction rate for concealed permit holders is about 17.6 per 100k in Texas, according to an academic paper by John Lott, Moody, and Wang published in 2025. From the paper:

Of the 43,932 total convictions in the Texas DPS 2023 report, only 284 — or 0.6 percent — were convictions of LTC holders, a conviction rate of 17.6 per 100,000.

Convictions are not the same as arrests. Arrests for felonies tend to result in about 65% convictions. Arrests for misdemeanors result in about 45% convictions. A conviction rate is likely to be about half of the arrest rate. If we double the conviction rate to approximate the arrest rate, concealed permit holders have less than one-fifth the arrest rate of police officers. The arrest rate for concealed carry permit holders is about 1.7% of the arrest rate of the general population.

The Crime Prevention Research Center (CPRC) sums up how law-abiding permit holders are for convictions of firearm-related violations:

*Concealed handgun permit holders are extremely law-abiding. In Florida and Texas, permit holders are convicted of firearms related violations at one-twelfth of the rate at which police officers are convicted.*

Minnesota tracks the number of carry permits that are revoked each year. A look at the Minnesota numbers shows that revocations of permits are close to the number of concealed permit convictions in Texas. The numbers and methodology may be significantly different in the two states. In 2024, the number of permit holders in Minnesota was about 400 thousand. The number of permit revocations was 47. That is a revocation rate of 11.5 per 100k in 2024.

The crime rates of permit holders are much, much lower than those of the general population and much lower than those of police officers.

Very few people believe disarming the police is a good idea. Police officers, even retired police officers, have the legal right to carry in most places where most people are prevented from carrying weapons. Police officers have the legal right to carry in all states and territories of the United States.

Congress created the LEOSA Act as a way to protect the public with more responsible armed people on the streets. They also created it as a way to protect police officers. The same logic applies to people with concealed carry permits. Those people are much less likely to break laws than even police officers are.

It is common sense to increase the number of such protectors. There are about 700 thousand sworn police officers. There are about another 500 thousand retired officers. There are over 20 million Americans with concealed carry permits.

(149)

**About Dean Weingarten:**

Dean Weingarten has been a peace officer, a military officer, was on the University of Wisconsin Pistol Team for four years, and was first certified to teach firearms safety in 1973. He taught the Arizona concealed carry course for fifteen years until the goal of Constitutional Carry was attained. He has degrees in meteorology and mining engineering, and retired from the Department of Defense after a 30 year career in Army Research, Development, Testing, and Evaluation.

(150)