# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JULIO BARRETO, JR., *et al.*,

        *Plaintiffs*,

MONTGOMERY COUNTY, MD,

        *Defendant.*

Case No. 26-cv-02912-DKC

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTIONS FOR AN ADMINISTRATIVE STAY, FOR A TRO AND FOR A
## PRELIMINARY INJUNCTION

Matthew Larosiere*
6964 Houlton Cir.
Lake Worth, FL 33467
Larosieremm@gmail.com
*Bar application pending


Dated: July 31, 2026

Mark W. Pennak
MARYLAND SHALL ISSUE, INC.
9613 Harford Rd, Ste. C #1015
Baltimore, MD 21234
mpennak@marylandshallissue.org
Phone: (301) 873-3671
District Court Bar # 21033

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

STATEMENT OF THE CASE..............................................................................................2

    A.    *Engage Armament*:.................................................................................................2

    B.    Bill 23-26: .................................................................................................................4

    C.    Maryland State Firearms Law:...............................................................................5

    D.    Statement of Facts:..................................................................................................7

ARGUMENT ..........................................................................................................................8

    I.    STANDARD FOR A PRELIMINARY INJUNCTION .......................................8

    II.    PLAINTIFFS HAVE STANDING......................................................................11

    III.    RELIEF IS APPROPRIATE UNDER COUNT I ..........................................12

    IV.    RELIEF IS APPROPRIATE UNDER COUNT II..........................................17

    V.    RELIEF IS APPROPRIATE UNDER COUNT III.........................................18

        A.    The *Bruen* Framework .....................................................................................18

        B.    Section 57-11(a) and Section 57-10 Are Unconstitutional ....................................24

CONCLUSION......................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024) ........................................................26

*AAR v. Hudson* 144 F.4th 582 (4th Cir. 2025) ................................................ 12

*Assanah-Carroll v. Law Offices of Edward J. Maher, PC.*, 480 Md. 394 (2022) .......................12

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989) ......................................10

*Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) ...........................8

*Di Base v. SPX Corp.*, 872 F.3d 224 (4th Cir. 2017) ....................................................8, 9

*District of Columbia v. Heller,* 554 U.S. 570 (2008) ........................................ 20, 24, 30

*Engage Armament LLC v. Montgomery County*, Md., 494 Md. 1 (2026) .............................*passim*

*Hardaway v. Nigrelli,* 639 F. Supp. 3d 422 (W.D.N.Y. 2022), *aff'd in part, vacated in part, and remanded, Antonyuk,* 89 F.4th 271 (2d Cir. 2023) ....................................................26

*Heller v. District of Columbia*, 670 F.3d 1224 (D.C. Cir. 2012) ....................................................20

*Holiday Universal, Inc. v. Montgomery County,* 377 Md. 305 (2003) .............................................2

*Hunt v. Wash. State Apple Ad. Comm'n,* 432 U.S. 333 (1977) .......................................................12

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) ...............................................................11

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026) ...............................................6, 25, 26, 27

*Kipke v. Moore*, 695 F.Supp.3d 638 (D.Md. 2023), *aff'd in part,*
165 F.4th 194 (4th Cir. 2026) ....................................................... 6, 9, 10, 11, 24

*Kipke v. Moore*, No. 1799L, Dkt. #95 (4th Cir. March 2, 2026) .................................................27

*Legend Night Club v. Miller,* 637 F.3d 291 (4th Cir. 2011) ...........................................................11

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ......................................................................10

*Montgomery Cty. v. Broadcast Equities, Inc.*, 360 Md. 438 (2000) ...............................................12

*Nathan v. Alamo Heights Indep. School District*, 173 F.4th 576 (5th Cir. 2026) ........................23

*New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022) ..........................................*passim*

*Novotny v. Moore,* No. 25-1324 (U.S. filed May 20, 2026)........................................................26

*Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020)............................................10

*Ross v. Meese*, 818 F.2d 1132 (4th Cir. 1987)...........................................................................10

*Short v. Hartman,* 87 F.4th 593 (4th Cir. 2023).........................................................................26

*Spencer v. Nigrelli*, 648 F. Supp. 3d 451 (W.D.N.Y. 2022), *aff'd on other grounds, Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *vacated and remanded,* 144 S.Ct. 2709 (2024), *reaffirmed sub nom. Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)..................................26

*St. Michael's Media,Inc. v. Mayor & City Council of Baltimore*,
 566 F.Supp.3d 327 (D. Md. 2021)...........................................................................................9

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..............................................................11

*Tyma v. Montgomery County,* 369 Md. 497 (2002) ....................................................................12

*United States v. Duvall,* 740 F.3d 604 (D.C. Cir. 2013)..............................................................26

*United States v. Hemani*, 146 S.Ct. 1677 (2026) ..................................................................*passim*

*United States v. Rahimi,* 602 U.S. 680 (2024) .............................................................19, 23, 28, 30

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)...............................................................8

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir 2024),
 *rev'd on other grounds,* 146 S.Ct. 2032 (2026) ....................................................................26

*Wolford v. Lopez*, 146 S.Ct. 2032 (2026) ..............................................................................*passim*

**Statutes**

2023 Maryland Laws, Ch. 680 (SB 1)..................................................................................6, 7, 25

2023 Maryland Laws, Ch. 651 (HB 824) ........................................................................................6

2022 Montgomery Co. Laws, Ch. 36 (Bill 21-22) ..................................................................*passim*

2026 Montgomery Co. Laws, Ch. 18 (Bill 23-26)...................................................................*passim*

MD Code, Criminal Law, § 4-203(b)(3),(4),(5)............................................................................27

MD Code, Criminal Law, § 4-209(b)(1)(i),(iii) ..............................................................................2

MD Code, Criminal Law, § 4-209(c) ...............................................................................7, 18, 28

MD Code, Criminal Law, § 6-411(c), (d)......................................................................6

MD Code, Criminal Law, § 6-411(d) ...............................................................6, 24, 25

MD Code, Criminal Law, §§ 4-111(a)(2), (a)(4), (a)(8) ...............................................6

MD Code, Criminal Law, §§ 4-111(b)(9)(i), 4-611(b)(6) .............................................6

MD Code, Criminal Law, §§ 4-111, 6-411 ...................................................................6

MD Code, Criminal Law, § 4-209(a)........................................................................2, 17

Md Code, Criminal Law, 4-209(b)(1)(iii) .....................................................................4

MD Code, Natural Resources, § 10-410(c)(1)...........................................................5, 28

MD Code, Public Safety, § 5-306(a)(6)(ii).....................................................................6

Montgomery County Charter, § 112 ...............................................................................9

Montgomery County Code, § 1-19...................................................................................5

Montgomery County Code § 57-10 ........................................................................passim

Montgomery County Code § 57-11(a)......................................................................passim

Montgomery County Code §57-11(b)(6)........................................................................12

**Rules**

Rule 201, Federal Rules of Evidence.......................................................................14, 16

**Treatises**

A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2022)..............9

**Constitutional Provisions**

Article XI-A of the Maryland Constitution ....................................................1, 3, 10, 17

U.S. Constitution, Amendment 2 .............................................................................passim

## INTRODUCTION

The Complaint challenges Montgomery County Emergency Bill 23-26E, enacted by the Montgomery County Council on July 21, 2026, to amend Chapter 57 of the Montgomery County Code ("Chapter 57"), and it was signed into law on July 27, 2026 ("Bill 23-26"). A copy of Bill 23-26 is attached to the Complaint as Exhibit A. That Bill was purportedly passed to bring the County law into alignment with the Maryland Supreme Court's opinion in *Engage Armament LLC v. Montgomery County*, Md., 494 Md. 1 (2026). As more fully set forth below, that attempt to bring the County into compliance with the Maryland Constitution and State law fails.

Bill 23-26 also violates the Second Amendment to the United States Constitution, as construed by *New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022), *United States v. Hemani*, 146 S.Ct. 1677 (2026), and *Wolford v. Lopez*, 146 S.Ct. 2032 (2026). Bill 23-26 "hobbles what the Second Amendment protects: the right of Americans to carry arms for self-defense as they go about their daily lives" and is therefore "unconstitutional." *Wolford,* 146 S.Ct. at 2041. Plaintiffs seek a temporary administrative stay to maintain the *status quo ante* to give this Court an opportunity to address the issues, including the motion for a TRO and the motion for a preliminary injunction. In these motions, Plaintiffs seek only limited relief, *viz.*, an order restraining the County enforcing Section 57-10 and Section 57-11(a) in so far as these two sections apply to a person who has received a wear and carry permit issued by the Maryland State Police. Any remaining issues may await final judgment on the merits.

**STATEMENT OF THE CASE**

A.      **Engage Armament:**

Montgomery County has chartered home rule under Section 3 of Article XI-A of the Maryland Constitution, and, under that provision, the County is empowered to enact only "local laws." Under these provisions, Montgomery County is not empowered to enact "general laws." Under Maryland law, "[a] general law ordinarily deals with 'a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state.'" *Engage Armament*, 494 Md. at 25, quoting *Holiday Universal, Inc. v. Montgomery County*, 377 Md. 305, 315 (2003).

In 2022, the Montgomery County Council enacted Bill 21-22 to amend Chapter 57 of the County Code, 2022 Laws of Montgomery County, Ch. 36, relying on the authority provided by MD Code, Criminal Law, § 4-209(b)(1). See Complaint, Exh. B. Bill 21-22 was enacted "in response to the United States Supreme Court's decision" in *Bruen*. *Engage Armament*, 494 Md. at 14. Section 4-209 "authorizes local regulation of six types of conduct related to firearms in three areas, two of which are relevant here: 'with respect to minors'; and 'within 100 yards of or in a park, church, school, public building, and other place of public assembly.'" *Id.*, 494 Md. at 13, citing MD Code, Criminal Law, § 4-209(b)(1)(i),(iii). "Any local firearm regulation that does not fit within the scope of that authorization is expressly preempted by, among other provisions, § 4-209(a)." *Id.*

*Engage Armament* invalidated Bill 21-22 in part. The Court first defined a "place of public assembly" as used in Section 4-209(b)(1)(iii) to be "a location that is open for members of the public to gather for a common purpose, such as deliberating, legislating, worship, entertainment, education, or recreation." 494 Md. at 15. The Court held that "hospitals, community health centers, long-term facilities, childcare facilities, and 'government building[s], including any place owned by or under

2

the control of the County,' are not fairly encompassed within the definition of a 'place of public assembly.'" 494 Md. at 16. *Engage Armament* therefore invalidated Chapter 57 to the extent it included those locations in its definition of "a place of public assembly." *Id*.

*Engage Armament* then addressed the plaintiffs' argument that Section 57-11(a) of the County Code "violates Article XI-A of the Maryland Constitution because it is not substantively a local law." 494 Md. at 25. The Court noted that "the cumulative effect of the amendments to Chapter 57—especially the expanded definition of place of public assembly and the elimination of the exception for permit holders from the restrictions in § 57-11(a)—prohibits all permit holders from carrying their firearms in a substantial portion of Montgomery County, including the State and county highways running through the County." 494 Md. at 27. *Engage Armament* explained that "§ 57-11(a), as amended, is not a local law because of its application to holders of State-issued wear-and-carry permits traveling on public highways who cross within 100 yards of a place of public assembly." 494 Md. at 28. The Court reasoned that the County law was a general law because "[a]pplying the County's regulation in that way imposes a burden on travel 'of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state.'" *Id*. (citation omitted). The Court further noted that the County's law "burden[s] permit holders, including the many who reside outside the County but drive within it, with the choice of significant travel restrictions or regularly yielding their benefits as permit holders." 494 Md. at 28.

In so holding, *Engage Armament* went on to state:

> Our holding that § 57-11(a) is not a local law because it reaches non-Montgomery County residents traveling within the County on public highways should not be interpreted as a determination that an exception for travel on public highways would alone remedy the problem and transform § 57-11(a) into a local law. Any determination of whether an amended § 57-11(a) is a local law will depend on the scope of the amended law and evidence concerning its effects.

3

494 Md. at 28 n.23. *Engage Armament* concluded: "In sum, we hold that § 57-11(a), as amended and currently constructed, is not a local law, and so is beyond the legislative authority of the County." 494 Md. at 28.

**B.      Bill 23-26:**

In response to *Engage Armament* the County enacted Bill 23-26. That Bill first amends Section 57-1 of the County Code to modify its definition of "a place of public assembly" by striking those locations invalidated by *Engage Armament.* 494 Md. at 16. As noted, *Engage Armament* held that those locations "are not fairly encompassed within the definition of a 'place of public assembly'" as used in Md Code, Criminal Law, 4-209(b)(1)(iii). *Id.* As thus amended, "a place of public assembly" under Chapter 57 is defined as: "(1) a publicly or privately owned: (A) park;[1] (B) place of worship; (C) school; (D) library; (E) recreational facility; or (F) multipurpose exhibition facility, such as a fairgrounds or conference center; (2) government building open to the public for the business of government or community use; (3) polling place; (4) courthouse; or (5) legislative assembly." "A 'place of public assembly' includes all property associated with the place, such as a parking lot or grounds of a building." See Complaint, Exh. A.

Bill 23-26 did not amend Section 57-11(a) of the County Code, which continues to provide that "[i]n or within 100 yards of a place of public assembly, a person must not: (1) sell, transfer, possess, or transport a ghost gun, undetectable gun, handgun, rifle, or shotgun, or ammunition or major component for these firearms." Bill 23-26, however, did amend Section 57-11(b) to state that Section 57-11(a) does not apply:

---

[1] As detailed in the Complaint, ¶ 18, the term "park" is not limited to a private or public "park" designated as such by signage or otherwise. By common dictionary definitions, "parks" may include an "area maintained in its natural state" or "a piece of ground in or near a city or town kept for ornament and recreation." https://www.merriam-webster.com/dictionary/park.

> [T]o a firearm that is carried or transported in a motor vehicle if the firearm is: (A) locked in a container; or (B) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

That amendment makes clear that Section 57-11(a) continues to apply to a permit holder who carries or transports a firearm while not traveling in "a motor vehicle," *viz.,* is on foot.

Bill 23-26 also amended Section 57-10 of the County Code which provides that "[i]t shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition. See Complaint ¶ 15. Bill 23-26 amended Section 57-10 to provide:

> This Section must not be interpreted to prohibit a firearm that is carried or transported on person or in a motor vehicle, as defined under the Maryland Transportation Article, as amended, if the firearm is: (1) in a motor vehicle, locked in a container; or (2) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

A violation of Chapter 57 is a strict liability offense and punished as "Class A violation" under Section 1-19 of the County Code by a $1,000 fine and 6 months in jail.

**C.    Maryland State Firearms Law:**

MD Code, Criminal Law, § 4-203(a)(1) broadly prohibits the wear, carry, or transport a handgun, whether concealed or open, "on or about the person" or "in a vehicle."  Subsection (b)(2) of Section 4-203 provides that Section 4-203(a) does not prohibit "the wearing, carrying, or transporting of a handgun by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article." State law prohibits only loaded long guns (ordinary rifles and shotguns) in or on a vehicle. MD Code, Natural Resources, § 10-

5

410(c)(1). Apart from "sensitive areas" where all firearms are banned, State law does not regulate the otherwise lawful possession of long guns or the transport of unloaded long guns in a vehicle.

After *Bruen*, the Maryland State Police began to issue wear and carry permits on a "shall issue" basis without regard to whether the applicant showed that he or she possessed a "good and substantial reason" previously required by Maryland State law, MD Code, Public Safety, § 5-306(a)(6)(ii). This "good and substantial reason" requirement was later struck down as unconstitutional in *In re Rounds,* 255 Md. App. 205 (2022). House Bill 824, 2023 Maryland Laws, Ch. 651, subsequently repealed the "good and substantial reason" requirement.

In response to *Bruen*, the 2023 Maryland General Assembly enacted Senate Bill 1, 2023 Maryland Laws, Chapter 680, codified in part at MD Code, Criminal Law, §§ 4-111, 6-411. Section 6-411 presumptively barred persons with firearms from entering a dwelling or any privately owned property without the prior consent of the private property owner via signage or otherwise. MD Code, Criminal Law, § 6-411(c), (d). SB 1 defined "property" for these purposes as "a building" and provided that "'property' does not include the land adjacent to a building." MD Code, Criminal Law, § 6-411(a)(6). This Court promptly enjoined enforcement of Section 6-411(d), holding that this restriction was unconstitutional under *Bruen*. See *Kipke v. Moore*, 695 F.Supp. 638 (D.Md. 2023). That ruling was affirmed in *Kipke v. Moore*, 165 F.4th 194, 218-19 (4th Cir. 2026), on grounds that "Maryland's rule would effectively declare most public places 'gun-free zones'" and that result "likely stretches the sensitive places doctrine too far."

SB 1 also imposed firearms restrictions in an "area for children and vulnerable individuals," in "special purpose" areas, and in "government or public infrastructure" areas. MD Code, Criminal Law, §§ 4-111(a)(2), (a)(4), (a)(8). SB 1 did not create 100-yard buffer zones or ban all firearms at privately owned parks, libraries, places of worship, recreational facilities, or at "all property

6

associated with the place, such as a parking lot or grounds of a building." SB 1 expressly preserved the right of a private property owner to possess firearms in all private property locations. MD Code, Criminal Law, §§ 4-111(b)(9)(i), 4-611(b)(6). SB 1 also enacted MD Code, Criminal Law, §§ 4-111(b)(9)(ii), which provides that an owner (or lessee) may also have an "express agreement" with permit holders to carry handguns (and with any adult with respect to long guns) in all privately owned areas regulated by SB 1. SB 1 punishes only a "person who willfully violates" its provisions. See §§ 4-111(f), Section 6-411(e).

**D.      Statement of Facts:**

The Plaintiffs are five individual members of Plaintiff Maryland Shall Issue, Inc. ("MSI") and MSI itself, suing on behalf of its members. Three of these individual Plaintiffs (Messrs. Barreto, and Moore and Dr. Sachs) live in Montgomery County. Two other Plaintiffs (Messrs. Duncan and Thacher) live in other Maryland counties but regularly visit and/or do business within the County. As part of their daily lives, all the individual Plaintiffs regularly walk on foot within 100 yards of "a place of public assembly" in the County, including entering many locations that are private property open to the public, such as stores. All the individual Plaintiffs have wear and carry permits issued by the State Police. MSI has other members who have carry permits and who live inside the County, as well as members who live outside the County but regularly visit and carry in the County. These members are regularly on foot within 100 yards of "a place of public assembly." MSI testified at the June 9, 2026, Council hearing, https://bit.ly/4xd1gD4, and submitted a 22-page memorandum of law in opposition. See Complaint, Exh. D. Each of the individual Plaintiffs has submitted

comprehensive Declarations that provide details concerning the Declarants' activities within the County. MSI's Declaration details similar activities of other members.

**ARGUMENT**

**I.      STANDARD FOR A PRELIMINARY INJUNCTION**

A party seeking a preliminary injunction order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) the injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). "The standard for obtaining either a TRO or a preliminary injunction is identical." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at \*3 (D.C. Cir. Feb. 15, 2025) (per curiam). When the government is the opposing party, these factors merge. *Roe v. Dep't of Def.,* 947 F.3d 207, 230 (4th Cir. 2020). The standard for an administrative stay under the All Writs Act, 28 U.S.C. § 1651, and the Court's inherent powers to manage its docket is simply whether the potential irreparable harms to the plaintiffs warrant staying the operative effect of a provision and maintaining the *status quo* while the Court awaits and/or considers a response to a complaint or a motion. See, e.g., *Doe 1 v. U.S. Office of Director of National Intelligence*, 2025 WL 540410 (D.D.C. Feb. 18, 2025).

All these elements are satisfied here. "A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Base v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (collecting case law). "[A] preliminary injunction can also act to restore, rather than merely preserve, the status quo, even when the nonmoving party has disturbed it." *Id.* at 231. This motion seeks to maintain the *status quo ante* pending a final judgment. The element of a likelihood of success "does not require a 'certainty of success,'" but only that "the plaintiff 'must make a clear showing that he is likely to succeed at

8

trial.'" *St. Michael's Media, Inc. v. Mayor & City Council of Balt.*, 566 F.Supp.3d 327, 351 (D. Md. 2021), quoting *Di Biase*, 872 F.3d at 230.

These standards are satisfied here because the bans imposed by Section 57-10 and Section 57-11(a) are unconstitutional under both the Maryland Constitution and the Second Amendment. On November 23, 2023, the Circuit Court for Montgomery County enjoined enforcement of both Section 57-10 and Section 57-11(a). See *Engage Armament*, 494 Md. at 4. The County never asked for a stay of that injunction. Since that time, permit holders, including the named Plaintiffs and other members of MSI, were protected by that injunction and were thus able to possess and carry firearms inside the County in accordance with State law. The County elected to enact Bill 23-26 as "emergency" legislation thereby making the Bill effective immediately, instead of after 91 days, as otherwise required by Section 112 of the County's Charter. The County has thus intentionally created the very "emergency" that necessitates immediate relief from this Court.

Bill 23-26 now effectively makes it nearly impossible for Plaintiffs and MSI members to carry as they go about their daily lives. Barreto Decl. ¶¶ 3, 4, 5; Sachs Decl. ¶¶ 3, 4; Moore Decl. ¶¶ 3, 4, 5, 6; Duncan Decl. ¶¶ 3, 4; Thacher Decl. ¶¶ 3, 4, 5, 6. MSI members are affected the same way. Johnston Decl. ¶¶ 4, 5, 6, 7, 10. One named Plaintiff, Dr. Howard Sachs, cannot even leave his home or enter his vehicle without violating Section 57-11(a). Sachs Decl. ¶ 4. See Section 57-11(b)(4) (exempting "possession of a firearm or ammunition … in the person's own home"). The same is true of another member of MSI who cannot carry when leaving leave his home or going into Olney as part of his regular activities. Johnston Decl. ¶ 5. MSI has another member, a non-County resident, who can no longer carry at work in Rockville, and still another member, also non-County resident, who can no longer carry while visiting family members in Friendship Heights, MD. *Id.* ¶ 6.

9

"The denial of a constitutional right, if denial is established, constitutes irreparable harm." *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); see also *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). That is why "[w]hen an alleged deprivation of a constitutional right is involved ... most courts hold that no further showing of irreparable injury is necessary." A Wright & Miller, Federal Practice and Procedure § 2948.1 (3d ed. 2022). There is no "hierarchy of constitutional rights." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 628 (1989). Thus, in *Kipke v. Moore*, 695 F.Supp.3d 638, 662 (D.Md. 2023), *aff'd in part,* 165 F.4th 194 (4th Cir. 2026), this Court ruled that "[t]he deprivation of a constitutional right 'unquestionably constitutes irreparable injury.'" (Quoting *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022)). That ruling applies equally to the State constitutional rights.

As *Kipke* implicitly recognized, the Second Amendment is entitled to the same recognition accorded to "other Bill of Rights guarantees." *Bruen,* 597 U.S. at 70. To hold otherwise would impermissibly "subject" the Second Amendment "to an entirely different body of rules." *Id.* "The right protected by the Second Amendment is entitled to no less protection than other constitutional rights." *Wolford*, 146 S.Ct. at 2050 n.13. "[W]hen the government crosses the line from permissible regulation into unconstitutional infringement, courts have a duty to say so in the cases before them—no less in the Second Amendment context than in any other." *Hermani*, 146 S.Ct. at 1685. This Court would not hesitate to enjoin violations of other Bill of Rights protections. It should likewise not hesitate to enforce the Second Amendment against infringements by the County in this case.

As demonstrated below, Chapter 57, as amended by Bill 23-26, disarms Plaintiffs and other permit holders in violation of their constitutional rights. Sections 57-10 and Section 57-11(a) are each a "general law" under Article XI-A of the Maryland Constitution. Section 57-10 is separately

10

preempted by State law. Section 57-10 and Section 57-11(a) also violate the Second Amendment, as most recently construed in *Wolford* and *Hemani.* The balance of the equities and the public interest favor Plaintiffs. The County was content with allowing the Circuit Court's injunction to stay in place for almost three years and that injunction was affirmed in part by *Engage Armament.* There is no reason to think that a TRO and a preliminary injunction would harm the County while this case is being litigated. The County has no legitimate interest in enforcing an unconstitutional law because "upholding constitutional rights is in the public interest." *Legend Night Club v. Miller,* 637 F.3d 291, 303 (4th Cir. 2011). "A state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted). See *Kipke,* 695 F.Supp.3d at 662-63.

## II.    PLAINTIFFS HAVE STANDING

Each of the individual plaintiffs has an "intent to engage in conduct proscribed by the statute" and thus has standing to bring this suit. *Kipke*, 165 F.4th at 212-13. See Barreto Decl. ¶¶ 5,6; Sachs Decl. ¶¶ 5,6; Moore Decl. ¶¶ 3, 4, 5,6; Duncan Decl. ¶¶ 4,5,6; Thacher Decl. ¶¶ 3,4,5,6. The harms inflicted on Plaintiffs' rights by the emergency enactment of Bill 23-26 are "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (citation omitted). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). The alleged harms are traceable to Chapter 57's bans and the requested relief will redress these injuries. Plaintiff MSI has standing to represent the interests of its members who are similarly harmed. See Johnston Decl.

11

¶¶ 3-6. *Hunt v. Wash. State Apple Ad. Comm'n,* 432 U.S. 333, 343 (1977); *AAR v. Hudson* 144 F.4th 582 (4th Cir. 2025).

### III.    RELIEF IS APPROPRIATE UNDER COUNT I

Count I alleges that Chapter 57, as amended by Bill 23-26, is not a local law under Article XI-A § 3, of the Maryland Constitution, as construed by *Engage Armament*. Under Article XI-A, § 3, "if an 'ordinance enacted by a charter county does not constitute a 'local law' within the meaning of Article XI-A, it is beyond the authority of a charter county and, therefore, is unconstitutional.'" *Assanah-Carroll v. Law Offices of Edward J. Maher, PC.*, 480 Md. 394, 424-25 (2022), quoting *Montgomery Cty. v. Broadcast Equities, Inc.*, 360 Md. 438, 441 n.1 (2000). A general law "deals with the general public welfare, a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." *Assanah-Carroll,* 480 Md. at 425. "Where a charter county attempts to enact an ordinance on 'matters of significant interest to the entire state,' [this Court has] determined that it is not, in fact, 'a local law' under Article XI-A." *Engage Armament*, 494 Md at 26, quoting *Assanah-Carroll*, 480 Md. at 25. A "local law deals with 'some matter of governmental administration peculiarly local in character in which persons outside of that locality have no direct interest.'" *Tyma v. Montgomery County,* 369 Md. 497, 507 n.7 (2002), quoting *Norris v. Mayor and City Council of Baltimore*, 172 Md. 667, 680 (1937). "[A] local law applies to only one subdivision" and "pertains only to a subject of local import.'" *Engage Armament*, 494 Md. at 25, quoting *Tyma*, 369 Md. at 507. "Even an act of the General Assembly cannot validly authorize a county to pass a general law." *Engage Armament*, 494 Md. at 25. MD Code, Criminal Law, § 4-209(b)(1) does not authorize the County to enact a general law.

In this case Section 57-11(a) of Chapter 57 provides: "In or within 100 yards of a place of public assembly, a person must not: (1) … possess, or transport a … handgun, rifle, or shotgun,

or ammunition or major component for these firearms." Section 57-11(b)(6), of Chapter 57, as amended by Bill 23-26, provides an exception to these bans for "the possession of a handgun by a person who has a permit to carry the handgun under State law while the person travels on public highways within 100 yards of a place of public assembly." (Emphasis added). As thus limited by Section 57-11(b)(6), Section 57-11(a) would apply to permit holders who are walking or on foot on or near a public sidewalk at or within 100 yards of "a place of public assembly" as defined by Bill 23-26.

That reality makes Section 57-11(a), as amended by Bill 23-26, a general law for the same reasons that Section 57-11(a), as amended by Bill 21-22, was found to be a general law in *Engage Armament*. The scope of Section 57-11, as amended by Bill 23-26 "burden[s] permit holders, including the many who reside outside the County" who drive into Montgomery County and exit their vehicles. These individuals face the same "choice of significant travel restrictions or regularly yielding their benefits as permit holders." *Engage Armament*, 494 Md. at 28. The "scope" of Bill 23-26 is still huge. *Engage Armament*, 494 Md. at 28 note 23. Section 57-11(a) extends to every non-resident permit holder who drives into the County and gets out of his or her vehicle. Given "the County's lengthy and complex highway system," which "carries large volumes of traffic coming from or going to the seven jurisdictions directly bordering the County," Chapter 57 "imposes a burden on travel 'of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state.'" *Engage Armament,* 494 Md. at 28 (citation omitted).

*Engage Armament* also invalidated Chapter 57 as a general law because "[i]n effect, the County's regulation creates pockets of roadway throughout the County's lengthy and complex highway system in which travelers with State-issued wear-and-carry permits are banned from

13

carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible from the road." *Engage Armament,* 494 Md. at 28. Bill 23-26, "in effect," likewise creates thousands of "pockets" of prohibited zones "throughout the County" in which permit holders "are banned from carrying firearms based on the proximity of those segments of roadway to buildings or locations that might not abut or even be visible" to a person on foot.

The "evidence concerning its effects," *Engage Armament,* 494 Md. at 28 n.23, is also compelling. As defined by Bill 23-26, "places of public assembly" literally encompass thousands of locations. Montgomery County GIS Open Data shows that Montgomery County is home to 1,262 public bikeways, https://bit.ly/40MxYgZ, 605 houses of worship, https://bit.ly/3OLbfvG, 693 public parks, https://bit.ly/3qjHLfb (not including four federal parks and any privately owned "parks"), 258 private schools, https://bit.ly/3RyA0wd, 137 public elementary schools, https://bit.ly/40JIzcB, 40 middle schools, https://bit.ly/3PTz8RL, 25 high schools, https://bit.ly/4htvDNF, 42 public recreation centers, https://bit.ly/3WB1VhL, 10 colleges and universities, https://bit.ly/3Csn5Yr, 29 municipalities https://bit.ly/4g9jAE8, 45 Post Offices, https://bit.ly/4h8YAhZ, 38 fire stations, https://bit.ly/4gfCxVy, 15 public swimming pools, https://bit.ly/4awPtW2, 13 Metro stations, https://bit.ly/4aySiG0, and 11 MARC commuter train locations, https://bit.ly/3Cdo3b7. The County's 100-yard bans extend to any "park," including federal parks where carry with a permit is allowed by federal law. See 54 U.S.C. § 104906. See Complaint ¶ 17. All these places are identified by name and address in the GIS data, are not subject to reasonable dispute, and thus may be judicially noticed under Rule 201 of the FRE.

Similarly, using MNCPPC - Montgomery County Data Catalog - Property data, Plaintiffs have developed an interactive webpage consisting of a map of the areas that qualify as a "place

of assembly" as that term is defined by Bill 23-26. See Complaint ¶ 19; Lettman Decl. ¶¶ 3,4. Specific details of each parcel, including its address and classification according to County records, can be shown simply by dragging a mouse across individual areas. That interactive map can be found at https://public.johnlettman.com/montgomery/, and it demonstrates that there are nearly 86,000 acres (over 26 percent of the County), that fall within the definition of a "place of public assembly" as defined by Bill 23-26. That includes public places designated for "common use" by the County. By land use category, there are, for example, 3,926 parcels labeled as "parks," comprising almost 16 percent of the County. Area calculations exclude 100-yard buffer zones. See Complaint ¶ 19. A non-interactive Scalable Vector Graphic of this data is shown below:



The indisputable data for "effect" also includes the raw number of permit holders throughout the State who are affected by Bill 23-26. See Complaint, ¶ 62, Exh. E. As of April 2025, there were more than 200,000 people who possessed a Maryland wear and carry permit,

15

with Baltimore County residents having the most permits at 29,214 permits and Prince George's County residents coming in second with 25,770 permits. https://perma.cc/T272-NA8G. As of that point in time, just 1% of Montgomery County's 1.1 million residents, or 11,173 people, had carry permits. *Id.* Between November 16, 2024, and November 15, 2025, the Maryland State Police issued a total of 98,154 wear and carry permits, of which only 6,504 permits were issued to residents of Montgomery County. See MARYLAND STATE POLICE - LICENSING DIVISION, 2025 HANDGUN PERMIT REPORT EXECUTIVE SUMMARY CHART, attached as Exhibit E to the Complaint.[2] In sum, Section 57-11(a) creates thousands of pockets of 100-yard "gun-free zones" that directly affect all these permit holders the moment they stop and get out of their vehicles inside the County. See Complaint, ¶ 19.

The effects of Section 57-10 are even more dire in their extraterritorial impact. Section 57-10 regulates every person, permit holder or otherwise, all County residents and all non-County residents, who travel in the County, providing that "[i]t shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition." (Emphasis supplied). Section 57-10 on its face regulates all firearms (not merely handguns) and all types of ammunition (not merely handgun ammunition) with respect to possession "upon his person" or "in a motor vehicle" in the County.

These restrictions are not limited to "pockets," and their effects are not limited to "the people who live in the county." *Engage Armament*, 494 Md. at 26 (citation omitted). Rather, Section 57-10 affects everyone in the State (and elsewhere) who happen to get out of their vehicles after driving through the County with firearms or ammunition on a "highway system

---

[2] The Court may take judicial notice of this Report under Rule 201 of the Federal Rules of Evidence, as it is an official report issued by the Maryland State Police as required by MD Code, Public Safety, § 5-312, and the information therein is "not subject to reasonable dispute."

[that] carries large volumes of traffic coming from or going to the seven jurisdictions directly bordering the County." *Engage Armament*, 494 Md. at 28. Section 57-10 plainly "has significant extraterritorial impact" and thus violates Article XI-A no less than Section 57-11(a). *Id.* And it matters not at all whether Section 57-10 (or Section 57-11(a)) is authorized by a State statute because "[e]ven an act of the General Assembly cannot validly authorize a county to pass a general law." *Id.* at 25. For all these reasons, neither Section 57-10 nor Section 57-11(a) is "a local law" within the meaning of Article XI-A of the Maryland Constitution. *Id.* at 26.

## IV.    RELIEF IS APPROPRIATE UNDER COUNT II

Count II focuses on Section 57-10 which provides: "It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition." Count II alleges that Section 57-10 is preempted by MD Code, Criminal Law, § 4-209(a), and by the express preemption of local regulation regarding the "wearing, carrying or transporting of handguns," as imposed by 1972 Maryland Laws, Ch. 13, § 6, and the express preemption of local regulation of the "possession" of "regulated firearms" imposed by MD Code, Public Safety, § 5-133(a). Complaint ¶¶ 75, 76.

*Engage Armament* held that County restrictions for places of public assembly properly enacted under MD Code, Criminal Law, § 4-209(b)(1)(iii) were not preempted by these express preemption provisions. *Engage Armamen*t, 494 Md. at 13. But in so holding the Court also ruled that "[a]ny local firearm regulation that does not fit within the scope of that authorization is expressly preempted by, among other provisions, § 4-209(a)." *Id*. (emphasis added). Precisely because Section 57-10 is County-wide, it is indisputably not limited to "places of public assembly." It therefore "does not fit" within Section 4-209(b)(1)(iii) and is preempted.

17

The County will no doubt respond that Section 57-10 is a recodification of a prior section of the County Code that existed prior to the 1985 enactment of Section 4-209 and is thus valid under Section 2 of that legislation, 1985 Laws of Maryland, Ch. 724. Section 2 provided that "this Act shall not affect or repeal any local ordinance in existence as of January 1, 1985." That argument fails. Section 4-209(c), as enacted in 1985, also provides: "To the extent that a local law does not create an inconsistency with this section or expand existing regulatory control, a county, municipal corporation, or special taxing district may exercise its existing authority to amend any local law that existed on or before December 31, 1984." (Emphasis added).

As noted, Bill 23-26 expressly amends Section 57-10, providing: "This Section must not be interpreted to prohibit a firearm that is carried or transported on person or in a motor vehicle, as defined under the Maryland Transportation Article, as amended, if the firearm is: (1) in a motor vehicle, locked in a container; or (2) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code" by a person who has a wear and carry permit.  Nothing in that amendment is remotely limited to "places of public assembly." It is therefore "inconsistent" with limited grant of authority provided by Section 4-20(b)(1)(iii) and fails under Section 4-209(c). Indeed, the amendment makes Section 57-10 **more** restrictive as the only sure way to avoid prosecution under Section 57-10 is to "lock[] in a container" all firearms. The exception for permit holders applies only to handguns. For all these reasons, Section 57-10, as amended by Bill 23-26, is preempted.

## V.    RELIEF IS APPROPRIATE UNDER COUNT III

### A.    The *Bruen* Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." "[T]he Second

Amendment embodies a uniform national standard" that is equally applicable to the States and the federal government. *Wolford v. Lopez*, 146 S.Ct. 2032, 2042 (2026). "The Second Amendment protects[] the right of Americans to carry arms for self-defense as they go about their daily lives." *Wolford,* 146 S.Ct. at 2041. "The right protected by the Second Amendment is entitled to no less protection than other constitutional rights." *Id.* at 2050 n.13.

*New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1, 28 (2022), established a two-step process for analyzing Second Amendment claims. At the *Bruen* Step One "stage … the question is simply whether a challenged law falls within the Second Amendment's 'plain text.'" *Wolford,* 146 S.Ct. at 2049, quoting *Bruen,* 597 U. S. at 24. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen,* 597 U.S. at 24. See also *United States v. Hemani*, 146 S.Ct. 1677, 1685 (2026) ("we begin by asking whether the Amendment's terms cover the conduct in question" and if so "the Constitution 'presumptively' protects it"), quoting *Bruen*, 597 U.S. at 24. "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional." *Wolford*, 146 S.Ct. at 2044. This textual inquiry is determined by whether "the law place[s] *any restrictions* on either the 'keep[ing]' (*i.e.*, possession) or the 'bear[ing]' (*i.e.*, carrying) of arms." *Id.* at 2043, quoting *Bruen*, 597 U.S. at 32-33. (Emphasis added). "[H]istorical materials and precedents" "are out of place at *Bruen*'s first step." *Id.* at 2049. A court may not "smuggle additional limits, drawn from our regulatory tradition into the plain-text stage of the inquiry." *Id.* at 2054 n.1 (Barrett, J., concurring).

At Step Two of the *Bruen* analysis, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *United States v. Rahimi,* 602 U.S. 680, 692 (2024). See also *Hemani*, 146 S.Ct. at 1691 ("'Even when a law regulates arms-

bearing for a permissible reason,' we have said, 'it may not be compatible with the [Second Amendment] if it does so to an extent beyond what was done at the founding.'"), quoting *Rahimi*, 602 U. S. at 692. "Why and how the regulation burdens the right are central to this inquiry." *Rahimi,* 602 U. S. at 692. In performing this inquiry under Step Two, courts may not engage in "an ahistorical and 'judge-empowering interest-balancing inquiry.'" *Wolford*, 146 S.Ct. at 2042, quoting *District of Columbia v. Heller,* 554 U.S. 570, 634 (2008) (internal quotes omitted). Accord *Bruen*, 597 U.S. at 22.

*Bruen* establishes several requirements to determine whether a historical regulation is sufficiently analogous. "'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.'" *Bruen,* 597 U.S. at 34, quoting *Heller,* 554 U.S. at 634-35. 20th century and late 19th century statutes and regulations "cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen,* 597 U.S. at 66 & n.28. "'[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Bruen*, 597 U.S. at 29, quoting *Heller v. District of Columbia*, 670 F.3d 1224, 1274 n.6 (D.C. Cir. 2012) (Kavanaugh, J., dissenting). See also *Hemani*, 146 S.Ct. at 1690 (a historical law must have been "focused on protecting the public" in the same concrete sense as the challenged restriction).

Restrictions on the right to keep and bear arms dating from after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide an appropriate historical analogue required by *Bruen*. Only those restrictions with roots in the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Bruen*, 597 U.S. at 24. See also *Hemani,* 146 S.Ct. at 1686 ("the more a modern law diverges from traditional laws in purpose and operation,

20

the less likely it is to survive review"); *Wolford,* 146 S.Ct. at 2044 ("acceptance [of a restriction] may be express, as when judicial decisions explicitly acknowledged the rule's legality. Or the acceptance may be tacit, as when a restriction on the keeping or carrying of arms was "open, widespread, and unchallenged.").

The historical analogue must be "well-established and representative." *Bruen,* 597 U.S. at 30. Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Id.,* 597 U.S. at 30, 55 n.22 & 65. "An outlier legal rule adopted in a few locales is not enough." *Wolford,* 146 S.Ct. at 2050. See also *id.* at 2053 ("a lone statute adopted nearly a century after the adoption of the Second Amendment and well after the adoption of the Fourteenth Amendment sheds little if any light on the meaning of the Second Amendment right"); *Id.* (a statute that "was neither widespread nor widely accepted … carries no weight"). Late 19th and early 20th century statutes are too late. *Bruen,* 597 U.S. at 66 n.28.

Most importantly, the historical analogue must be "relevantly similar," which is to say that it must burden ordinary, law-abiding citizens' rights in a similar manner and for similar reasons. *Bruen*, 597 U.S. at 28-29; *Wolford*, 146 S.Ct. at 2052. That inquiry is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era. *Bruen*, 597 U.S. at 29. As stated in *Wolford*:

> Determining whether this condition is met requires consideration of 'how' the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. And a court must also consider 'why' the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law.

146 S.Ct. at 2044.

Courts must assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29.

21

"[T]he relevant question under *Bruen* ... is not simply whether two laws targeted similar conduct. It is instead *why* they targeted that conduct—that is, what 'reason' justified the restriction." *Wolford,* 146 S.Ct. at 2060 n.10 (Barrett, J., concurring).

The possession and transport of firearms, as regulated by Chapter 57, is all conduct "that could have occurred when the Second and Fourteenth Amendments were adopted." *Wolford*, 146 S.Ct. at 2045. The "how" inquiry mandated by *Bruen* requires that government prove well-established and representative analogue restrictions which were "similar to that imposed by the challenged law." *Id.* at 2044. In such cases, the analogue must be "distinctly similar" to the modern law and "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen,* 597 U.S. at 27. Thus, in *Wolford*, the Court rejected Hawaii's reliance on historical anti-poaching laws, holding that "[t]hese old laws, however, are vastly different from Hawaii's new default rule." 146 S.Ct. at 2051. Similarly, in *Hemani*, the Court rejected the government's suggested analogues because they "targeted different kinds of people, did so for different purposes, and operated in different ways." 146 S.Ct. at 1687.

Even in cases where "the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted," "the 'how' and 'why' of the historical analogue and modern regulation must be close enough to enable a court to say: 'Because this historical law was understood to be compatible with the right codified by the Second Amendment, we can infer that the restriction imposed by the modern law is likewise consistent with that right.'" *Wolford,* 146 S.Ct. at 2044. In such instances, "application of step two of the *Bruen* framework called for" analogues that "were sufficiently similar to support the provision's constitutionality because the challenged regulation was 'consistent with the principles that underpin our regulatory

22

tradition.'" *Id.* at 2045, quoting *Rahimi,* 602 U.S. at 698-99. See *Bruen*, 597 U.S. at 39 ("'[T]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted,* not as they existed in the Middle Ages.'"); *Rahimi,* 602 U.S. at 697 (relying on "the ancient common-law prohibition on affrays"); *Wolford*, 146 S.Ct. at 2045 (relying on the historical common law of trespass).

The historical analysis is a legal inquiry which is appropriately presented in briefs. See *Bruen*, 597 U.S. at 25 n.6 (noting that the historical inquiry presents "legal questions" that judges can address) (emphasis in original). See also *id.* at 33 n.8 (rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). The historical inquiry is a matter of legislative facts and poses questions of constitutional law for the Court. See, e.g., *Nathan v. Alamo Heights Indep. School District*, 173 F.4th 576, 607-08 & n.57 (5th Cir. 2026) (collecting authorities). Expert testimony on analogues is neither appropriate nor probative. *Id.* Accordingly, the required analogue inquiry does not require fact-finding by a court or opinion testimony of expert witnesses. Discovery is not appropriate or necessary.

In *Wolford,* the Supreme Court reaffirmed *Bruen*'s holding that "the Second and Fourteenth Amendments protect the right to carry handguns outside the home for self-defense," 146 S.Ct. at 2041, and struck down Hawaii's ban on firearms on private property held open to the public unless the private property owner consented, either by signage or otherwise. The Court reasoned that "[t]he effect of this new rule is to impose severe restrictions on the daily activities of residents" because the law barred residents "from entering many places that people routinely visit in the course of their daily routines, such as gas stations, convenience stores, restaurants, coffee shops, drug stores,

23

grocery stores, 'big box' stores, home improvement stores, barber shops or hair salons, dry cleaners, and laundromats." *Id. Wolford* thus confirms the Fourth Circuit's holding in *Kipke* that the presumptive ban of firearms in or on private property open to the public, as imposed by MD Code, Criminal Law, § 6-411(d), is unconstitutional. *Wolford*, 146 S.Ct. at 2046 (citing Section 6-411(d) as imposing the same ban as Hawaii).

These principles bear heavily on so-called "sensitive places." The Supreme Court has, several times, pointed to historical regulations on the right to keep and bear arms in discrete locations that it has called "sensitive place[]" laws. See *Heller*, 554 U.S. at 626; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010); *Bruen*, 597 U.S. at 30–31; *Wolford*, 146 S.Ct. at 2042. *Bruen* mentioned historical restrictions on carrying in "legislative assemblies, polling places, and courthouses," and "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Bruen*, 597 U.S. at 30. But in so holding, the *Bruen* Court made clear that the government may not ban firearms in crowded places because any such rule would "eviscerate" the general right to publicly carry arms for self-defense. *Id.* at 31. The burden is on the County to put forth analogues to these sensitive places. With the guidance provided by *Wolford* and *Hemani*, it cannot do so.

### B.      Section 57-11(a) and Section 57-10 Are Unconstitutional

There can be no dispute here that "'the plain text of the Second Amendment protects' what petitioners want to do: carry handguns for self-defense." *Wolford*, 146 S.Ct. at 2047. See also *Kipke*, 165 F.4th at 207-08. Likewise, Plaintiffs do not challenge the County's bans in schools, government buildings, polling places and legislative assemblies. But Chapter 57 is far broader because the County has enacted a legal scheme that effectively "den[ies] ordinary citizens their right to public carry" everywhere in the County and thus fails at *Bruen* Step Two.  *Bruen,* 142 S.Ct. at 2138 n.9.

24

Indeed, the County's total bans on arms within 100 yards of all places of public assembly create so many 100-yard, gun-free zones that carry permit holders are barred from carrying in vast acreage of private property held open to the public. The scope of the bans, the number of permit holders State-wide and in nearby counties, and the declarations of the Plaintiffs all make that self-evident.

These bans on arms on private property open to the public are, of course, precisely the type of bans that *Wolford*, and the Fourth Circuit in *Kipke*, held to be unconstitutional. Indeed, the County's bans are more restrictive than the restrictions invalidated in *Wolford* and *Kipke*; the statutes at issue in those cases at least allowed the private property owner to possess firearms and empowered the owner to give consent to arms on his or her private property. Here, Section 57-11(a) and Section 57-10 ban possession of arms on private property by even the owner who has no power to give consent. As noted, SB 1 expressly preserves the right of private owners to possess arms and give consent even in the otherwise sensitive places that are restricted by that legislation.

As *Wolford* and *Kipke* make clear, Section 57-10 and Section 57-11(a) fail the "how and why" inquiry. There is no "well-established, representative historical analogue" for Chapter 57's bans on the possession or transport of firearms at privately owned places open to the public, including privately owned parks, places of worship, libraries, recreational facilities, multipurpose exhibition facilities, fairgrounds or conference centers. SB 1, for example, does not impose any restrictions at any of these privately owned places other than the presumptive ban created by MD Code, Criminal Law, § 6-411(d), which was struck down by the Fourth Circuit in *Kipke* in a holding that *Wolford* confirms. Nor is there any "well-established, representative historical analogue" for "all property associated with the place, such as a parking lot or grounds of a building" for these areas. *Wolford* invalidated the Hawaii statute which presumptively banned firearms in the building, and the parking lots of private property open to the public. See *Wolford*, 146 S.Ct. at 2048.

25

Likewise, there is no "well-established, representative historical analogue" for Section 57-11(a)'s bans imposed on the 100-yard zone around any of these privately owned locations that are open to the public, including places of worship. For example, not even the Ninth Circuit was willing to tolerate bans at places of worship. *Wolford v. Lopez*, 116 F.4th 959, 996 (9th Cir 2024), *rev'd on other grounds,* 146 S.Ct. 2032 (2026) (affirming district court's holding that "Plaintiffs are likely to succeed" in their challenge to California's prohibition on "the carry of firearms at places of worship").[3] The Ninth Circuit likewise struck down Hawaii's bans with respect to shared parking lots adjacent to government buildings. 116 F.4th at 991-92.

While the Ninth Circuit in *Wolford* upheld other bans at the so-called "sensitive places" there at issue, the Supreme Court reversed the Ninth Circuit's decision as to the presumptive bans on private property open to the public and remanded the case "for further proceedings consistent with this opinion," 146 S.Ct. at 2053. The Ninth Circuit's "sensitive places" rulings must thus be reconsidered on remand. Going forward, the lower courts must adhere to *Hemani*'s and *Wolford*'s clarification of *Bruen* in addressing the constitutionality of bans in such places. That point applies equally to the "sensitive places" bans sustained in *Kipke*. See *Short v. Hartman,* 87 F.4th 593, 605 (4th Cir. 2023) (circuit "precedent ... is not binding if it subsequently proves untenable considering Supreme Court decisions").[4] See *United States v. Duvall,* 740 F.3d 604, 609 (D.C. Cir. 2013)

---

[3] Other courts are in accord. See, e.g,, *Spencer v. Nigrelli*, 648 F. Supp. 3d 451, 467–68 (W.D.N.Y. 2022), *aff'd on other grounds, Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *vacated and remanded,* 144 S.Ct. 2709 (2024), *reaffirmed sub nom. Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024); *Hardaway v. Nigrelli,* 639 F. Supp. 3d 422, 439–43 (W.D.N.Y. 2022), *aff'd in part, vacated in part, and remanded, Antonyuk,* 89 F.4th 271. See also *Antonyuk*, 120 F.4th at 1014 ("The New York legislature amended the place of worship provision after the district courts enjoined it," noting the law as amended "has an exception for 'those persons responsible for security at such place of worship.'").

[4] The plaintiffs in *Kipke* have filed a petition for certiorari challenging the Fourth Circuit's "sensitive places" rulings. *Novotny v. Moore,* No. 25-1324 (U.S. filed May 20, 2026). In the

(Kavanaugh J., concurring in the denial of rehearing en banc) ("Vertical *stare decisis* applies to Supreme Court precedent in two ways. First, the result in a given Supreme Court case binds all lower courts. Second, the reasoning of a Supreme Court case also binds lower courts. So once a rule, test, standard, or interpretation has been adopted by the Supreme Court, that same rule, test, standard, or interpretation must be used by lower courts in later cases.").

There is certainly no "well-established, representative historical analogue" for the total bans imposed by Section 57-10 on the possession and transportation of all firearms (including long guns), concealed or unconcealed, upon the person or in a vehicle. While *Bruen* suggested that States may condition the concealed carry of handguns by requiring shall-issue carry permits, *Bruen*, 597 U.S. at 38 n.9, Section 57-10 applies to all firearms and, prior to Bill 23-26,  did not respect carry permits at all. While there are exceptions listed in Section 57-10 (Complaint ¶ 15), none of those exceptions allow possession for self-defense. The amendment made to Section 57-10 by Bill 23-26 for carry permit holders does not help Section 57-10. First, the exception for permit holders is limited to handguns and thus does not apply to possession or transport of long guns. All long guns (and handguns possessed by persons without a permit) must be "locked in a container" as the only sure way to avoid criminal liability. In contrast, State law allows possession and transport of a handgun by non-permit holders if it is "unloaded and carried in an enclosed case or an enclosed holster," MD Code, Criminal Law, § 4-203(b)(3),(4),(5), and imposes no restrictions on the possession and transport of unloaded long guns in a vehicle. MD Code, Natural Resources, § 10-410(c)(1). Second, and as noted above, that amendment enacted by Bill 23-26 makes Section 57-10 "inconsistent" with the limited authority afforded by Section 4-209(b)(1)(iii), and accordingly is precluded by Section

---

meantime, the Fourth Circuit has stayed its mandate in *Kipke* pending disposition of that petition for certiorari, thereby leaving the district court's decision in full effect. *Kipke v. Moore*, No. 1799L, Dkt. #95 (4th Cir. March 2, 2026).

27

4-209(c). The amendment is thus void *ab initio*. In sum, the County will be unable to carry its burden as to either Section 57-10 or Section 57-11(a).

Even more clearly, Section 57-10 and Section 57-11(a) fail the "why" inquiry mandated by *Bruen,* as clarified by *Rahimi, Wolford* and *Hemani.* Indeed, the "why" inquiry is dispositive of this case without any need to undertake the "how" inquiry. The only rationale for the County's bans is that the County's political leadership intensively dislikes firearms in public spaces. In enacting Bill 21-22, the County sought to restrict such possession of firearms to the maximum extent possible after *Bruen* was decided by vastly (and illegally) broadening the definition of "a place of public assembly" in the multiple ways struck down in *Engage Armament*, and by also repealing the existing exemption for permit holders then found in Section 57-11(b). *Engage Armament,* 494 Md. at 21 ("Before the Amendments, § 57-11(b)(5) excepted all holders of State-issued wear-and-carry permits from the restrictions contained in § 57-11(a).").

County officials acted in open defiance of *Bruen* in enacting that legislation. The Council President (and bill sponsor) announced: "This legislation will help to ensure that we do everything possible to minimize the amount of guns in our public space." Press Release (July 12, 2022), https://bit.ly/3VvCf3u. Other County officials unanimously agreed. See County Executive Media Briefing (June 29, 2022), https://bit.ly/3B9ucB4 (starting at 01:29); County Council Hearing on Bill 21-22E, https://bit.ly/3P1mmz9 (starting at 01:40). Those views were endorsed by the leadership of the Montgomery County Police Department, *id.*, by the County Council, County Session (Nov. 15, 2022), https://bit.ly/3VydQdF (starting at 02:04:13), and by the County Executive, FOX 5 DC (Oct. 31, 2022), https://bit.ly/3ET5bv3 (starting at 02:05).

Fundamentally, any regulation of arms-bearing conduct must be "for a permissible reason." *Rahimi*, 602 U.S.at 692. Disagreement with the right to keep and bear arms is not such a reason.

28

Like Hawaii in *Wolford*, County political leaders "disapprove of people carrying guns in public." *Wolford*, 146 S.Ct. at 2056 (Barrett, J., concurring). And like Hawaii, the County "is responding to the general danger associated with the presence of firearms, not to any specific, heightened risk of their misuse." *Id*. at 2058. But such concerns are not "a permissible reason" for restrictions because, as in *Wolford*, "[m]ere disapproval of protected conduct is not a valid reason to severely restrict it." *Id*. (Emphasis added). That point *should* be obvious. Like Hawaii, the County can offer "no evidence" of any laws in our Nation's history that "were designed to vindicate the community's aversion to people carrying guns in public." *Id.* It is simply not "plausible" that any such laws ever existed during the Founding or any other relative period. *Id.* "Merely local attitudes can neither shrink nor inflate the meaning of fundamental Bill of Rights guarantees that apply to the States through the Fourteenth Amendment." *Wolford*, 146 S.Ct. at 2050.

Stated differently, there are no historical analogues that had a "distinctly similar" "rationale" for the type of restrictions imposed by the County. See *Wolford*, 146 S.Ct. at 2044. Those distinctly similar analogues must be for legitimate and "permissible" reasons. For example, *Wolford* rejected out of hand Hawaii's reliance on historical "Black Codes" which were enacted for the purpose of restricting the possession of arms by a disfavored segment of the population (newly freed slaves). See *Wolford,* 146 S.Ct. at 2053 ("The statute Hawaii cites was part of Louisiana's Black Code, and it provided a tool for disarming blacks and thus leaving them defenseless against attacks."). As the Court stated, "[u]nless we put history entirely out of our minds, Hawaii's claim that this tainted artifact illuminates the original understanding of the right to keep and bear arms cannot be taken seriously." *Id.*

Bills 21-22 and 23-26 are, of course, not "Black Codes," but these Bills and the Black Codes do share the same fundamentally flawed rationale, *viz.,* the felt need to disarm Americans purely for

29

the sake of disarmament. Section 57-11(a) leaves people "defenseless against attacks" at and within 100 yards of the outer perimeter of the grounds and parking lots of places of worship and at thousands of other locations throughout the County. Section 57-10 does the same thing throughout the County by effectively requiring people (including permit holders for long guns) to lock up their firearms in a "container" where the firearms are useless "for the purpose of immediate self-defense." *Heller*, 554 U.S. at 635 (striking down D.C.'s safe storage law). Purposely leaving people defenseless is indefensible because "[t]he Second Amendment protects[] the right of Americans to carry arms for self-defense as they go about their daily lives." *Wolford*, 146 S.Ct. at 2041. Without a "permissible reason," the County's laws cannot possibly survive the "why" inquiry mandated by *Bruen, Rahimi, Wolford* and *Hemani*.

## CONCLUSION

For all the foregoing reasons, this Court should grant Plaintiffs' motions for an administrative stay, a TRO and a preliminary injunction against the enforcement of Section 57-11(a) and Section 57-10 of Chapter 57.

Respectfully submitted,

*/s/ Mark W. Pennak*

Matthew Larosiere*                          Mark W. Pennak
6964 Houlton Cir.                           MARYLAND SHALL ISSUE, INC.
Lake Worth, FL 33467                        9613 Harford Rd, Ste. C #1015
Larosieremm@gmail.com                       Baltimore, MD 21234
*Bar application pending                    mpennak@marylandshallissue.org
                                            Phone: (301) 873-3671
                                            District Court Bar # 21033

Dated: July 31, 2026.
                      *Counsel for Plaintiffs*