IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JULIO BARRETO, JR., et al. :

v. : Civil Action No. DKC 26-2912

MONTGOMERY COUNTY, MARYLAND :

**MEMORANDUM OPINION**

Plaintiffs Julio Barreto, Jr., Dr. Howard Sachs, Matthew Edward Moore, Alan Duncan, Arthur Scott Thacher, and Maryland Shall Issue, Inc. (collectively, "Plaintiffs") filed a complaint against Defendant Montgomery County, Maryland ("County") challenging portions of the Montgomery County law on weapons, purportedly focused on recent amendments in "Expedited Bill No. 23-26" ("EB23-26").[1] (ECF No. 1). Presently pending and ready for resolution is the motion for administrative stay,[2] temporary restraining order ("TRO"), or preliminary injunction filed by Plaintiffs. (ECF No. 8). On September 3, 2026, the court held a hearing on the motion in coordination with another case challenging some of the same

---

[1] The dispute is not just about the amendments enacted in EB23-26. Rather, the underlying County regulation of firearm possession by persons holding permits to carry, wear, or transport a handgun ("Permit") must be addressed.

[2] It is both inappropriate and unnecessary to issue an administrative stay in the circumstances presented here. An administrative stay may be necessary if a defendant is about to take action that could moot an action before a court has time to act or to determine its own jurisdiction.

provisions of the County Code.[3] For the following reasons, the motion for a preliminary injunction will be denied.

## I. Background

### A. The Challenged Provisions of the Montgomery County Code

Section 57-11 of the Montgomery County Code prohibits the sale, transfer, possession, or transport of firearms, ammunition, or major component for firearms "[i]n or within 100 yards of a place of public assembly." Montgomery Cnty., Md, Code ("Code") Section 57-11(a). "A place of public assembly" is defined currently as follows:

> **57-1 Definitions – place of public assembly**
> (1) a publicly or privately owned:
> (A) park;
> (B) place of worship;
> (C) school;
> (D) library;
> (E) recreational facility; or
> (F) multipurpose exhibition facility, such as a fairgrounds or conference center;
> (2) government building open to the public for the business of government or community use;
> (3) polling place;
> (4) courthouse; or
> (5) legislative assembly.

[3] The other case is *Silver Spring Jewish Center, Inc. and Rabbi J. Menashe Shapiro v. Montgomery County, Md., et al.*, DKC 26-2963. "[F]or now, the cases [are] coordinated, but not consolidated." (ECF No. 14).

> A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

*Id.* Section 57-1. The prohibition in Section 57-11 does not extend to security guards licensed to carry the firearm and contains other exceptions not relevant here. *Id.* Section 57-11(b).

Section 57-10 of the Code provides:

> **57-10 Keeping guns on person or in vehicles.** It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition unless:
>
> (a) *Lawful mission.* Such person is then engaged upon a lawful mission for which it is necessary to carry a gun upon his person; or
>
> (b) *Special guard, special police, etc.* Such person is employed as a special guard, special police officer or special detective and has been lawfully deputized by the sheriff for the county, or has been appointed a constable in the county, or has been licensed under the laws of the state, should such a law be enacted, to carry such gun and then is on or in the immediate vicinity of the premises of any employer whose occupation lawfully requires the employment of a person carrying a gun while in the discharge of the duties of such employment; or
>
> (c) *Military service.* Such person is then lawfully engaged in military service or as a duly authorized peace officer; or
>
> (d) *Hunting, target practice, etc.* Such person is engaged in lawful hunting, drill, training or target practice on property of which he is the owner or lessee or on property with the prior

> permission of the owner or lessee thereof; or
>
> (e) *Going to or returning from hunting, target practice, etc.* Such person is engaged in going to or from lawful hunting, drill training or target practice, or in delivering such gun to or carrying it from a gunsmith or repairman, or is engaged in any other lawful transfer of possession; provided, that such person shall be on or traveling upon a public highway or property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; provided further, that such gun shall not be loaded with explosive ammunition.
>
> This Section is not to be interpreted to prohibit a firearm that is carried or transported on person or in a motor vehicle, as defined under the Maryland Transportation Article, as amended, if the firearm is:
>
> (1) In a motor vehicle, locked in a container; or
>
> (2) A handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

A violation of Section 57-10 or -11 is a "Class A violation to which the maximum penalties for a Class A violation apply." Code Section 57-15. A criminal Class A violation is punishable by a maximum of a $1000 fine or 6 months in jail, and a civil violation

is punishable by a maximum fine of $500 for a first offense, and $750 for repeat offenses. *Id.* Section 1-19. Civil and criminal citations may be issued by any "enforcement officer," which includes County police officers and State officers "whose job includes the issuance of a citation." *Id.* Sections 1-18(a)(3), (b)(1).

**B. Status of Enforcement**

The timeline of the County's firearm laws, prior litigation, and developing Second Amendment law merits brief recitation. Chapter 57 was enacted in 1981. (ECF No. 17-2). By 1997, that law prohibited the sale, transfer, possession, or transport of a firearm "in or within 100 yards of a place of public assembly." A place of worship was included in the list. Prior to 2022, Section 57-11 contained an exemption for "the possession of a handgun by a person who has received a permit to carry the handgun under State law." That subsection was deleted by EB 21-22 (ECF No. 17-7), after the Supreme Court's decision in *New York Rifle & Pistol Assn v. Bruen,* 597 U.S. 1 (2022). Receiving a Permit under Maryland law, prior to *Bruen*, required good and substantial reason. After *Bruen*, that standard was no longer enforced and the number of Permits increased.

In 2021, multiple provisions of Chapter 57 were challenged on both state law and federal constitutional grounds, and, eventually, cases in both the Circuit Court for Montgomery County and this court proceeded. See, *Maryland Shall Issue, Inc. v. Montgomery County,* 680 F.Supp.3d 567 (2023), and *Engage Armament LLC v. Montgomery County*, 494 Md. 1 (2026). The state trial court stayed enforcement pending that litigation. In *Engage Armament*, the Supreme Court of Maryland held that several provisions of the prior iteration of Chapter 57 violated state law, including that some locations listed in 57-1 as places of public assembly were preempted by state law, and that Section 57-11(a) was not a "local law" within the authority of the County to enact. *Engage Armament*, 494 Md. at 48, 71. After that case was decided by the Supreme Court of Maryland earlier this year, the stay apparently was lifted.

On July 27, 2026, the County enacted EB23-26,—narrowing firearm prohibitions slightly—to permit firearms in vehicles in certain circumstances, even if within 100 yards of a place of public assembly, and to alter the list of places of public assembly. Its stated rationale was to address the defects in its prior law recognized in *Engage Armament*.

Thus, while the precise provisions at issue here may have been in force for some time, the practical reality is that, not until *Bruen* was a Permit available to a large number of individuals, and until very recently, the threat of enforcement of the Montgomery County law as to permitted gun owners was remote, if not non-existent. This challenge is timely.

Plaintiffs challenge various aspects of the current law, albeit not very precisely. In their three count complaint, they allege (1) that Section 57-11 continues to be an impermissible general law;[4] (2) that Section 57-10 is preempted by state law, and (3) that Sections 57-10 and -11 violate the Second Amendment. In their motion for preliminary injunction, Plaintiffs' constitutional challenge focuses more narrowly on: (1) the provisions prohibiting firearm possession by a Permit holder in a place of assembly (other than a school) that is privately owned but open to the public and (2) the provisions prohibiting possession of a firearm by a Permit holder while walking within 100 yards of any other place of public assembly. (*See* No. 8-1, at 29–30).

[4] The parties disagree over whether Plaintiffs also challenge Section 57-10 as a general law. (*See* ECF No. 8-1, at 16–17; ECF No. 17, at 10). Count I of the complaint refers in places to "Chapter 57" in general, but focuses on the effects of Section 57-11 and does not mention Section 57-10.

The County represents that until the resolution of this litigation, 1) the Maryland State's Attorney will defer criminal prosecutions of Section 57-10 or -11, and 2) County police officers will not issue criminal citations under Section 57-10 or -11. (ECF No. 24, ¶¶ 1-3). However, the County acknowledged at the September 3 hearing that its police force could still issue civil citations for violations of the Sections.

**C. Factual Background**

Plaintiffs are an association and five individuals. Maryland Shall Issue, Inc. ("MSI") is a Maryland corporation located in Baltimore, Maryland "dedicated to the preservation and advancement of gun owners' rights in Maryland." (ECF No. 1, ¶ 50). MSI has about 2100 members from across Maryland, including those with and without Permits. Some MSI members with Permits visit shops, houses of worship, and other locations within 100 yards of places of public assembly in the County. One member carries a firearm at his synagogue at the request of his rabbi. MSI also has members without Permits who wish to transport unloaded firearms and ammunition within the County.

Julio Barreto, Jr. resides in Montgomery County, possesses a Permit, travels within the County while armed and on foot, and frequently comes within 100 yards of a place of assembly, including

places of worship, recreation facilities, and government buildings. He is a member of the board of directors of MSI.

Dr. Howard Sachs also lives in Montgomery County, possesses a Permit, and is a member of MSI. He, too, travels throughout the County, at times on foot, coming within 100 yards of parks and places of worship. Matthew Edward Moore, also a resident of the County, is a member of MSI and possesses a Permit. He belongs to a particular church and, with the knowledge and permission of the Church leadership, he carries his firearm for personal protection and the protection of the members of the Church. He also travels throughout the County, coming within 100 yards of other places of worship, schools, and other defined as places of public assembly.

Alan Duncan resides in Queen Anne’s County, Maryland, is a member of MSI, has a Permit, and regularly visits Sugar Loaf Mountain in Montgomery County, a privately owned park that is open to the public. He also frequents other places within 100 yards of courthouses, parks, and other venues within the definition of place of public assembly. Arthur Scott Thacher resides in Carroll County, Maryland, is a member of MSI, and has a Permit. He commutes to his employment in Gaithersburg, Maryland, where the parking lot is shared with a worship center. He walks along roads and visits

places that are within 100 yards of a church and parks within 100 yards of a library.

### D. Procedural Background

Plaintiffs filed a complaint on July 27, 2026,[5] and a motion for administrative stay, TRO, or preliminary injunction on July 31, 2026. The County filed an answer (ECF No. 15) and responded to the motion (ECF No. 17) on August 24, 2026. Plaintiffs replied on August 31, and a hearing was held on September 3, 2026. Plaintiffs submitted a letter with supplemental argument on September 4, 2026. (ECF No. 22). The County submitted two documents with supplemental arguments on September 8, 2026. (ECF Nos. 23, 24).

## II. Standard of Review

> A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524–26 (4th Cir. 2003); *see also* [*De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220–21

---

[5] The civil cover sheet reported that this case is "related" to *SSJC*, 26-2963. (ECF No. 3). Counsel did not reveal that MSI is a party to another case that has been pending in this court since 2021, *Maryland Shall Issue v. Montgomery County*, TDC-21-1736, that also challenges the same Montgomery County laws, albeit before the 2026 amendments. The claims in this case arguably could have been asserted in a motion for leave to amend or supplement in that case. Counsel did not adequately explain at the hearing why a new case was filed instead.

> (1945)]. Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by "a clear showing" that, among other things, it is likely to succeed on the merits at trial. [*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)]; *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 [](1997) (per curiam).

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345–46 (4th Cir. 2009), *vacated on other grounds by* 559 U.S. 1029 (2010) *and reissued in part*, 607 F.3d 355 (4th Cir. 2010).

To be entitled to a TRO or preliminary injunction, plaintiffs must clearly show that "(1) they are likely to succeed on the merits; (2) they will suffer irreparable harm; (3) the balance of the equities favors their position; and (4) the relief they seek is in the public interest." *Bauer v. Elrich*, 463 F.Supp.3d 606, 610 (D.Md. 2020) (citing *Winter*, 555 U.S. at 20); *see also N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025). Each of these requirements must be fulfilled. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). In other words, failure to satisfy any one of the four factors is dispositive and motions for preliminary injunctive relief should be denied.

## III. Analysis

### A. Likelihood of success on the merits

#### 1. Local Law

In *Engage Armament*, the Supreme Court of Maryland struck down Section 57-11(a) because it exceeded the County's authority to enact only "local laws." 494 Md. at 69–70. The court reasoned that because Section 57-11(a)'s 100-yard buffer zones extended to "pockets of roadway" on the County's major highways, it regulated non-resident holders of Permits merely passing through the County. *Id.* at 69. This created a "significant extraterritorial impact" that was "beyond the authority of the County" to impose. *Id.* at 70.

Following the ruling in *Engage Armament* on April 28, 2026, the County amended Section 57-11 to include the following exception:

> This section does not . . . apply to a firearm that is carried or transported in a motor vehicle if the firearm is: (A) locked in a container; or (B) a handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

(ECF No. 17–10). Section 57-11 thus no longer applies to firearms legally transported in cars by Permit holders. Plaintiffs allege, however, that the updated Section 57-11 remains an impermissible general law. (ECF No. 1 ¶¶ 61–73).

Article XI-A of the Maryland Constitution grants charter counties such as the County the "full power to enact local laws" upon subject matters expressly authorized by state law. Md. Const. art. IX-A, sections 2, 3. Among other subjects, state law authorizes charter counties to enact local laws that "may aid in maintaining the peace, good government, health, and welfare of the county." Md. Code Ann., Loc. Gov't Section 10-206(a)(2) (West 2026). In contrast to local laws, counties cannot enact "general laws." *See Engage Armament*, 494 Md. at 65.

A local law must 1) have limited geographic reach; and 2) have subject matter of only local significance.

> A general law ordinarily deals with "a subject which is of significant interest not just to any one county, but rather to more than one geographical subdivision, or even to the entire state." [*Holiday Universal, Inc. v. Montgomery County*, 377 Md. 305, 315 (2003)] (quoting *Steimel v. Bd. Of Election Supervisors of Prince George's County*, 278 Md. 1, 5[](1976)). By contrast, a local law "applies to only one subdivision" and "pertains only to a subject of local import."

> *Tyma v. Montgomery County*, 369 Md. 497, 507 [](2002).

*Engage Armament*, 494 at 65.

First, a local law must be "confined in its operation to prescribed territorial limits." *Steimel*, 278 Md. at 5. In *State v. Stewart*, for example, the then-named Court of Appeals of Maryland held that a set of parking restrictions within the city of Baltimore was a local law, reasoning that the regulations were:

> confined and limited by the territorial boundaries of Baltimore city, and only those who have occasion to use the streets and highways of the city are subject to its provisions, and then only during such time as they are so using them; and the fact that citizens of other parts of the state, or outside of the state, are subjected to these regulations while using the streets and highways of Baltimore city, does not change its status as a local law.

152 Md. 419, 426 (1927). Other examples of local laws include a law repealing Sunday retail restrictions in Prince George's County, *Steimel*, 278 Md. at 5, and zoning regulations of liquor stores in Baltimore city. *Park v. Bd. of Liquor License Comm'rs*, 338 Md. 366, 381 (1995).

Stated in the negative, a law is general and not local if it "'substantially affects persons and entities' outside of the county." *Engage Armament*, 494 Md. at 66 (quoting *Holiday Universal*, 377 Md. at 319). In *Holiday Universal*, a Montgomery

County law prohibiting unfair trade practices was held to be a general law because it reached some contracts performed outside of the County. 377 Md. at 315–16.

Most relevant here, in *Engage Armament* the Supreme Court of Maryland held that an earlier version of Section 57-11(a) was not a local law because of its "significant extraterritorial impact." *Id.* at 70. The court reasoned that because Section 57-11(a) banned the carrying of firearms on parts of the County's high volume highway system, non–resident gun owners transiting the County were faced "with the choice of significant travel restrictions or regularly yielding their benefits as [P]ermit holders." *Id.*

The court emphasized that highways passing through the County such as Interstate 270 "serve as primary corridors of travel for much of the State of Maryland" and that non-resident Permit holders could not avoid violating the law without suffering significant costs. *Id.* at 69, 70. In a footnote, the court noted that if Section 57-11(a) were amended to carve out highways, a future challenge would similarly "depend on the scope of the amended law and evidence concerning its effects." *Id.* at 70, n.23.

Second, a local law must not be of "significant interest" to multiple jurisdictions or to the entire state. *Steimel,* 278 Md. at 5. For instance, a law is not local if it purports to alter

uniform state laws or regulatory regimes. *See Assanah-Carroll v. Law Offs. of Edward J. Maher, P.C.*, 480 Md. 394, 426 (2022) (creating a new cause of action under the Maryland Consumer Protection Act was a matter of significant state-wide interest); *McCrory Corp. v. Fowler*, 319 Md. 12, 20 (1990) (creating a private cause of action for employment discrimination was a general law because it "encroache[d] upon an area which heretofore had been the province of state agencies."). By contrast, a law that solely relates to county administrative matters will likely be local. *See, e.g., Cole v. Secretary of State*, 249 Md. 425, 435 (1968) (converting Cecil County's justice system from justices of the peace and magistrates to people's courts was a local law); *Tyma v. Montgomery County*, 369 Md. at 500 ("extend[ing] employment benefits to the domestic partners of county employees" was a local law).

A law will also be of significant statewide interest if it impacts the collective rights or interests of state residents. In *Bradshaw v. Lankford*, a Somerset County prohibition of oyster harvesting in county waters was struck down as a general law because it "deprive[d] the people of the entire State of the common right which they enjoyed to take oysters by scoop or dredge[] within the waters of said county." 73 Md. 428, 431 (1891). In

*Norris v. Mayor and City of Council of Baltimore*, a statute authorizing the use of ballot machines in Baltimore city was held to be a general law because voting practices in Baltimore "affect the citizens of the whole state," as "the result of elections held there may determine" state and federal representation. 172 Md. 667, 682 (1937).

Plaintiffs argue that Section 57-11 is a general law because it imposes a burden on "every [P]ermit holder who drives into the County and gets out of his or her vehicle." (ECF No. 1, at ¶ 67.) They say that, because there are thousands of places of public assembly within the County, Section 57-11 makes it "impracticable for a person with a [Permit] to walk or patronize thousands of locations otherwise open to the public [in the County] without passing within 100 yards of the places at which possession and transport of a firearm is now banned." (*Id.*, at ¶ 70). Plaintiffs argue that this burden creates the same kind of substantial extraterritorial effect as was struck down in *Engage Armament*. (*Id.*, at ¶ 67).

Plaintiffs' allegations, however, describe local effects. Unlike the burden upon Permit holders in *Engage Armament* who were merely passing through the County on their way to extraterritorial destinations, here Plaintiffs challenge the burden on those who

"drive into Montgomery County[,] exit their vehicles," and walk around within the County. (ECF No. 1, at ¶ 67). Section 57-11 thus only creates a burden when the Permit holder chooses to enter the County, park his or her vehicle, and spend time within County borders.[6]

Similar contentions were addressed in *Stewart*, in which the Supreme Court of Maryland held that Baltimore parking regulations were local laws despite "the fact that citizens of other parts of the state, or outside of the state, are subjected to these regulations while using the streets and highways of Baltimore city." 152 Md. at 426. A local law such as parking regulations or the Sunday retail restrictions repealed in *Steimel* will necessarily burden non-residents when they enter the locality.

Moreover, *Engage Armament* emphasized the extreme effects of Section 57-11 as it was then written. The law made it difficult for large numbers of people with no interest in Montgomery County to pass through the County on their way to other destinations. 494 Md. at 69. And the law was so restrictively written that Permit holders would have to choose between "significant travel

[6] These individuals could, of course, bring the weapon in the car without running afoul of the law, and leave it there locked in a container if they wish to alight in or near a defined place of public assembly. Code Section 57-11(b)(6)(A).

restrictions or regularly yielding their benefits as [P]ermit holders." *Id.* at 70.

Plaintiffs have not established similarly extreme effects here. Plaintiffs allege that "over 26 percent of the County" falls within the scope of Section 57-11, but this does not demonstrate extraterritorial effect. (ECF No. 1, at ¶ 19). Nor do Plaintiffs' allegations regarding burdens on their individual recreation, commerce, and employment within the County. (*See* ECF No. 1, ¶¶ 37–52).

Plaintiffs have not shown that Section 57-11 has any other significant impact outside of the County. It does not alter a uniform state regime, as Maryland law expressly permits counties to regulate firearm possession within 100 yards of places of public assembly. Md. Code Ann., Crim. Law., Section 4-209(b)(1)(iii) (2026). Nor does the law impact a collective interest like natural resources or the franchise.

Plaintiffs have not shown a likelihood of success on this claim.

**2. Preemption of Section 57-10**

Plaintiffs contend that Section 57-10 of the Code is preempted by state law. Defendant counters that the law is saved by the

'grandfather clause' in Maryland Code section 4-209(c). Md. Code Ann., Crim. Law., Section 4-209.

Section 4-209 of the Maryland Code preempts counties from regulating "the purchase, sale, taxation, transfer, manufacture, repair, ownership, possession, and transportation of" firearms, firearm components, and ammunition. Md. Code. Ann., Crim. Law Section 4-209(a) (West 2026).

Section 4-209 contains several exceptions to preemption. Counties are not preempted from regulating firearms, components, and ammunition with respect to three subjects: minors, law enforcement officers, and within 100 yards of places of public assembly. *Id.* Section 4-209(b(1)). Most relevant here, Section 4-209 also contains a 'grandfather clause' as follows:

> To the extent that a local law does not create an inconsistency with this section or expand existing regulatory control, a county, municipal corporation, or special taxing district may exercise its existing authority to amend any local law that existed on or before December 31, 1984.

*Id.* Section 4-209(c).

On July 21, 2026, the County passed Bill 23-26E, amending Section 57-10 to include the language noted above, exempting from the scope of Section 57-10 firearms transported in locked

containers in a motor vehicle and handguns carried by a Permit holder.

Plaintiffs argue that Section 57-10 is expressly preempted by Section 4-209(a) and two other earlier state law provisions. (ECF No. 1, ¶¶ 74–77. The County, in its Opposition, argues that Section 57-10 is not preempted because it is covered by the grandfather clause. (ECF No. 17, at 17).[7] The County is correct that 57-10 is protected by the grandfather clause, and Plaintiffs have not shown likelihood of success on this claim.

As an initial matter, Plaintiffs raise two additional state preemption statutes which predate Section 4-209: 1) 1972 Maryland Laws, Ch. 13 Section 6, and MD Code, Public Safety, Section 5-133(a). These provisions were among several addressed by the Supreme Court of Maryland in *Engage Armament*, 494 Md. at 37–40. The court held that "the General Assembly's intent was for the later-enacted and more specific [Section] 4-209(b)(1) to prevail over the earlier-enacted and more general preemption provisions."

[7] The County also appears to argue that an exception within Section 57-10 for carrying while on a "lawful mission" saves the entire Section from preemption by placing it within the subject-matter exceptions found within 4-209(b). (*See* ECF No. 17, at 21–22). This argument is not availing, because even if an *exception* to Section 57-10 is not preempted, the remainder of the Section 57-10 could still be preempted.

*Id.* at 40. Therefore, these earlier statutes do not preempt Section 57-10.

Turning to preemption under Section 4-209, Section 57-10 does not fall within the three subject matter exceptions found in 4-209(b). However, the County argues that the Section is protected within the "savings clause" or grandfather clause found in Section 4-209(c). (ECF No. 17, at 17).

The legislative timeline is important to resolving this argument. On April 21, 1981, the County enacted amended Chapter 57 of the County Code to state "it shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition," subject to several exceptions. (ECF No. 17-2). This provision was later labelled as Section 57-10.

In 1985, the Maryland General Assembly enacted Section 4-209 of the Maryland Code. *Engage Armament*, 494 Md. 1, at 37–39.On July 21, 2026, the County passed Bill 23-26E, amending Section 57-10 to include the following language:

> This Section must not be interpreted to prohibit a firearm that is carried or transported on person or in a motor vehicle, as defined under the Maryland Transportation Article, as amended, if the firearm is: (1) in a motor vehicle, locked in a container; or 2) a handgun worn, carried, or transported in compliance with any limitations imposed under

> Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

(ECF No. 1, ¶¶ 15, 16).

Caselaw interpreting the grandfather clause is absent. *See Blue v. Batth*, No. 15-1024-GJH, 2017 WL 4162244, at *13 (noting uncertainty regarding the grandfather clause and declining to decide whether it preempted a Prince George's County ordinance). However, the most natural reading of the language is that it preserved then-existing county gun laws, and permitted amendments to those laws so long as the amendments do not "create an inconsistency with this section or expand existing regulatory control." This interpretation is supported by an opinion by the Maryland Attorney General, contemporaneous with enactment, written to the Governor regarding the grandfather clause:

> The language of this subsection could be read to say that existing law may be amended if the law is not inconsistent with this section and does not expand existing regulatory control. However, it would seem that no existing law would "expand existing regulatory control," while all laws subject to this subsection are inconsistent with the section, and exist only because of the operation of Section 2. Thus, if the subsection is to allow any amendments, it must be interpreted to permit amendments (new "local laws and regulations") to those laws saved by Section 2 if <u>the amendment</u> is

> not inconsistent with the section and does not expand existing regulatory control. This interpretation finds some support in the legislative history.

(ECF No. 17-16, at 3 (emphasis in original)). Although not binding, the Supreme Court of Maryland cited to and agreed with a different portion of the same opinion in *Engage Armament*, suggesting that it is a persuasive source. 494 Md. at 39–40.

Applying the interpretation that a preexisting law is only preempted if it is expanded or made inconsistent *by amendment*, Section 57-10 is not preempted. Section 57-10 was enacted before 1984, and thus falls within the scope of the grandfather clause. The only amendment to 57-10 challenged here, found in Bill 23-26E, does not expand the scope of the law or create new inconsistencies. Rather, the amendment narrows the scope of the bill by exempting firearms transported in locked containers or handguns carried by a Permit holder.

Although this is not the only possible interpretation of the grandfather clause, Plaintiffs have not carried their burden to show clearly that another, more favorable interpretation should apply. Accordingly, Plaintiffs have not show likelihood of success on this claim.

### 3. **Second Amendment**

Plaintiffs' constitutional claim in Count III is asserted under 42 U.S.C. § 1983, for which they must establish that a defendant was acting under color of state law and that the defendant caused plaintiff to suffer a loss of a constitutional right due to unlawful action.

"To state a claim under § 1983, a plaintiff must allege that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States." *Lilly v. Baltimore Police Dep't*, 694 F. Supp. 3d 569, 584 (D. Md. 2023)(citing *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); and *Safar v. Tingle*, 859 F.3d 241 (4th Cir. 2017)). There is no dispute that Defendant was acting under color of state law.

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[T]he Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" against the states. *McDonald v. Chicago*, 561 U.S. 742, 791 (2010); *see District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

To determine whether a violation of one's rights under the Second Amendment has occurred,

> [f]irst, a court must determine whether the law before it clashes with the "plain text" of the Amendment's language. [*Bruen*, 597 U.S. at 24]. This inquiry entails three subsidiary questions. First, does the law apply to "the people"—which is to say, to "all members of the political community"? *Heller*, 554 U.S. at 580. Second, does it concern any form of "Arms," *i.e.*, any weapon customarily used for offensive or defensive purposes? *See id.*, at 584[.] Third, does the law place any restrictions on either the "keep[ing]" (*i.e.*, possession) or the "bear[ing]" (*i.e.*, carrying) of arms? *See Bruen*, 597 U.S. at 32–33.

*Wolford v. Lopez*, 609 U.S. ----, 146 S.Ct. 2032, 2043 (2026). "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional, [*Bruen*, 597 U.S. at 24]—which means that it *may* violate the preexisting right that the Amendment codified." *Id.* at 2044.

Then, the relevant government then may attempt to show that "its challenged law did not infringe the historical understanding of the codified right." *Id.* (citing *Bruen*, 597 U.S. at 24). At this second step of the analysis, "[a] variety of sources, including scholarship, may aid this inquiry." *Id.* (citing *Bruen*, 597 U.S. at 34–60).

In its recent opinion in *Wolford*, the Supreme Court of the United States offered additional specificity as to how courts should approach this second step of the inquiry block-quoted above. First, when assessing "proffered" historical analogues, courts should consider "the number of jurisdictions in which [the analogue(s)] were adopted." *Id.* (citing *Bruen*, 597 U.S. at 67). At this stage, where a historical analogue was "neither widespread nor widely adopted, it carries no weight." *Id.* at 2053. Second, courts must query "the extent to which [the analogue(s)] were well-accepted." *Id.* at 2044. At this part of the inquiry, courts should consider whether acceptance of the analogue(s) is "express" or "tacit," *id.*, "as when a restriction on the keeping or carrying of arms was 'open, widespread, and unchallenged.'" *Id.* (quoting *Bruen*, 597 U.S. at 36). Third, courts need to determine "whether any analogue or collection of analogues is 'relevantly similar' to the modern law." *Id.* (quoting *Bruen*, 597 U.S. at 29). Such a finding requires courts to consider:

> "how" the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. [*Bruen*, 597 U.S. at 29]. And a court must also consider "why" the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law. [*Id.*]. In order to be sufficiently similar to the modern law being

> challenged, a putative analogue need not be a “dead ringer” or “historical twin.”

*Id.* at 2044. Finally, the Court instructs that while this inquiry “undeniably necessitates an exercise of judgment,” *id.*, “it is not mechanical.” *Id.*

In another opinion of the Court this June, *Hemani*—which was issued a week or so before *Wolford*—the Court supplied additional context for this third and final sub-part of *Bruen* step two. *United States v. Hemani*, 608 U.S. ----, 146 S. Ct. 1677 (2026). In *Hemani*, the Court considered the government’s “habitual drunkard laws” historical analogues alongside the modern-day “§ 922(g)(3)’s unlawful user provision.” *Id.* at 1687. The Court determined that the historical analogues “differ[ed] dramatically” from § 922(g)(3) “on every single metric the government invit[ed]” the Court to consider. *Id.* The Court found that the habitual drunkard laws “targeted different kinds of people, did so for different purposes, and operated in different ways.” *Id.* The Court, however, declined to decide whether “any one of these problems taken in isolation would prove fatal to the government’s cause[.]” *Id.*

It remains somewhat an open question whether historical analogues need be clustered around 1776 (the founding era), 1791 (ratification of the Second Amendment), 1868 (ratification of the

Fourteenth Amendment), or otherwise. *See Kipke v. Moore*, 165 F.4th 194, 225 n.5 (4th Cir. 2026)[8] (Agee, J., concurring in part and dissenting in part); *see also Wolford*, 146 S.Ct. at 2067 n.5 (Kagan, J. dissenting) (stating that the Court "has declined to decide the relevance of Reconstruction-era laws to the *Bruen* inquiry."). The United States Court of Appeals for the Fourth Circuit supplies some guidance on this score, which is binding on this court: at the first step, the historical sources courts can look to are limited to the Founding Era, and at the second, sources "can come [from] throughout American history." *Id.* at 207. Indeed, "[t]he Court has made clear that the Second Amendment does not impose 'a law trapped in amber' and allows for regulations beyond 'ones that could be found in 1791.'" *Id.* (quoting *United States v. Rahimi*, 602 U.S. 680, 691–92 (2024)).

Plaintiffs broadly challenge Chapter 57 as "a legal scheme that effectively 'den[ies] ordinary citizens their right to public carry' everywhere in the County and thus fails at *Bruen* Step Two."

[8] The *Kipke* plaintiffs and defendants both initially filed petitions for writ of certiorari with the Court, challenging different parts of the Fourth Circuit's ruling. Following the Court's ruling in *Wolford*, defendants moved to dismiss their petition, and the Court dismissed the petition on August 13, 2026. *Moore v. Kipke*, No. 25-1206 (Aug. 13, 2026). Plaintiffs' petition, *Novotny v. Moore*, No. 25-1324, is still pending before the Court. In early September, the case was distributed for the Court's September 28, 2026, conference.

(ECF No. 8-1,at 29 (quoting *Bruen*, 597 U.S. at 38, n.9)). In their complaint, Plaintiffs purport to bring both facial and as applied challenges. (*Id.*, ¶ 82.) Plaintiffs' motion for administrative stay, TRO, or preliminary injunction, however, does not specify whether this challenge is facial or as-applied.

> The line between facial and as-applied challenges goes to "the breadth of the remedy employed by the Court," but the line has not been particularly "well defined." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331[] (2010).

*White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 203–04 (4th Cir. 2022). "An as-applied challenge is one which depends on the identity or circumstances of the plaintiff. *See Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172–73 (4th Cir. 2009) (en banc)." *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022). "An 'as applied' challenge contends that a law's application to a particular person under particular circumstances deprives that person of a constitutional right. Thus, a successful 'as applied' challenge precludes the enforcement of a statute against a plaintiff alone." *Marcellus v. Virginia State Bd. of Elections*, 168 F.Supp.3d 865, 872 n.8 (E.D.Va. 2016), *aff'd*, 849 F.3d 169 (4th Cir. 2017).

> "An as-applied challenge asks the reviewing court to declare the disputed statute unconstitutional 'on the facts of the particular case.'" *United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019) (quoting *Sanjour v. EPA*, 56 F.3d 85, 92 n.10 (D.C. Cir. 1995)). The challenge is not "that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id*. (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)). Accordingly, "to succeed on an as-applied challenge, [a defendant] must establish (1) that the Second Amendment protects his particular conduct, and (2) that his [particular prohibitor] is insufficient to justify the challenged regulation of Second Amendment rights." *Id*.

*United States v. Lehman*, 8 F.4th 754, 757 (8th Cir. 2021).

To prevail on a facial challenge, a plaintiff must show that there is "no set of circumstances" in which the law can be applied constitutionally. *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The Supreme Court has instructed that facial challenges are 'disfavored' because they 'often rest on speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534, 222 L. Ed. 2d 1059 (2025) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)).

As the party seeking preliminary relief, Plaintiffs bear the burden of showing they are entitled to the relief they seek. *See Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 229 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026) (citing *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)). In their Motion for an administrative stay, TRO, or preliminary injunction, Plaintiffs seek an injunction barring the County from enforcing Sections 57-10 and -11 against any person "person who has received a Permit" under Maryland law, not just Plaintiffs. (ECF No. 8, at 1). Plaintiffs make no attempt to relate their claims to their individual identities or circumstances. *Richmond Med. Ctr. for Women*, 570 F.3d at 172–73. Accordingly, their request for preliminary relief is a facial challenge.

To prevail, Plaintiffs must show that (1) the challenged sections of the Code clash with the plain text of the Second Amendment and concern restrictions to either keeping or bearing firearms; and (2) that Defendant cannot carry its burden of justifying the challenged sections by showing they did not infringe on the historical understanding of the codified Second Amendment right. *See Wolford*, 146 S.Ct. at 2044 (quoting *Bruen*, 597 U.S. at 24); *id.* (citing *Bruen*, 597 U.S. at 67); *see also Nat'l Ass'n for*

*Gun Rts. v. Lamont*, 153 F.4th at 229. Furthermore, as this a facial challenge, Plaintiffs must show no set of circumstances in which the challenged provisions are constitutional.

It is not entirely clear just what Plaintiffs contend and what relief they seek at this preliminary stage. The proposed order submitted with their motion sought a preliminary injunction prohibiting the County from enforcing both Section 57-10 and Section 57-11(a). (ECF No. 8-10). Counsel acknowledged at the hearing that their Second Amendment challenge to Section 57-10 rests on a finding that EB23-26, which narrowed the Section's scope to exclude Permit holders carrying handguns, was preempted by state law. Plaintiffs are unlikely to succeed on their preemption claim, *see supra* Part III-A-2, and thus their Second Amendment challenge to Section 57-10 need not be further addressed.

Plaintiffs also challenge, on Second Amendment grounds, the Section 57-11(a) prohibition on firearms in any location owned by a private party that is open to the public, except as to private schools. (ECF No. 8-1, at 30). And they contend that the ban on carrying arms within 100-yards of all places of assembly effectively denies them, and all ordinary citizens, of their right

to carry in public everywhere and thus is unconstitutional.[9] (*Id.*, at 31).

In reality, Plaintiffs do not contend that it is impermissible to designate any place owned privately but open to the public as "sensitive" because they concede that state and local law can prohibit weapons in schools, whether public or private. Rather, they propose application of *Wolford* such that, with the possible exception of schools, no state or local law can designate any other privately owned place open to the public as a sensitive place. The Court did not make any such sweeping pronouncement in *Wolford.*

Plaintiffs believe that the Court in *Wolford* held that the common law categorically prohibits anyone other than the private owner from deciding who may enter. This logic extends *Wolford* too far, at least for the purposes of showing entitlement to preliminary injunctive relief. In *Wolford*, the Court recognized the common law rule:

> At common law, opening up private property to the general public implies a "license to all persons to enter," meaning that "no person is a trespasser by merely entering therein" unless the property owner has given "due notice" that such a person is banned. *Commonwealth v. Power*, 48 Mass. 596, 602

[9] They may also be raising constitutional objections to prohibitions on "long guns." (ECF No. 8-1, at 32). Any such objection is not well-developed and falls short of the showing necessary to obtain preliminary injunctive relief.

> (1844); see also, e.g., State v. Steele, 106 N.C. 766, 780–783, 11 S.E. 478, 484–485 (1890); *Barney v. Oyster Bay & Huntington Steamboat Co.*, 67 N.Y. 301, 302–303 (1876); *Jencks v. Coleman*, 13 F.Cas. 442, 443–444 (No. 7,258), (CC RI 1835) (Story, J.).

*Wolford*, 146 S. Ct. at 2045. It then described the Hawaiian law as it then existed after *Bruen*:

> But even for those who fulfill these stringent requirements [as to licensing], Hawaii imposes two additional restrictions on carrying firearms.
>
> The first bans the possession of a firearm in significant categories of places: "[a]ny [state-owned] building" or "adjacent grounds and parking areas"; "[a]ny public or private hospital" or "other place at which medical or health services are customarily provided"; any "restaurant serving alcohol"; any "stadium, movie theater, or concert hall"; any "public library property"; "any public or private" college or university; "any public school, charter school," or private school; any "beach, playground," or park; "any bank or financial institution"; any "amusement park, aquarium, carnival, circus, fair, museum, water park, or zoo"; and any "public gathering, public assembly, or special event conducted on property open to the public." § 134–9.1(a). Some of these places are owned by the State, but many of the categories include privately owned property. So even if the owner of such a place wanted to admit individuals who are carrying a gun for self-defense, the owner could not do so.
>
> The second restriction—the one at issue in this case—generally prohibits licensed individuals from carrying a firearm, even if unloaded or inoperable, "on private property

> of another." § 134–9.5(a). Certain categories of individuals, such as police officers, are exempt, §§ 134–9.5(d), 134–11(a), but the ban otherwise applies unless "express authorization" has been given "by the owner, lessee, operator, or manager of the property," § 134–9.5(a). Such authorization must take one of two forms: "clear and conspicuous signage" that confers such consent or "[u]nambiguous written or verbal authorization" to carry a firearm on the premises from "the owner, lessee, operator, or manager of the property" or an agent of such a person. § 134–9.5(b).

*Id.* at 2046–47 (footnote omitted). Thus, while the Court recognized that Hawaii law prohibited firearms in some types of private property open to the public, it did not address that aspect of the law. Instead, it held that the requirement that the private owner expressly authorize firearms impermissibly flipped the presumption and was unconstitutional. *Wolford* does not directly affect the law at issue in this case. There is no general prohibition on possession of firearms in a privately owned property that is open to the public without express permission of the owner.

Of course, there are some privately-owned places open to the public that could not be designated as 'sensitive places' under the *Bruen* test.[10] But Plaintiffs have not shown that *all* privately

[10] For example, plaintiffs in the companion case *Silver Spring Jewish Center* are likely to succeed in their claim that firearm restrictions on houses of worship violate the Second Amendment. No. DKC 26-2963 (Sep. 10, 2026).

owned places open to the public are beyond the reach of state and local firearm restrictions. Plaintiffs request an undifferentiated declaration that a firearm ban on any private property open to the public, other than schools, is unconstitutional. Such a result does not follow from *Wolford*, and would contradict the Fourth Circuit's holdings in *Kipke* that the Second Amendment permits firearm bans in healthcare facilities, places of amusement, and locations that serve alcohol. 165 F. 4th at 216–18. Plaintiffs have thus failed to carry their burden to show a likelihood of success on this claim.

Plaintiffs' challenge to the buffer zones fails as well. Plaintiffs challenge the 100-yard buffer zones around all places of public assembly.[11] As a facial challenge, they must show that no set of circumstances exists under which any buffer zone would be valid. *Rahimi*, 602 U.S. at 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Accordingly, the facial challenge fails at this stage.

The *Bruen* step one analysis applies to the 100-yard buffer zones. In this circuit "[s]ensitive-place laws 'directly impact

[11] Plaintiff's motion is somewhat unclear as to whether they challenge only the buffer zones around privately-owned property, or also challenge buffer zones around publicly owned property like government buildings. At the hearing on September 3, Plaintiffs' counsel clarified that they are challenging all buffer zones.

the right to bear' arms and are therefore . . . 'subject to *Bruen*'s historical analysis' at step two." *Kipke*, 165 F.4th at 207 (quoting *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024)). Furthermore, *Bruen* itself engaged in an analysis of sensitive place regulations to model the "'analogical approach it envisioned'"—in doing so, the Court "'impl[ied] that sensitive-place regulations are justified by historical tradition at step two, not by plain text at step one.'" *Id.* (quoting *United States v. Price*, 111 F.4th 392, 417 n.2 (4th Cir. 2024) (en banc) (Quattlebaum, J., concurring)).

Roughly half of the places of public assembly as defined by Section 57-1—from which 100-yard buffers extend under Section 57-11(a)—likely are constitutional under the sensitive place doctrine (*i.e.*¸ schools; government buildings open to the public for the business of government or community use; polling places; courthouses; and legislative assemblies). The Court has suggested that schools, government buildings, polling places, courthouses, and legislative assemblies were "sensitive places" where firearms could be banned. *See, e.g.*, *Wolford v. Lopez*, 116 F.4th 959, 979 (9th Cir. 2024), *cert. granted in part*, 146 S. Ct. 79, 222 L. Ed. 2d 1241 (2025), *and rev'd and remanded*, 146 S. Ct. 2032, 225 L. Ed. 2d 494 (2026) (citations omitted); *Heller*, 554 U.S. at 626–27

("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding the carrying of firearms in sensitive places such as schools and government buildings[.]"). The Fourth Circuit has "adopted the Supreme Court's dicta as to schools" and determined that schools are sensitive places. *Kipke*, 165 F.4th at 212 n.3 (citing *LaFave v. Cnty. of Fairfax*, 149 F.4th 476 (4th Cir. 2025)). From that premise, the Fourth Circuit evaluated the propriety of a firearms restriction on school grounds by analogizing to the constitutionality of the restrictions within the schools themselves and found that firearm restrictions on school grounds are constitutional. *Id.* at 212 (citing *Bruen*, 597 U.S. at 31).

In light of that background, Plaintiffs' facial challenge to the 100-yard buffers around places of public assembly fails. Only one constitutional application need exist for Plaintiffs' facial challenge to falter at the preliminary injunction stage. One likely constitutional application under Section 57-11(a) is the 100-yard buffer around schools.

Interestingly, the issue has arisen in the criminal law context most directly. Title 18 U.S.C. § 922 (q)(2) makes it unlawful, under some circumstances, for an individual to possess a firearm in a "school zone." "School zone" is defined in §

921(a)(26) as "in, or on the grounds of" a public, private, or parochial school, or "within a distance of 1,000 feet from the grounds" of those types of schools. Different defendants have moved to dismiss charges alleging a violation of that statute on Second Amendment grounds, prompting courts to conduct the *Bruen* analysis. In doing so, one court recently observed that "courts across the county have found that there is a history and tradition of placing restrictions on firearm possession in the area surrounding schools and other sensitive places." *United States v. Taras*, No. 25-cr-00262-DAD, 2026 WL 2364515, at *6 (E.D.Cal. Aug. 14, 2026) (collecting cases, including *Maryland Shall Issue*, 680 F.Supp.3d at 589). In their opposition, Defendants quote Judge Chuang's opinion in the earlier Second Amendment challenge to the previous iteration of the challenged law here. (ECF No. 26-1, at 30). They argue that Defendants had been credited for supplying "'numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a 'sensitive place[.]'" (*Id.*). Furthermore, Defendants claim that the "buffer zone was untouched by the new Bill." (*Id.*). In this regard, Judge Chuang concluded that "where numerous examples of buffer zone statutes exist, and where they impose the same burden on Second Amendment rights and

are comparably justified," a plaintiff's likelihood of success on the merits dwindles. *Maryland Shall Issue*, 680 F.Supp.3d. at 590.

Therefore, Plaintiffs' facial challenge—what has been deemed the "'most difficult challenge to mount successfully'"—does not succeed at the preliminary injunction stage because they failed to "'establish that no set of circumstances exists under which the [challenged sections] would be valid.'" *Rahimi*, 602 U.S. at 693 (2024) (quoting *Salerno*, 481 U.S. at 745). Plaintiffs have not established that, as to the 100-yard buffer zones around each type of place of public assembly, the challenged provisions "lack[] any 'plainly legitimate sweep.'" *Bianchi*, 111 F.4th at 452 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

**B. Other Factors**

It is not necessary to address the other factors relevant to preliminary injunctive relief given the failure to demonstrate likelihood of success on the merits.

**IV. Type of Relief**

For the foregoing reasons, Plaintiffs are not entitled to preliminary relief. They filed a motion for both a TRO and a preliminary injunction. Different procedures apply, depending on the type of relief being granted. See *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 423 (4th Cir. 1999), for a

description of the differences in procedure and application of the two forms of relief. Here, notice was provided and a hearing was held. No party requested discovery or suggested that any discovery was needed on the issues presented in the motion. Accordingly, it is not necessary to consider temporary relief in order for the court to consider the request for a preliminary injunction. The court will deny a preliminary injunction.

A separate order will be entered.

/s/
DEBORAH K. CHASANOW
United States District Judge